Brian A. Cabianca (AZ Bar No. 016410)
brian.cabianca@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
2325 E. Camelback Road, Suite 700
Phoenix, AZ 85016
Telephone: (602) 528-4000
Facsimile: (602) 253-8129

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| Walton U.S. Land Fund 4, LP; Walton U.S. Land Fund 5, LP; WUSF 4 GP, LLC; and WUSF 5 GP, LLC, | Case No. |
|---|---|
| Plaintiffs, | **COMPLAINT** |
| v. | **JURY TRIAL REQUESTED** |
| Ira Gaines in his individual capacity and as trustee for the Ira J. Gaines Revocable Trust Dated November 24, 2004; Peachtree Partners; and IG Holdings, Inc., an Arizona corporation, | |
| Defendants. | |

Plaintiffs Walton U.S. Land Fund 4, LP ("Land Fund 4"), Walton U.S. Land Fund 5, LP ("Land Fund 5," and with Land Fund 4 the "Fund Partnerships"), WUSF 4 GP, LLC ("General Partner 4") and WUSF 5 GP, LLC ("General Partner 5," and with General Partner 4 the "Fund General Partners") hereby allege against Defendants Ira Gaines, in his individual capacity and as trustee for the Ira J. Gaines Revocable Trust Dated November 24, 2004 ("Gaines Trust"), Peachtree Partners, and IG Holdings, Inc. ("IG Holdings") as follows:

## SUMMARY

1.     Defendant Ira Gaines is a convicted felon and serial securities huckster. As a result of an action brought by the U.S. Securities and Exchange Commission ("SEC") for

his prior federal securities law violations, since 2004, Mr. Gaines has been permanently enjoined from making certain tender offers for a public company's securities.

2. Now, using the same deceptive tactics, Mr. Gaines, individually and/or under the alter ego of Peachtree Partners, is making tender offers ("Offers") to acquire ownership interests in limited partnerships, like the Fund Partnerships managed by the Fund General Partners here, and engaging in other unlawful conduct.

3. The Offers are deceptive and misleading in violation of common law and federal securities law. The Offers—each titled an "Offer to Repurchase" and enclosing a form bearing Plaintiffs' wordmark—falsely imply an endorsement by Plaintiffs. The Offers are made far below market price, and fail to disclose material information necessary for investors to evaluate the Offers, including Gaines's history of securities violations and convictions.

4. The Offers also breach the relevant limited partnership agreements which, among other things, prohibit a limited partner from holding himself or itself out as acting on behalf of the Fund Partnerships or Fund General Partners. Mr. Gaines, through his alter egos, including the Defendant Gaines Trust and IG Holdings, breached or induced the breach of the partnership agreements by making the misleading Offers.

5. Plaintiffs file this Complaint to enjoin Mr. Gaines from making similar offers to other limited partners and to recover damages for his deceptive and misleading statements.

**PARTIES**

6. Plaintiff Walton U.S. Land Fund 4, LP ("Land Fund 4") is a limited partnership formed under the laws of the state of Delaware.

7. Plaintiff WUSF 4 GP, LLC ("General Partner 4") is a Delaware limited liability company. General Partner 4 is the general partner of Land Fund 4.

8. Plaintiff Walton U.S. Land Fund 5, LP ("Land Fund 5") is a limited partnership formed under the laws of the state of Delaware.

9.    Plaintiff WUSF 5 GP, LLC ("General Partner 5") is a Delaware limited liability company.  General Partner 5 is the general partner of Land Fund 5.

10.    Defendant Ira J. Gaines is an individual who, upon information and belief, is a citizen of Arizona residing in Phoenix, Arizona.

11.    Mr. Gaines is, upon information and belief, the trustee of Ira J. Gaines Revocable Trust Dated November 24, 2004.

12.    Defendant Peachtree Partners is, upon information and belief, a general partnership organized under the laws of the State of Arizona, with its principal place of business believed to be at 1819 E. Morten Ave, Ste 180, Phoenix, AZ 85020.  Peachtree Partners is, upon information and belief, controlled by Mr. Gaines.

13.    Defendant IG Holdings, Inc. is, upon information and belief, an Arizona corporation with its principal place of business in Phoenix, Arizona.  IG Holdings is, upon information and belief, controlled by Mr. Gaines.

## JURISDICTION AND VENUE

14.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa(a) because Plaintiffs' claims for violations of 15 U.S.C. § 78n(e) arise under the laws of the United States.

15.    This Court has supplemental jurisdiction over Plaintiffs' other claims, including claims asserted under Arizona state law, pursuant to 28 U.S.C. § 1367(a) because the other claims are so related to claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

16.    This Court has personal jurisdiction over Defendants because they are citizens of Arizona.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) and 15 U.S.C. § 78aa(a), because Defendants reside in this District and a substantial part of the acts, omissions, and events giving rise to the claims occurred in this District.

3

## FACTS

### A.    Mr. Gaines's Prior Securities Violations

18.    In approximately 1998, Mr. Gaines and his alter egos began to make "mini-tender offers" to acquire stocks of public companies.

19.    Mini-tender offers are tender offers for less than 5% of a class of securities.

20.    Mini-tender offers are not subject to the filing, disclosure, and procedural requirements of Section 14(d) of the federal Securities Exchange Act of 1934 ("Exchange Act") and Regulation 14D.  *See* 15 U.S.C § 78n(d); 17 C.F.R. § 240.14d-1 to -103.  All tender offers (including mini-tender offers), however, are subject to the anti-fraud provisions of the federal securities laws, including Section 14(e) of the Exchange Act and Regulation 14E.  *See* 15 U.S.C § 78n(e); 17 C.F.R. § 240.14e-1 to -8.

21.    As the SEC determined after holding administrative proceedings, during 1998 and 1999, Mr. Gaines's company, Defendant IG Holdings, violated Section 14(e) of the Exchange Act because its "below market mini-tender offers" did not include "material information about the offers" that a reasonable investor would consider to be important in determining whether to accept the offer. *In the Matter of IG Holdings, Inc.,* Exchange Act Release No. 41759 (Aug. 19, 1999).

22.    As the SEC determined after holding administrative proceedings, in 1998, Defendant Peachtree Partners, controlled by Mr. Gaines, also violated Section 14(d) of the Exchange Act and Regulation 14D by failing to comply with filing, disclosure, and procedural requirements for making tender offers. *In the Matter of Peachtree Partners,* Exchange Act Release No. 41760 (Aug. 19, 1999).

23.    Mr. Gaines settled the investigations brought by the SEC against IG Holdings and Peachtree Partners in August 1999 and admitted to violations of the Exchange Act.

24.    Starting one month later, from September 1999 through March 2001, Mr. Gaines, individually and d/b/a Wrigley Drive Partners and Morten Avenue Partners, made deceptive "mini-tender offers" to shareholders to purchase up to 1% of the outstanding stock of 287 public companies.

4

25. Mr. Gaines deceived the shareholders by failing to disclose in his offers the following material facts: (1) Mr. Gaines's offer price was below the prevailing market price; (2) Mr. Gaines reserved sole discretion to modify his offers, including such terms as the offer price and the offer period; and (3) Mr. Gaines reserved the right to terminate his offers without notice, regardless of how many shareholders had tendered shares.

26. In 2002, the SEC brought a complaint against Mr. Gaines for his deceptive mini-tender offers. Complaint, *SEC v. Gaines*, No. 2:02-cv-01685-PGR (D. Ariz. Aug. 29, 2002). To settle that action, Mr. Gaines agreed to a permanent injunction from ever directly or indirectly, offering, making or engaging in mini-tender offers. In addition, Gaines also agreed to pay $72,413 in disgorgement, including prejudgment interest, and a $50,000 civil penalty. Judgment, *SEC v. Gaines*, No. 2:02-cv-01685-PGR (D. Ariz. Jan. 6, 2004).

27. On April 23, 2013, Mr. Gaines, through Peachtree Partners, made a tender offer to shareholders of BlackRidge Financial, Inc., to purchase up to 40% of its outstanding shares.

28. On May 14, 2013, the North Dakota Securities Commissioner entered an order summarily suspending the BlackRidge tender offer. The Commissioner determined that the tender offer was materially misleading for failing to disclose "regulatory actions taken by the Securities and Exchange Commission against Peachtree Partners, Ira J. Gaines, and other entities controlled by Gaines, concerning mini-tender offers of public companies."

29. From 2018 to 2020, Mr. Gaines attempted to avoid his restriction against engaging in certain securities transactions by concealing his identity as the true owner of shares, using nominees to trade the shares on his behalf, engaging third parties to promote the stock held by his nominees, and using deceptive opinion letters from a co-conspirator attorney to convert the shares to unrestricted.

30. In December 2020, Mr. Gaines was criminally charged in federal court for one count of conspiracy in violation of 18 U.S.C. § 371, four counts of securities fraud in

violation of 15 U.S.C. § 78j(b), five counts of wire fraud in violation of 18 U.S.C. § 1343, eight counts of transactional money laundering in violation of 18 U.S.C. § 1957, nine counts of concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B), and five counts of aggravated identity theft in violation of 18 U.S.C. § 1028A.  Criminal Complaint, *U.S. v. Gaines*, 2:21-cr-00266-GMS (D. Ariz. Dec. 14, 2020).

31.     In 2023, Mr. Gaines pleaded guilty to a felony violation of 15 U.S.C. § 77e, sale of unregistered securities.  *See* Plea Agreement, *U.S. v. Gaines*, 2:21-cr-00266-GMS (D. Ariz. Apr. 11, 2023), ECF No. 173.

**B.     The Fund Partnerships**

32.     The Fund Partnerships are both limited partnerships formed under the laws of the state of Delaware.

33.     The Fund Partnerships are both governed by a partnership agreement (the "Partnership Agreements").

34.     A true and correct copy of Land Fund 4's Partnership Agreement, titled Agreement of Limited Partnership of Walton U.S. Land Fund 4, LP is attached hereto as **Exhibit 1**.

35.     A true and correct copy of Land Fund 5's Partnership Agreement, titled Agreement of Limited Partnership of Walton U.S. Land Fund 5, LP is attached hereto as **Exhibit 2**.

36.     Article 6 of the Partnership Agreements specifies that the management of each Fund Partnership is vested in that Fund Partnership's general partner.

37.     The Fund General Partners are the general partners of the Fund Partnerships.

38.     Under the Partnership Agreements, a subscriber of Fund Partnership units can be admitted as a limited partner.  Ex. A § 4.2; Ex. B § 4.2.

39.     Limited partners of Fund Partnerships are entitled to receive a list of the names and addresses of all partners.  Ex. A § 6.10; Ex. B § 6.10.

40. Section 8.2(b) of the Partnership Agreements provides that no limited partner shall "transact any affairs on behalf of the Partnership or execute any document that binds or purports to bind the Partnership, the General Partner, or any other Partner as such."

41. Section 8.2(c) of the Partnership Agreements provides that no limited partner shall "hold such [limited] Partner out as having the power or authority to bind the Partnership, the General Partner, or any Partner as such."

42. Article 9 of the Partnership Agreements governs the assignment and transfer of units in the Partnership.

43. Section 9.1 provides that "A Unit may be transferred or assigned by a Partner . . . only with the consent of the General Partner," *i.e.* the Fund General Partners.

44. Section 9.2 further provides that "the General Partner has the right, in its sole and absolute discretion, to reject any transfer." Further, "[t]he General Partner is required under the Securities Act and this Agreement to refuse to register any transfer of the securities not made pursuant to registration under the Securities Act or pursuant to an available exemption from registration."

45. On or about April 11, 2025, the Gaines Trust, with Mr. Gaines as trustee, purchased units of Land Fund 4.

46. On or about January 21, 2025, the Gaines Trust, with Mr. Gaines as trustee, purchased units of Land Fund 5.

47. From about October 24, 2024 to about May 1, 2025, IG Holdings purchased units of Land Fund 4.

48. From about February 9, 2024 to about January 30, 2026, IG Holdings purchased units of Land Fund 5.

**C.    The Offers**

49. Mr. Gaines, on behalf of his alter egos IG Holdings and/or the Gaines Trust, requested lists of the partners of the Fund Partnerships.

50. On or about November 1, 2025, Mr. Gaines, under the name of Peachtree Partners, sent an Offer to the partners of Land Fund 5 (the "November 1, 2025 Offer").

51. The November 1, 2025 Offer is described as an "Offer to Repurchase."

52. The November 1, 2025 Offer offered to purchase units for a price of $6.25 per unit, less an administration fee of $300.

53. $6.25 per unit is well below the market price for units of Land Fund 5.

54. The November 1, 2025 Offer did not disclose that Peachtree Partners was the subject of a Cease and Desist Order for violation of Section 14(d) of the Exchange Act and Regulation 14D.

55. The November 1, 2025 Offer did not disclose that IG Holdings was the subject of a Cease and Desist Order for violation of Section 14(e) of the Exchange Act.

56. The November 1, 2025 Offer did not disclose that Mr. Gaines is subject to a January 5, 2004 judgment obtained by the SEC enjoining him from violating the anti-fraud provisions of the Exchange Act and engining in any mini-tender offer of a public company.

57. The November 1, 2025 Offer did not disclose that Mr. Gaines pleaded guilty to a felony violation for sale of unregistered securities.

58. The November 1, 2025 Offer included a form titled "Walton™ Title Transfer – Transferor," using Walton's wordmark.

59. Upon information and belief, the form "Walton™ Title Transfer – Transferor" was modified by Mr. Gaines from a prior form provided by affiliates of Plaintiffs.

60. On or about February 1, 2026, Mr. Gaines, under the name of Peachtree Partners, sent an Offer to the partners of Land Fund 4 (the "February 1, 2026 Offer").

61. The February 1, 2026 Offer is described as an "Offer to Repurchase."

62. The February 1, 2026 Offer offered to purchase units for a price of $3.25 per unit, less an administration fee of $300.

63. $3.25 per unit is well below the market price for units of Land Fund 4.

64. The February 1, 2026 Offer did not disclose that Peachtree Partners was the subject of a Cease and Desist Order for violation of Section 14(d) of the Exchange Act and Regulation 14D.

8

65. The February 1, 2026 Offer did not disclose that IG Holdings was the subject of a Cease and Desist Order for violation of Section 14(e) of the Exchange Act.

66. The February 1, 2026 Offer did not disclose that Mr. Gaines is subject to a January 5, 2004 judgment obtained by the SEC enjoining him from violating the anti-fraud provisions of the Exchange Act and engaging in any mini-tender offer of a public company.

67. The February 1, 2026 Offer did not disclose that Mr. Gaines pleaded guilty to a felony violation for sale of unregistered securities.

68. The February 1, 2026 Offer included a form titled "Walton™ Title Transfer – Transferor," using Walton's wordmark.

69. Upon information and belief, the form "Walton™ Title Transfer – Transferor" was modified by Mr. Gaines from a prior form provided by affiliates of Plaintiffs.

70. In both Offers, Mr. Gaines stated that Peachtree Partners "reserve[d] the right to assign [its] ownership to [its] affiliates."

**D.    Mr. Gaines Interferes with Plaintiffs' Contracts and Business**

71. In connection with the Offers, Mr. Gaines has engaged in a campaign to "take over Walton and run them out of business."

72. Mr. Gaines and his affiliate have attended conferences held by Plaintiffs and their affiliates as part of Mr. Gaines's campaign to "take over Walton and run them out of business."

73. Around November 2025, Mr. Gaines told an individual that Plaintiffs and their affiliates have "never returned any money to any investor."

74. Upon information and belief, Mr. Gaines has told multiple other investors of the Fund Partnerships that Plaintiffs and their affiliates have "never returned any money to any investor."

75. The statement by Mr. Gaines that Plaintiffs and their affiliates have "never returned any money to any investor" is false.

9

76. Mr. Gaines made the statement with knowledge it was false, or at minimum, with reckless disregard of whether it was false. Indeed, even Mr. Gaines has received distributions of money from his investments in Plaintiffs and their affiliates, belying his statements.

77. As a result of Mr. Gaines's statement, Plaintiffs have incurred damages to their reputation and have incurred costs in making communications with limited partners to correct the misleading statements made by Mr. Gaines.

## CAUSES OF ACTION

### Count 1 – Violation of Section 14(e) of the Exchange Act

### (Against Ira Gaines individually; Peachtree Partners)

78. The preceding allegations are incorporated by reference as if fully set forth herein.

79. Mr. Gaines, individually and/or under the alter ego of Peachtree Partners, made Offers to acquire units of the Fund Partnerships.

80. The Offers omitted that Mr. Gaines and companies he controls, including Peachtree Partners, have violated the Exchange Act and that Mr. Gaines has been convicted of a felony securities law violation.

81. Mr. Gaines and Peachtree Partners' omissions were material.

82. A reasonable investor, in deciding whether to tender its units, would have considered it important that Mr. Gaines and companies he controls, including Peachtree Partners, have violated the Exchange Act and that Mr. Gaines has been convicted of a felony securities law violation.

83. Mr. Gaines and Peachtree Partners' omissions altered the total mix of information that should have been available to the limited partners in the Fund Partnerships.

84. Mr. Gaines and Peachtree Partners made the Offers with actual knowledge that the Offers were materially false or misleading, or with reckless disregard as to whether the Offers were materially false or misleading. Mr. Gaines and Peachtree Partners knew

(or were reckless in not knowing) that his prior violations of the securities laws were required to be disclosed in the Offers, but made the Offers anyway in a knowing attempt to deceive the recipients.

85. Mr. Gaines and Peachtree Partners violated Section 14(e) of the Exchange Act by making the Offers.

86. As a direct and proximate result of the Offers, the market price for units of the Fund Partnerships has been artificially depressed in an amount to de determined at trial.

87. As a direct and proximate result of the Offers, Plaintiffs have seen increased costs to engage in financing and raising capital.

88. Plaintiffs' damages include, but are not limited to, the cost of communications with limited partners to correct the misleading statements made by Defendants in the Offers, and the depression in value of the Fund Partnerships' units.

**Count 2 – Breach of Contract of Section 8.2(c) of the Partnership Agreements**
**(Against Ira Gaines as Trustee for Gaines Trust; IG Holdings)**

89. The preceding allegations are incorporated by reference as if fully set forth herein.

90. The Partnership Agreements are enforceable contracts between Plaintiffs and limited partners in the Fund Partnerships, including the Gaines Trust and IG Holdings.

91. Plaintiffs performed their obligations under the Partnership Agreements.

92. Under Section 8.2(c) of the Partnership Agreements, no limited partner shall "hold such [limited] Partner out as having the power or authority to bind the Partnership, the General Partner, or any Partner as such."

93. The Gaines Trust and IG Holdings have materially breached the Partnership Agreement by (i) having their trustee and/or agent make the Offers and reserve the right to transfer units to the Gaines Trust or IG Holdings and (ii) presenting the Offers in such a way that gives the appearance that the Gaines Trust and/or IG Holdings has the power or authority to bind the Partnership, or is otherwise acting on behalf of the Partnership.

11

94.   Plaintiffs have suffered damages by the breach.  Plaintiffs' damages include, but are not limited to, the cost of communications with limited partners to correct the misrepresentations made by Defendants in the Offers.

## Count 3 – Interference with Contract

### (Against Ira Gaines individually; Peachtree Partners)

95.   The preceding allegations are incorporated by reference as if fully set forth herein.

96.   Mr. Gaines, individually and/or under the alter ego of Peachtree Partners, had knowledge of the Partnership Agreements and the limited partners' obligations under the agreements.

97.   Mr. Gaines, individually and/or under the alter ego of Peachtree Partners, intentionally interfered with Plaintiffs' contractual relationships with the limited partners, including the Gaines Trust and IG Holdings, by making the Offers and causing the Gaines Trust and IG Holdings to breach the Partnership Agreements.

98.   Mr. Gaines and Peachtree Partners' conduct was improper.  The Offers were misleading and deceptive for failing to include material information to evaluate the Offers, such as Mr. Gaines and Peachtree Partners' prior securities law violations.

99.   Plaintiffs have suffered damages by the breaches.  As a direct and proximate result of the interference, Plaintiffs have seen increased costs to engage in financing and raising capital.

## Count 4 – Interference with Business Expectancy

### (Against Ira Gaines individually)

100.   The preceding allegations are incorporated by reference as if fully set forth herein.

101.   Plaintiffs have a valid business expectancy with potential investors, including investors in affiliates of Plaintiffs.

102.   Mr. Gaines was aware of this valid business expectancy by virtue of his role as an investor and limited partner in Plaintiffs and their affiliates.

103. Mr. Gaines intentionally interfered with the termination of this expectancy by making the misleading Offers.

104. Mr. Gaines intentionally interfered with the termination of this expectancy by falsely stating that Plaintiffs and their affiliates have not returned any money to investors.

105. Mr. Gaines's interference was intentional and part of his campaign to "take over Walton and run them out of business."

106. Mr. Gaines's interference was improper. The Offers were misleading and deceptive for failing to include material information to evaluate the Offers, such as Mr. Gaines and Peachtree Partners' prior securities law violations. Mr. Gaines's statement regarding Plaintiffs' returns to investors was false.

107. Plaintiffs have suffered damages by the loss of the business expectancy. Plaintiffs' damages include greater difficulty to raise capital.

## Count 5 – Declaratory Judgment

### (Against all Defendants)

108. The preceding allegations are incorporated by reference as if fully set forth herein.

109. There exists an actual and justiciable controversy regarding the meaning and application of the Partnership Agreements, the validity of the Offers, and the validity of any acceptances of the Offers.

110. Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to judgment declaring that, under Section 9.2 of the Partnership Agreements, the Fund General Partners may reject any transfer made as a result of any partner accepting an Offer.

111. The declaratory relief sought herein will terminate the controversy.

112. Plaintiffs are further entitled to any and all supplementary relief necessary and proper to enforce the declaratory relief sought herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Court:

    a. Issue judgment in Plaintiffs' favor and against Defendants;

    b. Award Plaintiffs damages for Defendants' violation of Section 14(e) of the Exchange Act;

    c. Award Plaintiffs damages for Defendants' breach of contract and/or tortious interference with contract;

    d. Award Plaintiffs damages for Defendants' intentional interference with business expectancy;

    e. Declare that Plaintiffs may reject any transfer made as a result of any partner accepting an Offer;

    f. Permanently enjoin Defendants, their agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with them, from offering, making or engaging in any offer for shares of the Fund Partnerships;

    g. Direct Defendants to communicate the withdrawal of their Offers and to make appropriate statements to correct the material omissions and misrepresentations in those Offers;

    h. Award Plaintiffs all reasonable attorneys' fees and costs incurred in this suit pursuant to A.R.S. §§ 12-341 and 12-341.01; and

    i. Grant Plaintiffs such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiffs request a trial by jury on all claims set forth in this Complaint for which a jury trial is available.

/   /   /

14

RESPECTFULLY SUBMITTED this 8th day of May, 2026.

/s/ Brian A. Cabianca
Brian A. Cabianca (AZ Bar No. 016410)
brian.cabianca@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
2325 E. Camelback Road, Suite 700
Phoenix, AZ 85016
Telephone: (602) 528-4000
Facsimile: (602) 253-8129

*Attorneys for Plaintiffs*

# Exhibit 1

THE PARTNERSHIP INTERESTS EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES LAWS OF ANY STATE IN THE UNITED STATES OR THE LAWS OF ANY OTHER JURISDICTION AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH APPLICABLE UNITED STATES FEDERAL AND STATE SECURITIES LAWS, OR ANY APPLICABLE NON-U.S. SECURITIES LAWS.  IN ADDITION, TRANSFER OR OTHER DISPOSITION OF THE INTERESTS IS RESTRICTED AS PROVIDED IN THIS AGREEMENT.

**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**WALTON U.S. LAND FUND 4, LP**

TABLE OF CONTENTS

ARTICLE 1    DEFINITIONS AND INTERPRETATION.................................................................1
    1.1    Definitions.................................................................1
ARTICLE 2    THE PARTNERSHIP.................................................................7
    2.1    Formation of the Partnership.................................................................7
    2.2    Name.................................................................7
    2.3    Foreign Qualification.................................................................7
    2.4    Maintaining Status of the Partnership.................................................................7
    2.5    Principal Place of Business.................................................................8
    2.6    Registered Agent and Registered Office.................................................................8
    2.7    Addresses.................................................................8
ARTICLE 3    PURPOSES AND POWERS OF THE PARTNERSHIP.................................................................8
    3.1    Purposes of the Partnership.................................................................8
    3.2    Powers.................................................................8
ARTICLE 4    ADMISSION OF LIMITED PARTNERS AND CAPITAL CONTRIBUTIONS.................................8
    4.1    Division into Units.................................................................8
    4.2    Additional Limited Partners.................................................................9
    4.3    Refusal of Subscriptions.................................................................9
    4.4    Capital Contributions – Class A Partners.................................................................9
    4.5    No Additional Capital Contributions - Partners.................................................................9
    4.6    Capital Contribution – General Partner and Class B Partner.................................................................9
    4.7    Book-Entry Evidence of Ownership.................................................................9
    4.8    Joint Holders of Units.................................................................9
ARTICLE 5    ACCOUNTS, ALLOCATIONS AND DISTRIBUTIONS.................................................................10
    5.1    Capital Accounts.................................................................10
    5.2    Allocations of Net Profits and Net Losses.................................................................10
    5.3    Regulatory Allocations.................................................................10
    5.4    Tax Allocations.................................................................11
    5.5    Other Provisions.................................................................11
    5.6    Distributions.................................................................12
    5.7    Return of Capital.................................................................12
    5.8    No Interest Payable on Accounts.................................................................12
    5.9    Limitation on Distributions.................................................................12
    5.10    Unclaimed Interest or Distribution.................................................................13
    5.11    Withholding.................................................................13
    5.12    Code Section 83 Safe Harbor Election.................................................................13
ARTICLE 6    POWERS, RIGHTS AND OBLIGATIONS OF THE GENERAL PARTNER.................................13
    6.1    Management of the Partnership.................................................................13
    6.2    Obligations of the General Partner.................................................................14
    6.3    Transactions Involving Affiliates.................................................................14
    6.4    Safekeeping of Assets.................................................................14
    6.5    Powers of General Partner.................................................................14
    6.6    Records of the Partnership.................................................................17
    6.7    Fiscal Year.................................................................17
    6.8    Auditors.................................................................17
    6.9    Reporting.................................................................17
    6.10    Registrar and Transfer Agent.................................................................17
    6.11    Conflict of Interest.................................................................18
    6.12    Consent to Conflict.................................................................18
    6.13    Conduct of Partnership Affairs.................................................................19
    6.14    Indemnification of Partnership.................................................................19
    6.15    No Fiduciary Duties.................................................................19
REIMBURSEMENT AND REMUNERATION OF GENERAL PARTNER.................................................................19
    7.1    Expenses.................................................................19
    7.2    Borrowing Costs.................................................................20

i

ARTICLE 8      LIABILITY OF LIMITED PARTNERS AND GENERAL PARTNER ........................................20
    8.1      Liability of Limited Partners to Third Parties .....................................20
    8.2      Limitation on Authority of Limited Partners .....................................20
    8.3      Liability of Limited Partners Upon Dissolution.................................20
    8.4      Maintenance of Limited Liability ......................................................20
    8.5      General Partner Liability to Partners...................................................20
    8.6      Other Activities...................................................................................20
    8.7      Indemnification of the General Partner and Limited Partners...........21

ARTICLE 9      ASSIGNMENTS AND TRANSFERS OF UNITS .........................................................22
    9.1      Transfer or Assignment of Unit .........................................................22
    9.2      Rejection of Transfer .........................................................................23
    9.3      Ongoing Obligation of Partner...........................................................23
    9.4      Transferees or Assignees Who Are Not Substituted Partners ............23
    9.5      Parties Not Bound to See to Trust or Equity.......................................23
    9.6      Effective Date of Transfer or Assignment ..........................................23
    9.7      Compulsory Transfer or Acquisition of Units.....................................23
    9.8      Drag-Along .........................................................................................24
    9.9      Effect of Bankruptcy, Death, Incompetence or Termination of a Limited Partner ......26
    9.10    Withdrawal of Limited Partner ...........................................................26

ARTICLE 10    TERM .......................................................................................................26
ARTICLE 11    DISSOLUTION AND TERMINATION ........................................................................27
    11.1    Events of Dissolution.........................................................................27
    11.2    Winding Up.........................................................................................27
    11.3    Distribution of Assets on Dissolution ................................................27
    11.4    Reports...............................................................................................27
    11.5    No Other Right; No Recourse to General Partner...............................28
    11.6    Final Filing.........................................................................................28

ARTICLE 12    REPRESENTATIONS....................................................................................................28
    12.1    Status of General Partner ...................................................................28
    12.2    Status of Each Limited Partner ..........................................................28
    12.3    Survival of Representations ................................................................30

ARTICLE 13    CHANGE OF GENERAL PARTNER ...........................................................................30
    13.1    Removal or Withdrawal of General Partner........................................30
    13.2    Admission of Substitute General Partner ...........................................30
    13.3    Effect of Bankruptcy, Withdrawal, Death or Dissolution of a General Partner ......31
    13.4    Withdrawal.........................................................................................31
    13.5    Removal of General Partner................................................................31
    13.6    Release and Indemnification upon Removal or Withdrawal; Use of Walton Name ...............32
    13.7    Conversion to Limited Partner ...........................................................32

ARTICLE 14    MEETINGS ..................................................................................................................32
    14.1    Meetings.............................................................................................32
    14.2    Place of Meeting ................................................................................32
    14.3    Notice of Meeting ..............................................................................33
    14.4    Chairman............................................................................................33
    14.5    Quorum ..............................................................................................33
    14.6    Consents Without Meeting..................................................................33
    14.7    Adjournment ......................................................................................33
    14.8    Voting ................................................................................................33
    14.9    Record Date .......................................................................................33
    14.10   Proxies ...............................................................................................34
    14.11   Validity of Proxies .............................................................................34
    14.12   Corporations.......................................................................................34
    14.13   Attendance of Others .........................................................................34
    14.14   Rules ..................................................................................................34
    14.15   Waiver of Defaults.............................................................................34
    14.16   Minutes ..............................................................................................35

| 14.17 | Resolutions Binding | 35 |
|---|---|---|
| 14.18 | Actions Requiring Extraordinary Action | 35 |
| ARTICLE 15 | AMENDMENTS | 36 |
| 15.1 | Amendments to Agreement | 36 |
| 15.2 | Amendments In Discretion of General Partner | 36 |
| 15.3 | Notice to Partners | 37 |
| 15.4 | Limitation On Amendments | 37 |
| ARTICLE 16 | NOTICES | 37 |
| 16.1 | Addresses For Notices | 37 |
| 16.2 | Notices | 37 |
| ARTICLE 17 | POWER OF ATTORNEY | 37 |
| ARTICLE 18 | MISCELLANEOUS | 39 |
| 18.1 | Governing Law | 39 |
| 18.2 | Date for Actions | 39 |
| 18.3 | Headings | 39 |
| 18.4 | Number and Gender | 39 |
| 18.5 | Currency | 39 |
| 18.6 | Statutes | 39 |
| 18.7 | Provisions Severable | 39 |
| 18.8 | Further Assurances | 39 |
| 18.9 | Binding Effect | 39 |
| 18.10 | Waiver | 39 |
| 18.11 | Entire Agreement | 40 |
| 18.12 | Counterparts | 40 |
| 18.13 | Ownership and Use of Names | 40 |
| EXHIBIT A - PARTNERS | | 41 |
| EXHIBIT B - TRANSFER FORM | | 42 |
| EXHIBIT C - FORM OF DECLARATION OF TRANSFEREE | | 43 |

**[This space intentionally left blank.]**

**WALTON U.S. LAND FUND 4, LP**
**AGREEMENT OF LIMITED PARTNERSHIP**

This Agreement of Limited Partnership of Walton U.S. Land Fund 4, LP, a limited partnership formed under the laws of the State of Delaware (the "*Partnership*"), is made and entered into as of March 26, 2013 by and among WUSF 4 GP, LLC, a Delaware limited liability company (the "*General Partner*") and those Persons who from time to time are accepted as limited partners of the Partnership in accordance with this Agreement, and who are listed on **Exhibit A**, as such exhibit may be amended from time to time (each individually a "*Limited Partner*," collectively the "*Limited Partners*" and collectively with the General Partner, the "*Partners*"), and

NOW, THEREFORE, the Partners hereby agree as follows:

**ARTICLE 1**
**DEFINITIONS AND INTERPRETATION**

1.1          Definitions

In this Agreement, unless the context otherwise requires:

"**Act**" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. §§ 17-101, et seq., as amended from time to time;

"**Adjusted Capital Account Deficit**" means, with respect to any Partner at any time, the deficit balance, if any, in such Partner's Capital Account as of such time, after giving effect to the following adjustments:

(1)          Add to such Capital Account the amount that such Partner is obligated to restore or is deemed to be obligated to restore pursuant to Regulations Section 1.704-1(b)(2)(ii)(c) or the penultimate sentence of each of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(2)          Subtract from such Capital Account such Partner's share of the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently with those provisions;

"**Adverse Effect**" means (i) the Partnership being classified as a "publicly traded partnership" under the Code, (ii) the assets of the Partnership being considered "plan assets" within the meaning of regulations adopted under ERISA or Section 4975 of the Code, (iii) the Units being required to be registered under the Securities Exchange Act of 1934, as amended, or (iv) some other legal, regulatory, pecuniary, tax or material administrative disadvantage to the Partnership or Partners;

"**Affiliate**" of a Person means another Person who controls, is controlled by, or is under common control with, such Person;

"**Agreement**" means this agreement, including the schedules and exhibits, as amended or supplemented from time to time and "herein", "hereby", "hereof", "hereunder", "hereto" and similar expressions mean or refer to this Agreement and not to any particular provision of this Agreement;

"**Auditors**" means the certified public accounting firm appointed by the General Partner from time to time to audit the financial statements of the Partnership;

"**Business Day**" means, with respect to any particular location, any day other than a Saturday, Sunday or federal holiday of the United States of America, on which national banks doing business in such location are open to the public for the conduct of retail, walk-in banking business and not merely electronic banking business;

"**Capital Account**" means the capital account maintained for each Partner on the Partnership's books and records under the following provisions:

(1)          To each Partner's Capital Account there shall be added (a) the Partner's Capital Contributions, (b) the Partner's allocable share of Net Profits and any items in the nature of income or gain that are specially allocated to the Partner under Article 5 or any other provision of this Agreement, and (c) the amount of any Partnership liabilities assumed by the Partner or that are secured by any property distributed to the Partner;

1

(2)      From each Partner's Capital Account there shall be subtracted (a) the amount of (i) cash and (ii) the Gross Asset Value of any Partnership assets (other than cash) distributed to the Partner under this Agreement in its capacity as a Partner, (b) the Partner's allocable share of Net Losses and any other items in the nature of expenses or losses that are specially allocated to the Partner under Article 5 or any other provision of this Agreement, and (c) liabilities of the Partner assumed by the Partnership or that are secured by any property contributed by such Partner;

(3)      If any Unit or fractional Unit in the Partnership is transferred under this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Unit or fractional Unit;

(4)      In determining the amount of any liability for purposes of subsections (1) and (2) of this definition, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations; and

(5)      The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Regulations;

"**Capital Contribution,**" with respect to any Partner, means the total amount of cash and the Gross Asset Value of property (other than cash) contributed or deemed to have been contributed, to the capital of the Partnership by the Partner (or by a predecessor Partner in the case of a Partner who acquires Units from a predecessor Partner in accordance with this Agreement) for the Units held by such Partner;

"**Cause**" means any act or failure to act by the General Partner relating to the performance of its duties under this Agreement that constitutes gross negligence, fraud, willful misconduct, or a breach of any of its material obligations under this Agreement which breach has a material adverse effect on the Partnership or the Limited Partners and such breach is not substantially cured within 60 days (or is not in the process of being substantially cured within 60 days and is not substantially cured within 120 days) after receipt by the General Partner of written notice from a Limited Partner with respect thereto;

"**Certificate**" means any instrument or document that is required under the laws of the State of Delaware, or any other jurisdiction in which the Partnership conducts business, to filed for recording in the appropriate public offices within the State of Delaware or such other jurisdiction to perfect or maintain the Partnership as a limited partnership, to effect the admission, withdrawal, or substitution of any Partner from or to the Partnership, or to protect the limited liability of the Limited Partners as limited partners under the laws of the State of Delaware or such other jurisdiction;

"**Class A Unit**" means a unit of equal and undivided interest in the Partnership entitling the holder thereof to the rights of a holder of Class A Units pursuant to the terms of this Agreement;

"**Class A Partner**" means a Partner holding Class A Units;

"**Class B Unit**" means a unit of equal and undivided interest in the Partnership entitling the holder thereof to the rights of a holder of the Class B Unit pursuant to the terms of this Agreement;

"**Class B Partner**" means the Partner holding the Class B Unit;

"**Code**" means the United States Internal Revenue Code of 1986, as amended;

"**Concept Planning**" means those preliminary development activities with respect to a Property during its preliminary development phase, intended to protect the value of the Property and prepare the Property for physical development, such as one or more of the following without limitation: performing development feasibility assessments, preparing a conceptual master plan for the Property, seeking appropriate planning, land use and other regulatory approvals, formation of improvement districts, negotiating service agreements, and preparing and seeking approval of subdivision plats;

"**Concept Planning Allocation**" means that portion of the Reserve established pursuant to the terms of the Private Placement Memorandum to pay for the Partnership's allocable share of Concept Planning costs;

"**Co-Ownership Agreement**" means, for each Property, the Co-Ownership Agreement between the Partnership, the Fund Subsidiary (if applicable), the Walton Acquisition Entity and Walton USA, to be entered into when the Partnership and/or the applicable Fund Subsidiary first acquires all or part of the Interest in the Property, which will govern the rights and responsibilities of such parties with respect to the Property;

2

"**Depreciation**" means, for each Fiscal Year of the Partnership or other period, the amount of federal income tax depreciation, amortization or other cost recovery deduction allowable for an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner;

"**Dissenting Partner**" is defined in Section 9.8(a);

"**Eligible Transferee**" is defined in Section 9.7(a);

"**Encumbrance**" means any charge, claim, mortgage, servitude, easement, right of way, community or other marital property interest, covenant, equitable interest, license, lease or other possessory interest, lien, option, pledge, security interest, preference, priority, right of first refusal, restriction (other than any restriction on transferability imposed by federal, state or foreign securities Laws) or other encumbrance of any kind or nature whatsoever (whether absolute or contingent);

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations adopted pursuant thereto;

"**Event of Bankruptcy**" as to any Person means (i) the filing of a petition for relief as to such Person as debtor or bankrupt under Title 11, United States Code, as amended (or any successor statute) or similar provision of law of any jurisdiction (except if such petition is contested by such Person and has been dismissed within 90 days); (ii) the insolvency or bankruptcy of such Person as finally determined by a court proceeding; (iii) the filing by such Person of a petition or application to accomplish the same or for the appointment of a receiver or a trustee for such Person or a substantial part of his assets; and (iv) the commencement of any proceedings relating to such Person as a debtor under any other reorganization, arrangement, insolvency, adjustment of debt or liquidation law of any jurisdiction, whether now in existence or hereinafter in effect, either by such Person or by another, provided, that if such proceeding is commenced by another, such Person indicates his approval of such proceeding, consents thereto or acquiesces therein, or such proceeding is contested by such Person and has not been finally dismissed within 90 days;

"**Expenses**" is defined in Section 8.7(b);

"**Extraordinary Action**" means an action approved by a vote of Class A Partners holding at least 66⅔% of the Class A Units that are voted on the matter;

"**Fiscal Year**" is defined in Section 6.7;

"**Funding Agreement**" means the agreement between the Partnership, each Fund Subsidiary that becomes a party thereto, and Walton USA relating to the Properties, under which Walton USA will agree to fund certain expenses and other costs of the Partnership, and under which Walton USA will agree to pay, without reimbursement, certain expenses pertaining to the Partnership;

"**Fund Subsidiary**" means a wholly-owned subsidiary of the Partnership formed to acquire the Partnership's undivided interest in a Property.

"**General Partner**" is defined in the preamble, or any substitute general partner under Section 13.2;

"**Gross Offering Proceeds**" means the gross proceeds of the offering of Units before deduction of commissions, offering expenses and reserves;

"**Governmental Authority**" means any government or political subdivision thereof, whether federal, state, local or foreign, international, multinational or any agency or instrumentality of any such government or political subdivision, or any other similar board quasi-governmental regulating body (to the extent that the rules, regulations or orders of such body have the force of Law) or any court or arbitration tribunal;

"**Gross Asset Value**" means, for any asset, the asset's adjusted basis for United States federal income tax purposes, except as follows:

3

(1)     the Gross Asset Value of all the Partnership's assets immediately before the occurrence of any event described in subsections (a) through (e) hereof shall be adjusted to equal their respective gross fair market values, as determined by the General Partner using such reasonable method of valuation as the General Partner may adopt, upon the occurrence of the following events and in accordance with the applicable Regulations:

(a)     the acquisition of Units in the Partnership by a new or existing Partner in exchange for more than a de minimis Capital Contribution if the General Partner reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners of the Partnership;

(b)     the distribution by the Partnership to a Partner of more than a de minimis amount of assets in the Partnership as consideration for a whole or partial interest in the Partnership, if the General Partner reasonably determines that such adjustment is necessary or appropriate;

(c)     the liquidation of the Partnership within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g);

(d)     the grant of more than a de minimis number of Units in the Partnership in consideration for the provision of services to or for the benefit of the Partnership; or

(e)     at such other times as the General Partner shall reasonably determine necessary or advisable to comply with Regulations Sections 1.704-1(b) and 1.704-2;

(2)     the Gross Asset Value of any asset of the Partnership distributed to a Partner shall be the gross fair market value of the asset on the date of distribution as determined by the General Partner;

(3)     the Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets under Code Section 734(b) or 743(b), but only to the extent that the adjustments are taken into account in determining Capital Accounts under Regulations Section 1.704-1(b)(2)(iv)(m); *provided, however*, that Gross Asset Values shall not be adjusted under this subsection (3) to the extent that the General Partner reasonably determines that an adjustment under subsection (1) of this definition above is necessary or appropriate for a transaction that would otherwise result in an adjustment under this subsection; and

(4)     if the Gross Asset Value of a Partnership asset has been determined or adjusted under subsection (1) or (3) of this definition, the Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such Partnership asset for purposes of computing Net Profits and Net Losses;

"**Indemnified Person**" means each of the General Partner together with its successors in interest by merger, dissolution or otherwise and its officers, directors, managers, members, employees, agents and advisors and Limited Partners together with their respective heirs, devisees, legatees, personal representatives, trustees, executors, administrators, successors in interest by merger, dissolution or otherwise;

"**Interests**" means, collectively, the proportionate undivided interests in the Properties to be acquired by the Partnership, directly or indirectly, pursuant to the terms described in the Private Placement Memorandum;

"**Issuer Expense Allocation**" means that portion of the Reserve established pursuant to the terms of the Private Placement Memorandum for payment of Issuer Expenses (as defined in the Private Placement Memorandum);

"**Land Purchase Financing**" means any financing incurred by the Partnership for purposes of acquiring Interests in any of the Properties, the terms of which financing shall provide for repayment in full of the obligations in respect of such financing first out of the proceeds of the Private Placement conducted pursuant to the Private Placement Memorandum, and thereafter, to the extent the proceeds of the Private Placement are insufficient, extinguishment of all remaining outstanding obligations in respect of such financing pursuant to the exercise of the Option;

"**Law**" means any federal, state, county, local, municipal, foreign, international, multinational, or other constitution, law, statute, treaty, rule, regulation, ordinance, code, binding case law or principle of common law;

"**Limited Partners**" is defined in the preamble;

"**Losses**" means losses, liabilities, judgments, claims, damages, fees, costs and expenses of any kind, including fees, disbursements and costs of legal counsel and advisors and liabilities under state and federal securities Laws;

"**Lots**" means partially or completely finished lots or improvements;

"**Management Fee Allocation**" means that portion of the Reserve established pursuant to the terms of the Private Placement Memorandum for the payment of the Management Fee (as defined in the Private Placement Memorandum);

"**Net Profits**" or "**Net Losses**" means, for each Fiscal Year or other period, the Partnership's taxable income or loss for such year or period determined under Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately under Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(1)    any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses under this definition shall be added to the taxable income or loss;

(2)    any expenditure of the Partnership described in Code Section 705(a)(2)(B) or treated as a Code Section 705(a)(2)(B) expenditure under Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses, shall be subtracted from such taxable income or loss;

(3)    gain or loss resulting from any disposition of Partnership assets where such gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Partnership assets disposed of, notwithstanding that the adjusted tax basis of the Partnership assets differs from its Gross Asset Value;

(4)    in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing the taxable income or loss, there shall be taken into account Depreciation for the Fiscal Year;

(5)    to the extent an adjustment to the adjusted tax basis of any asset included in Partnership assets under Code Section 734(b) or 743(b) is required under Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Partner's interest, the amount of the adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for computing Net Profits and Net Losses;

(6)    if the Gross Asset Value of any Partnership asset is adjusted under subsection (1) or subsection (2) of the definition of "Gross Asset Value," the amount of the adjustment shall be taken into account in the taxable year of the adjustment as gain or loss from the disposition of the asset for computing Net Profits or Net Losses; and

(7)    notwithstanding any other provision of this definition, any items of income, gain, loss or deduction that are specially allocated under Section 5.3 shall not be taken into account in computing Net Profits or Net Losses. The amount of items of income, gain, loss and deduction available to be specially allocated shall be determined using principles analogous to those set forth in this definition;

"**Nonrecourse Deductions**" is defined in Regulations Sections 1.704-2(b)(1) and 1.704-2(c);

"**Offer**" is defined in Section 9.8(a);

"**Offeror**" is defined in Section 9.8(a);

"**Offeror's Notice**" is defined in Section 9.8(a);

"**Offeror's Units**" is defined in Section 9.8(a);

"**Option**" means the option by the lender in connection with any Land Purchase Financing, in the event proceeds of the Private Placement are insufficient to repay in full the Partnership's obligations under any such financing, to acquire from the Partnership (at the same price per acre paid by the Partnership) such portion of the Interests in the applicable Property acquired with the proceeds of such financing and not repaid with the proceeds of the Private Placement, and thereby extinguish all amounts owed by the Partnership to such lender under such Land Purchase Financing;

"**Ordinary Action**" means an action approved by the Class A Partners holding at least a majority of the Class A Units that are voted on the matter;

"**Partner**" or "**Partners**" is defined in the preamble;

5

"**Partner Minimum Gain**" means "partner nonrecourse debt minimum gain" as defined in Regulations Section 1.704-2(i)(2);

"**Partnership Minimum Gain**" has the meaning set forth in Regulations Sections 1.704-2(b)(2) and 1.704-2(d)(1) for the phrase "partnership minimum gain";

"**Partner Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Regulations Section 1.704-2(b)(4);

"**Partner Nonrecourse Deductions**" means "partner nonrecourse deductions" as defined in Regulations Section 1.704-2(i);

"**Partnership**" is defined in the preamble;

"**Permitted Encumbrance**" means, for each Property, any (i) statutory encumbrance for current taxes or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings by the entity alleged to owe such tax or charge; (ii) encumbrance arising or incurred in the ordinary course of business for amounts which are not overdue for a period of more than 60 days and which are not, individually or in the aggregate, significant; (iii) zoning, entitlement, building and other land use regulations imposed by Governmental Authorities having jurisdiction over the Property; (iv) covenants, conditions, restrictions, easements and other encumbrances affecting title to the Property which do not materially impair the ability of the Partnership to sell the Property; (v) public roads and highways; and (vi) encumbrances regarding deposits made to secure obligations arising from statutory, regulatory, contractual or warranty requirements, including rights of setoff;

"**Person**" means any natural person, any corporation, company, association, partnership, limited liability company, trust, unincorporated organization or other entity, or any government, political subdivision, agency or instrumentality of a government;

"**Private Placement**" means the offering, through a "private placement," of Units of the Partnership pursuant to Rule 506 of Regulation D and Rules 901 through 905 of Regulation S under the Securities Act of 1933, as amended;

"**Private Placement Memorandum**" means the Confidential Private Placement Memorandum dated June 1, 2013, pursuant to which the Partnership will conduct concurrent offerings and acquire interests in the Properties;

"**Proceeding**" is defined in Section 8.7(b);

"**Properties**" means the parcels, which may include Lots, in which the Partnership directly or indirectly acquires ownership interests in connection with the Private Placement as described in the Private Placement Memorandum, and each of such Properties individually, a "**Property**";

"**Register**" means the register of Partners maintained under Section 6.10;

"**Registrar and Transfer Agent**" means the registrar and transfer agent for the Partnership referred to in Section 6.10, which shall be the General Partner if no other registrar and transfer agent is appointed under Section 6.10;

"**Regulations**" means the U.S. Department of Treasury Regulations adopted under the Code. Any and all references herein to specific provisions of the Regulations shall be deemed to refer to any corresponding successor provision;

"**Regulatory Allocations**" is defined in Section 5.3(h);

"**Regulation S Investor**" is defined in Section 12.2(c);

"**Relevant Units**" is defined in Section 9.7(a);

"**Requesting Partners**" is defined in Section 14.1;

"**Reserve**" means a portion of the Gross Offering Proceeds which shall be set aside in a segregated account and which is comprised of the Concept Planning Allocation, the Issuer Expense Allocation and the Management Fee Allocation;

6

"**Securities Act**" means the Securities Act of 1933 as amended, including the rules and regulations promulgated thereunder;

"**Selling Group**" means the broker-dealers registered with the Financial Industry Regulatory Authority, Inc. who may be selected by the Partnership and by any other agents or sub-agents as the Partnership may appoint to offer the sale of Units and promote the formation of the Partnership's relationships with investment advisers;

"**Sharing Ratio**" means for any Class A Partner at any time, the percentage obtained by dividing the number of Class A Units held by the Partner by the aggregate number of outstanding Class A Units held by all Partners;

"**Subscription Agreement**" means a subscription agreement for the acquisition of Class A Units from the Partnership in such form as is approved from time to time by the General Partner;

"**Tax Matters Partner**" is defined in Section 6.9(b);

"**Transfer Notice**" is defined in Section 9.7(a);

"**Unit**" means either a Class A Unit or Class B Unit;

"**Unpaid Preference Amount**" means, for each Property and with respect to any Partner, (i) a 10.5% annual cumulative non-compounded preferred return on such Partner's Capital Contributions allocable to such Property, calculated on a daily basis with respect to the total amount of such Partner's Capital Contributions allocable to such Property in the possession of the Partnership on such day, where such total is (A) increased when a Capital Contribution allocable to such Property is accepted by the Partnership (increased in an amount equal to such accepted Capital Contribution) and (B) decreased when Capital Contributions allocable to such Property are returned to such Partner through a payment made by the Partnership to return all or part of such Partner's Unreturned Capital Contributions (decreased in an amount equal to such payment) (ii) less all prior distributions made by the Partnership to pay all or part of the Unpaid Preference Amount to such Partner;

"**Unreturned Capital Contributions**" means, for each Property and with respect to any Partner, (i) an amount equal to the Capital Contributions of such Partner allocable to such Property (ii) less all prior distributions made by the Partnership to return all or part of the Unreturned Capital Contributions allocable to such Property to such Partner;

"**Vendor**" is defined in Section 9.7(a);

"**Walton Acquisition Entity**" means, for each Property, the wholly-owned subsidiary of Walton USA that initially acquires the Property and from which the Partnership will acquire its interest in such Property;

"**Walton USA**" means Walton International Group (USA), Inc., an Arizona corporation.

## ARTICLE 2
## THE PARTNERSHIP

2.1        Formation of the Partnership

The Partnership is a limited partnership formed under the laws of the State of Delaware, pursuant to a Certificate of Limited Partnership filed with the Office of the Secretary of State of the State of Delaware on March 26, 2013, and upon the terms and conditions set forth in this Agreement.

2.2        Name

The name of the Partnership is "**Walton U.S. Land Fund 4, LP.**" The affairs of the Partnership shall be conducted under that name or under any other name or names as the General Partner may from time to time determine.

2.3        Foreign Qualification

The Partnership shall apply for authority to transact activities in those jurisdictions where the Partnership is required to do so by virtue of its operations or ownership of assets. The Partnership shall file any other certificates and instruments as may be necessary or desirable in connection with its formation, existence and operation, all as determined by the General Partner.

2.4        Maintaining Status of the Partnership

The General Partner shall execute, acknowledge, record and file, at the expense of the Partnership, the Certificate and any and all amendments thereto and all requisite fictitious name statements and notices in such places and jurisdictions as may be necessary to cause the Partnership to be treated as a limited partnership under, and otherwise to comply with, the laws of each state or other jurisdiction in which the Partnership conducts business. The General Partner shall do all things and shall cause to be executed and filed any certificates, declarations, instruments and documents as may be required under the Laws of the State of Delaware and the applicable Laws of any other jurisdiction to reflect the constitution of the Partnership from time to time. The General Partner and each Partner will execute and deliver as promptly as possible any documents that may be necessary or desirable to accomplish the purposes of this Agreement or to give effect to the formation and continued existence of the Partnership under any and all applicable Laws. The General Partner will take all necessary actions on the basis of information available to it in order to maintain the status of the Partnership as a limited partnership under the Act.

2.5    Principal Place of Business

The principal place of business of the Partnership shall be located at 4800 N. Scottsdale Road, Suite 4000, Scottsdale, Arizona 85251 or at any other place or places as the General Partner may determine from time to time.

2.6    Registered Agent and Registered Office

The initial registered agent of the Partnership in Delaware shall be The Corporation Trust Company. The address of the initial registered office of the Partnership in Delaware shall be Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The registered office and registered agent of the Partnership in Delaware may be changed by the General Partner from time to time.

2.7    Addresses

The addresses of the General Partner and the Limited Partners shall be the addresses referred to in Article 16, as such addresses may be changed from time to time under Article 16.

**ARTICLE 3**
**PURPOSES AND POWERS OF THE PARTNERSHIP**

3.1    Purposes of the Partnership

The Partnership is formed for the purposes of making an offering of its Class A Units in a Private Placement and using the proceeds thereof to purchase the Interests, holding the Interests as an investment, including, as applicable, while engaged in the management and preliminary development of the Properties, and eventually selling or otherwise disposing of the Interests, and performing any other activities as may be incidental to, arising from or related to the foregoing purposes as may be reasonably determined by the General Partner, including participating in Concept Planning before the sale or other disposition of the Interests.

3.2    Powers

The purposes of the Partnership set forth in Section 3.1 and the powers vested in the General Partner described in Section 6.5 shall be construed as both purposes and powers of the Partnership. The Partnership shall have, without limitation, the power to do, or cause to be done, any and all acts and things necessary, convenient or incidental to the accomplishment of the purposes of the Partnership, and the enumeration in Section 6.5 of any means by which the purposes of the Partnership may be accomplished shall not limit or be construed so as to limit the powers which may be exercised by the Partnership.

**ARTICLE 4**
**ADMISSION OF LIMITED PARTNERS AND CAPITAL CONTRIBUTIONS**

4.1    Division into Units

The interests of the Partners in the Partnership shall be divided into, and the Partnership is authorized to issue, up to 10,000,000 Class A Units (plus an overallotment of 0.05% or 5,000 Class A Units) and 1 Class B Unit. The Partnership, in the discretion of the General Partner, may issue fractional portions of whole Units. Each outstanding Class A Unit shall be of one class and have attached to it the same rights and obligations as, and shall rank equally and pari passu with, each other Class A Unit for distributions, allocations and voting. Each Class

8

A Unit shall initially be issued to a Partner for up to $10.00. The Class B Unit will be issued to Walton USA or one of its Affiliates for $0.01 at the initial closing of the Private Placement.

4.2        Additional Limited Partners

The General Partner may, subject to the other provisions of this Agreement, admit Limited Partners from time to time by the offering, sale and issuance of further Class A Units, or fractional portions thereof, pursuant to an offering conducted by the Partnership. The General Partner may determine the terms and conditions of such offering and sale of Class A Units thereunder and may do all such things as may be necessary or advisable to give effect to such offering and sale, and any such acts done are hereby ratified and confirmed by the Partners. Each Person subscribing for Class A Units pursuant to the offering must complete, execute and deliver to, or to the order of, the General Partner, a Subscription Agreement and any other documents deemed necessary by the General Partner to comply with applicable securities Laws and the terms and conditions of issue. A subscriber for Class A Units shall become a Limited Partner upon the acceptance by the General Partner of the subscriber's Subscription Agreement and payment of such Limited Partner's initial Capital Contribution. Thereupon, the Partners hereby consent to the admission of, and will admit, additional Limited Partners to the Partnership without further act of the Partners. Notwithstanding anything to the contrary set forth herein, the total number of Class A Units shall not exceed 10,000,000 (plus an overallotment of 0.05% or 5,000 Class A Units) without the consent of the Class A Partners by an Extraordinary Action.

4.3        Refusal of Subscriptions

The General Partner may, for any reason in its absolute discretion, refuse to accept any subscription for a Unit. In the event of any such refusal, the General Partner shall cause the return of the subscriber's Subscription Agreement, accompanying documents and any contribution of capital to the subscriber.

4.4        Capital Contributions – Class A Partners

Each original Class A Partner's Capital Contribution shall equal the purchase price of such Class A Units, inclusive of all commissions and fees payable by the Partnership to members of the Selling Group in connection with such purchase. For a Partner (successor Partner) who acquires Class A Units from a predecessor Partner under this Agreement, the successor Partner's original Capital Contribution shall be deemed to equal that of the initial Class A Partner who acquired each Class A Unit that is transferred to the successor Partner.

4.5        No Additional Capital Contributions - Partners

No Partner shall be required to make any Capital Contribution in excess of the amount provided for in Section 4.4.

4.6        Capital Contribution – General Partner and Class B Partner

Except for the $0.01 to be contributed by the Class B Partner at the initial closing of the Private Placement, neither the General Partner nor the Class B Partner shall be required to make any Capital Contribution, except that it may subscribe for and purchase Class A Units on the same terms and conditions as if it were not the General Partner or the Class B Partner.

4.7        Book-Entry Evidence of Ownership

The Units will be issued only in fully-registered book-entry form. Ownership of Units will be shown in, and transfer of Units will be effected only through, the Register. Certificates evidencing ownership of Units will not be issued. Units shall be transferable in the manner prescribed by Law and in this Agreement, subject to restrictions set forth under Article 9. Assuming all restrictions on transfers have been met, transfers of Units shall be made in the Register.

4.8        Joint Holders of Units

Where a Unit is subscribed for by or assigned to two or more Persons:

(a)        the name of each Person shall be shown on the Register for the Unit;

(b)        the Unit shall be presumed by the Partnership to be held jointly;

(c)        amounts distributed by the Partnership for the Unit will be in both names but may be sent to the Person whose name appears first on the Register for the Unit or to such one of

9

them as the joint holders direct in writing, and any one of such Persons may give effectual receipts for any distributions for the Unit with the other of such Persons having no further recourse against the Partnership; and

(d)     any one of such Persons may vote for the Unit as if that Person were solely entitled to the Unit, but if more than one of such Persons is present or is represented at a meeting, the Person whose name appears first on the Register for the Unit shall alone be entitled to vote in respect of the Unit.

### ARTICLE 5
### ACCOUNTS, ALLOCATIONS AND DISTRIBUTIONS

5.1     Capital Accounts

A Capital Account shall be established and maintained on the books of the Partnership for each Partner.

5.2     Allocations of Net Profits and Net Losses

Except as otherwise provided for in Section 5.3 or Section 5.5, Net Income and Net Losses shall be allocated amongst the Partners in such a manner that the sum of (i) the Capital Account of each Partner, (ii) such Partner's share of Partnership Minimum Gain, and (iii) such Partner's share of Partner Minimum Gain shall be equal to the respective amounts (positive or negative) which would be distributed to such Partner if the Partnership were to liquidate its assets for an amount equal to their Gross Asset Value and distribute the proceeds of such liquidation in accordance with Section 5.6(a).

5.3     Regulatory Allocations.

Notwithstanding Section 5.2, the following special allocations shall be made in the following order of priority:

(a)     If there is a net decrease in Partnership Minimum Gain during a Fiscal Year, then, to the extent required by Regulations Section 1.704-2(f), each Partner shall be allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, for subsequent years) in an amount equal to the Partner's share of the net decrease in Partnership Minimum Gain, determined under Regulations Section 1.704-2(g)(2). This Section 5.3(a) is intended to comply with the minimum gain chargeback requirement of Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)     If there is a net decrease in Partner Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Partner who has a share of the Partner Minimum Gain attributable to such Partner Nonrecourse Debt, determined under Regulations Section 1.704-2(i)(5), shall, to the extent required by Regulations Section 1.704-2(i)(4), be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent years) in an amount equal to the Partner's share of the net decrease in Partner Minimum Gain attributable to the Partner Nonrecourse Debt, determined in a manner consistent with the provisions of Regulations Section 1.704-2(g)(2). This Section 5.3(b) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirement of Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     If any Partner unexpectedly receives an adjustment, allocation, or distribution of the type contemplated by Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), and after receiving such adjustment, allocation, or distribution, the Partner has an Adjusted Capital Account Deficit, items of income and gain shall be allocated to all the Partners (in proportion to the amounts of their respective Adjusted Capital Account Deficits) in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of the Partner as quickly as possible. This Section 5.3(c) is intended to constitute a "qualified income offset" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d)     If the allocation of Net Loss to a Partner as provided in Section 5.2 would create or increase an Adjusted Capital Account Deficit for the Partner, there shall be allocated to the Partner only that amount of Net Loss as will not create or increase an Adjusted Capital Account Deficit. The Net Loss that would, absent the application of the preceding sentence, otherwise be allocated to the Partner shall be allocated to the other Partners in accordance with Section 5.2, subject to the limitations of this Section 5.3(d). If, after the allocation of Net Loss under the preceding two sentences, no additional amount of Net Loss can be allocated to any Partner without creating or increasing an Adjusted Capital Account Deficit for the Partner, then Net Loss shall be allocated to the

10

General Partner. This Section 5.3(d) is intended to implement the alternate test for economic effect set forth in Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(e)    To the extent that an adjustment to the adjusted tax basis of any Partnership asset under Code Section 734(b) or Code Section 743(b) is required, under Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss shall be specially allocated to the Partners in accordance with this Article 5 if Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Partners to whom such distribution was made if that Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(f)    The Nonrecourse Deductions for each Fiscal Year of the Partnership shall be allocated to the Class A Partners in proportion to their Sharing Ratios.

(g)    The Partner Nonrecourse Deductions shall be allocated each year to the Partner that bears the economic risk of loss (within the meaning of Regulations Section 1.752-2) for the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable.

(h)    The allocations set forth in Sections 5.3(a) through (g) (the "*Regulatory Allocations*") are intended to comply with the requirements of Regulations Sections 1.704-1(b) and 1.704-2. Notwithstanding the provisions of Section 5.2, the Regulatory Allocations shall be taken into account by the General Partner in specially allocating other items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Regulatory Allocations had not occurred. In exercising its discretion under this Section 5.3(h), the General Partner shall take into account future Regulatory Allocations that, although not yet made, are likely to offset other Regulatory Allocations previously made.

5.4      Tax Allocations.

(a)    Except as provided in Section 5.4(b), for income tax purposes under the Code and the Regulations and for applicable state, local and foreign Law, each Partnership item of income, gain, loss and deduction shall be allocated between the Partners in the same manner as its correlative item of "book" income, gain, loss or deduction is allocated under this Article 5.

(b)    Tax items concerning assets contributed to the Partnership with a Gross Asset Value that varies from its basis in the hands of the contributing Partner immediately preceding the date of contribution shall be allocated between the Partners for income tax purposes under Regulations promulgated under Code Section 704(c) or, if applicable, corresponding provisions of applicable state or local Law so as to take into account such variation. The Partnership shall account for such variation under any permissible method set forth in Regulations Section 1.704-3 as determined by the General Partner. If the Gross Asset Value of any Partnership asset is adjusted under subsection (1) or (3) of the definition of "Gross Asset Value," subsequent allocations of income, gain, loss and deduction for such Partnership asset shall take account of any variation between the adjusted basis of the Partnership asset for federal income tax purposes and its Gross Asset Value under any permissible method in Regulations Section 1.704-3 as determined by the General Partner. Any tax credits will be allocated to the Class A Partners in proportion to their Sharing Ratios, unless otherwise required by applicable tax Law. Allocations under this Section 5.4(b) are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Net Profits, Net Losses and any other items or distributions under any provision of this Agreement.

5.5      Other Provisions

(a)    For any Fiscal Year during which any Units are transferred between the Partners or to another Person or are otherwise disposed of or acquired, or there is for any reason a change in the Partners' respective Sharing Ratios, Net Profits, Net Losses and other items of income, gain, loss, deduction and credit shall be allocated and, to the extent necessary apportioned, under any method allowed under Section 706 of the Code and related Regulations, as reasonably determined by the General Partner; provided, that the General Partner shall use consistent methods for the same or substantially similar transactions and items in making such allocations or apportionments for all such changes in the Partners' respective Unit ownership or respective Sharing Ratios, whether occurring within a single Fiscal Year or in different Fiscal Years.

11

(b)　　If the Code or any Regulations require allocations of items of income, gain, loss, deduction or credit different from those in this Article 5, the General Partner is authorized to make new allocations relying on the Code and such Regulations, and no such new allocation shall give rise to any claim or cause of action by any Partner, *provided* that the allocations are consistent with the advice of the Partnership accountant or tax counsel and are not likely to alter materially the amounts that each Partner is entitled to receive under the terms of this Agreement.

(c)　　Solely for purposes of allocating excess nonrecourse liabilities of the Partnership among the Partners in connection with the determination of the Partners' adjusted tax bases for their interests in the Partnership, in accordance with Section 752 of the Code and the Regulations from time to time promulgated thereunder, the Partners agree that each Partner's interest in Partnership profits equals the Partner's Sharing Ratio, if any.

5.6　　　　Distributions

(a)　　After payment and reservation of all amounts necessary for payment for all expenses of the Partnership (including all amounts owing by the Partnership under the Funding Agreement and any tax withholding obligations) and reservation of such amounts as in the opinion of the General Partner are necessary having regard to the then current and anticipated resources of the Partnership and its commitments and anticipated commitments, distributions of cash of the Partnership (whether resulting from revenue or income earned by the Partnership or from the proceeds of the sale of all or any part of one or more Properties or the Interests or other assets of the Partnership including any amounts distributed under Section 11.3) will be made upon the sale or other disposition of a Property, at the sole discretion of the General Partner, to the Partners of record on the date the General Partner declares such distribution as follows:

(i)　　100% to the Class A Partners in proportion to and to the extent of each Class A Partner's Unreturned Capital Contributions allocable to such Property;

(ii)　　100% to the Class A Partners in proportion to and to the extent of each Class A Partner's Unpaid Preference Amount allocable to such Property; and

(iii)　　thereafter, 60% to the Class A Partners (to be distributed to them in accordance with their respective Sharing Ratios) and 40% to the Class B Partner on account of its Class B Unit.

(b)　　The manner and timing of all distributions will be in the sole discretion of the General Partner.

5.7　　　　Return of Capital

(a)　　No Partner shall be personally liable for the return of the Capital Contributions of the Partners, or any portion thereof, it being expressly understood that any such return of contributions shall be made solely from the Partnership assets.

(b)　　No Partner shall be entitled to a return, or to demand a return, of any part of such Partner's Capital Contribution or be entitled to any distribution or allocation except as provided in this Agreement.

(c)　　Notwithstanding anything else in the Agreement to the contrary, no Partner shall have an obligation to contribute additional capital to the Partnership in order to restore his Adjusted Capital Account Deficit or any deficit balance in his Capital Account.

5.8　　　　No Interest Payable on Accounts

Except as provided in this Agreement, no Partner has the right to receive interest on any credit balance in its Capital Account and no Partner is liable to pay interest to the Partnership on any deficit in its Capital Account.

5.9　　　　Limitation on Distributions

No distributions shall be made unless, after making the distribution, the Partnership retains sufficient assets to satisfy all liabilities of the Partnership (including any amounts owing by the Partnership under the

12

Funding Agreement). Notwithstanding anything contained under this Agreement to the contrary, including Section 4.6, the General Partner may require the Partners to return (in proportion to the distribution made) all or part of such distributions as have rendered the Partnership unable to satisfy all its liabilities and may require any Partner to forthwith return to the Partnership any amount otherwise distributed to any Partner in excess of the Partner's entitlement.

5.10        Unclaimed Interest or Distribution

If the General Partner shall hold any otherwise distributable amount that is unclaimed or that cannot be paid to a Partner for any reason, the General Partner shall be under no obligation to invest or reinvest the same but shall only be obliged to hold the same in a current non-interest-bearing account pending payment to the Person or Persons entitled to the distributable amount for a period commencing on the date upon which the amount became due and payable to such Partner and ending five years following the date of the dissolution of the Partnership under the provisions of this Agreement.

5.11        Withholding

Notwithstanding any other provision of this Agreement, the General Partner is authorized to take any action that it determines to be necessary or appropriate to cause the Partnership to comply with any withholding requirements established under the Code or any other federal, state or local Law including, without limitation, under Sections 1441, 1442, 1445 and 1446 of the Code. To the extent that the Partnership is required to withhold and pay over to any taxing authority any amount resulting from the allocation or distribution of income to any Partner or its assignee (including, without limitation, by reason of Section 1446 of the Code), the amount withheld shall be treated as a distribution of cash under Section 5.6 in the amount of the withholding from such Partner. Any amount withheld by the General Partner and paid over to a taxing authority shall be treated as actually distributed to the Partner in respect of whom such withholding and payment was made.

5.12        Code Section 83 Safe Harbor Election

(a)        Each Partner authorizes and directs the Partnership to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in IRS Notice 2005-43 (the "*Notice*") apply to any Units or other interest in the Partnership transferred to a service provider by the Partnership on or after the effective date of such Revenue Procedure in connection with services provided to the Partnership. For purposes of making such Safe Harbor election, the General Partner is hereby designated as the "partner who has responsibility for federal income tax reporting" by the Partnership and, accordingly, execution of such Safe Harbor election by the General Partner constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the Notice. The Partnership and each Partner hereby agree to comply with all requirements of the Safe Harbor described in the Notice, including, without limitation, the requirement that each Partner shall prepare and file all federal income tax returns reporting the income tax effects of each interest in the Partnership issued by the Partnership covered by the Safe Harbor in a manner consistent with the requirements of the Notice.

(b)        Each partner authorizes the General Partner to amend Section 5.12(a) to the extent necessary to achieve substantially the same tax treatment with respect to any Units or other interest in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership as set forth in Section 4 of the Notice (e.g., to reflect changes from the rules set forth in the Notice in subsequent IRS guidance), provided that such amendment is not adverse to such Partner (as compared with the after-tax consequences that would result to such Partner if the provisions of the Notice applied to all interests in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership).

## ARTICLE 6
## POWERS, RIGHTS AND OBLIGATIONS OF THE GENERAL PARTNER

6.1        Management of the Partnership

Management of the Partnership is vested in the General Partner. The General Partner, subject to Sections 6.5 and 14.18 and other provisions of this Agreement, shall manage and control the affairs of the

13

Partnership, represent the Partnership, and make all decisions regarding the affairs of the Partnership. No Person dealing with the Partnership shall be required to inquire into the authority of the General Partner to take any action or to make any decision in the name of the Partnership.

6.2        Obligations of the General Partner

The General Partner covenants that it will exercise its powers and discharge its obligations under this Agreement, in good faith. The General Partner shall put before the Partners for their consideration and acceptance or rejection, together with the applicable quorum and voting requirements, any offer to purchase one or more of the Partnership's Interests that the General Partner deems in its reasonable discretion to be a bona fide offer on terms equal to or better than those generally available in the market. The General Partner will exercise the care, diligence and skill of a reasonably prudent person, and it will devote such of its time to the Partnership's affairs as it determines, in good faith, to be reasonably necessary. The General Partner will be entitled to retain, at the expense of the Partnership, advisors, experts and consultants to assist it in the exercise of its powers and the performance of its obligations under this Agreement.

6.3        Transactions involving Affiliates

The validity of a transaction, agreement or payment involving the Partnership or its Affiliate, on the one hand, and the General Partner or its Affiliate, on the other hand, is not affected by reason of the relationships between the General Partner and the Partnership or their respective Affiliates or by reason of the approval or lack thereof of the transaction, agreement or payment by the officers of the General Partner or the officers or directors of the General Partner's manager, any or all of whom may be officers, directors, or employees of, or otherwise interested in or related to its Affiliates.

6.4        Safekeeping of Assets

The General Partner is responsible for the safekeeping and use of all of the funds of the Partnership, whether or not in its immediate possession or control, and will not employ or permit another to employ the funds or assets of the Partnership except for the exclusive benefit of the Partnership.

6.5        Powers of General Partner

(a)        In addition to the powers and authorities possessed by the General Partner under the Act or otherwise conferred by Law or elsewhere in this Agreement, the General Partner shall have the exclusive power and authority to manage and control the affairs of the Partnership and to do, or cause to be done, on behalf of and in the name of the Partnership any and all acts necessary, convenient or incidental to the activities of the Partnership without, except as otherwise provided in the Act or in this Agreement, further approval of the Partners including, without limitation, the power and authority:

(i)        to acquire the Interests in the Properties on behalf of the Partnership;

(ii)       to enter into the Funding Agreement and the Co-Ownership Agreements;

(iii)      to establish and disburse funds from the Reserve;

(iv)      to pay all real estate taxes or special assessments imposed on the Properties or the Interests;

(v)       to apply for and obtain any and all necessary financing required to carry out the purposes of the Partnership (including, without limitation, Land Purchase Financing), and to grant such Encumbrances on the Properties or the Partnership's Interests and any other assets of the Partnership as the General Partner may deem necessary or advisable in connection with such financing;

(vi)      to procure such insurance for the Partnership, the Interests and the Properties as it deems necessary or advisable;

(vii)     to pay all debts and financial obligations of the Partnership;

14

(viii)   to negotiate, enter into, execute and carry out agreements by or on behalf of the Partnership involving matters or transactions that are necessary or appropriate for or incidental to carrying on the Partnership's affairs;

(ix)   to manage and control all of the activities of the Partnership and to take all measures necessary or appropriate for the Partnership's property or ancillary to the property and to ensure that the Partnership complies with all necessary reporting and administrative requirements;

(x)   to manage, administer, conserve and dispose of (subject to the provisions of Section 6.5(b)) the Interests and any and all other assets of the Partnership, and in general to engage in any and all phases of the Partnership's affairs and to delegate, if the General Partner so chooses in its sole discretion, the management and administration of the Properties or the Interests and to enter into the Co-Ownership Agreements or similar agreements with any other Person;

(xi)   if the Partnership's participation in the development of all or a part of any Property beyond Concept Planning is approved by Extraordinary Action of the Partners, to reinvest all or any part of the income of the Partnership received from such Property or the Interest or from the sale of parts of such Property or the Interest (and that would have otherwise been available for distribution to the Partners under this Agreement) in such development;

(xii)   to conclude agreements with third parties, including Affiliates of and any other parties related to the General Partner, so that services may be rendered to the Partnership, and to delegate to any such Person any power or authority of the General Partner under this Agreement where, in the discretion of the General Partner, it would be in the best interests of the Partnership to do so (provided that such agreement or delegation will not relieve the General Partner of any of its obligations under this Agreement);

(xiii)   to decide in its sole and entire discretion the time when assets of the Partnership shall be distributed to the Partners and the amount of any such distribution;

(xiv)   notwithstanding Section 6.13(b), where the General Partner determines that it is not appropriate or advisable for the assets of the Partnership to be held or registered in the name of the Partnership, to hold the assets of the Partnership in the name of the General Partner or another nominee as nominee for the Partnership;

(xv)   to employ such Persons necessary or appropriate to carry out the affairs of the Partnership or to assist it in the exercise of its powers and the performance of its obligations under this Agreement and to pay such fees, expenses, salaries, wages and other compensation to such Persons as it shall in its sole discretion determine;

(xvi)   to make any and all expenditures and payments that it, in its sole discretion, deems necessary or appropriate in connection with the management of the affairs of the Partnership and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, (A) all legal, accounting and other related expenses incurred in connection with the organization and financing of the Partnership and the ongoing operation and administration of the Partnership and (B) any fees payable to the General Partner, and to

15

borrow on behalf of the Partnership such funds necessary or advisable to fund such expenditures and payments;

(xvii)  subject to Section 6.13(a), to open and operate one or more bank accounts to deposit and distribute funds of the Partnership and to appoint from time to time signing authorities and to draw checks and other payment of monies;

(xviii) to arrange for the preparation and timely filing of all tax and informational returns required of the Partnership;

(xix)   to maintain adequate books and records reflecting the activities of the Partnership;

(xx)    subject to the provisions of this Agreement, to admit any Person as a Partner;

(xxi)   to make or revoke any election, determination, application or designation on behalf of the Partnership that may be made under the Code (including an election to adjust the basis of the Partnership's property under Section 754 of the Code and an election to amortize the Partnership's organizational expenditures under Section 709 of the Code where the General Partner determines, in its sole discretion, that such an election would be appropriate), any other similar federal, state or local legislation, or any and all applications for governmental grants or other incentives;

(xxii)  to (A) adopt such conventions as it deems appropriate in determining the amount of depreciation, amortization and cost recovery deductions, and (B) make special allocations for federal income tax purposes of income (including, without limitation, gross income) or deductions, provided that such conventions and allocations would not have a material adverse effect on the Partners or the Partnership and are consistent with the principles of Section 704 of the Code;

(xxiii) to execute any and all deeds, documents and instruments and to do all acts as may be necessary or desirable in the opinion of the General Partner to carry out the intent and the purpose of this Agreement;

(xxiv)  to cause the Partnership to make any necessary withholdings of taxes for allocations or distributions to the Partners;

(xxv)   to attend to all required registrations, accounting, filing and reporting obligations, collections, remittances and other activities of the Partnership; and

(xxvi)  to commence and defend any and all legal proceedings for and on behalf of the Partnership as the General Partner may deem necessary or advisable;

and the General Partner may contract with any Person on behalf of the Partnership, including an Affiliate of the General Partner, to carry out any of the obligations of the General Partner and may delegate to such Person any power and authority of the General Partner under this Agreement, but no such contract or delegation shall relieve the General Partner of any of its obligations under this Agreement.

(b)     The General Partner, on behalf of the Partnership, may not take any action enumerated in Section 14.18 of this Agreement unless such action shall have been approved by Extraordinary Action of the Class A Partners.

16

6.6          Records of the Partnership

The General Partner shall maintain or cause to be maintained complete and adequate books (including those referred to in Section 5.1) and records of the affairs of the Partnership. Subject to applicable Laws, such books and records shall (until the expiry of one year following the termination of the Partnership) be kept available for inspection and audit by any Partner or his duly authorized representatives (at the expense of such Partner), for any purpose reasonably related to such Partner's interest as a Partner hereunder, on not less than 48 hours (excluding Saturdays, Sundays, and legal holidays) advance notice to the General Partner, during normal business hours at the principal place of business of the Partnership. Notwithstanding the foregoing, but subject to applicable Law, the General Partner may keep confidential any information the disclosure of which is prohibited by Law or agreement or the disclosure of which the General Partner reasonably believes is not in the best interests of the Partnership or could damage the Partnership or its interest in the Property.

6.7          Fiscal Year

Each Fiscal Year of the Partnership shall end on December 31 and unless otherwise determined by the General Partner, each period from and including January 1 to and including December 31 shall be referred to as a *"Fiscal Year."*

6.8          Auditors

The General Partner shall appoint the Auditors of the Partnership, which shall review and report to the Limited Partners on the financial statements of the Partnership as at the end of, and for, each Fiscal Year provided that the General Partner may, at any time and from time to time, change the Auditors of the Partnership.

6.9          Reporting

(a)          The General Partner shall forward or otherwise make available:

   (i)          to each Limited Partner, within 120 days of the end of each Fiscal Year, audited financial statements of the Partnership accompanied by a brief narrative  report on the operations of the Partnership; and

   (ii)          to each Limited Partner and former Limited Partner, where applicable, within 90 days of the end of each Fiscal Year, all income tax reporting information for the Units held by the Limited Partner necessary to enable the Limited Partner or former Limited Partner to file U.S. federal and state income tax returns for the Fiscal Year.

The documents and information to be provided pursuant to this Section 6.9(a) may be provided electronically to any Limited Partner or former Limited Partner, as applicable, to the extent such Limited Partner or former Limited Partner has provided an email address to the General Partner. Notwithstanding the foregoing, upon the written request of any Limited Partner or former Limited Partner, the General Partner shall forward hard copies of such documents and information to the requesting Limited Partner or former Limited Partner.

(b)          The Class B Partner is hereby designated as the Partnership's *"Tax Matters Partner"* under Code Section 6231(a)(7) and shall have all of the powers and responsibilities of such position as provided in the Code. The General Partner is specifically directed and authorized to take whatever steps the General Partner, in its discretion, deems necessary or desirable to perfect such designation, including filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under the Regulations. Expenses incurred by the Tax Matters Partner, in its capacity as such, will be Partnership expenses.

6.10          Registrar and Transfer Agent

The General Partner shall either act as registrar and transfer agent for the Partnership or appoint a duly qualified and properly licensed trust or other company for such purpose and in such capacity the Registrar and Transfer Agent shall maintain and keep a Register comprised of:

(a)          a list of the name and last known residence address of each Partner, and the number of Units held by such Partner;

17

(b)     particulars of the registration of Units;

(c)     particulars of the assignment of Units;

(d)     a copy of the Certificate of Formation of the Partnership and any amendments;

(e)     a copy of this Agreement and any amendments; and

(f)     any other records required by Law.

Upon request, a Limited Partner or his duly authorized representative shall be entitled to inspect, and at its expense receive a copy of, the Register.

6.11        Conflict of Interest

The Limited Partners acknowledge that the General Partner and its Affiliates and their respective directors and officers may be engaged in other businesses in which the Partnership will not have an interest and which may be competitive with the activities of the Partnership. The General Partner and its Affiliates and their respective managers, directors and officers may be a manager, member, partner, shareholder, director, officer, employee, consultant, joint venturer, advisor or act in any other capacity, of, with or to other entities, including limited partnerships and limited liability companies or other entities, that may compete with the Partnership. Some or all of the officers and directors of the manager of the General Partner (i) are directors and/or officers of Walton USA, which proposes to (a) enter into the Funding Agreement in respect of the Properties with the Partnership, and (b) with respect to each Property, enter into the Co-Ownership Agreement with the Partnership and the Walton Acquisition Entity, under which, among other things, the Partnership will be the manager of the Property and engage Walton USA to perform, at the direction of the Partnership, the duties of the Partnership as manager of the Property, (ii) with respect to each Property, control the Walton Acquisition Entity, the Affiliate of Walton USA that will continue to hold an interest in the Property after the Partnership acquires its Interest and will enter into the Co-Ownership Agreement with the Partnership; (iii) with respect to each Property, have negotiated the terms pursuant to which the Partnership will acquire its Interest, which terms include payments from the Partnership to the Walton Acquisition Entity; (iv) are managers, directors and/or officers of Affiliates of Walton USA to which Walton USA may delegate certain activities in respect of Concept Planning, and (v) are managers, directors and/or officers of other Affiliates of the General Partner and Walton USA. The General Partner may propose from time to time that the Partnership enter into contractual arrangements with Walton USA and/or its Affiliates for the provision of certain services and/or for other purposes.

6.12        Consent to Conflict

Subject to the General Partner's express obligations under this Agreement, the Limited Partners agree that the activities and facts described in Section 6.11, including the payment of fees to Affiliates of the General Partner for services provided to or on behalf of the Partnership or the Properties, shall not constitute a breach by the General Partner of any implied covenant of good faith and fair dealing to the Partnership or the Limited Partners, the Limited Partners hereby consent to such activities and the Limited Partners waive, relinquish and renounce any right to participate in, and any other claim whatsoever concerning, those activities. The Limited Partners further agree that neither the General Partner nor any other party referred to in Section 6.11 will be required to account to the Partnership or any Partner for any benefit or profit derived from any such activities or from such similar or competing activity or any related transactions by reason of any conflict of interest or any implied covenant of good faith and fair dealing unless such activity is contrary to the express terms of this Agreement or the Act. Each Limited Partner waives any right he may have against the General Partner for using for its own benefit information received as a consequence of the General Partner's management of the affairs of the Partnership.

18

6.13      Conduct of Partnership Affairs

The General Partner agrees to conduct the affairs of the Partnership as follows:

(a)      funds of the Partnership will not be commingled with any other funds of the General Partner or any other Person;

(b)      subject to Section 6.5(a)(xiv), assets of the Partnership shall be held in the name of the Partnership;

(c)      unless approved by Extraordinary Action, the Partnership shall not make loans to, nor guarantee the obligations of, the General Partner or any Affiliate of the General Partner or any of their respective directors or officers;

(d)      to the extent available on reasonable terms to the Partnership, the General Partner will obtain and maintain on behalf of the Partnership insurance in such amounts and with such coverage as in the judgment of the General Partner may be necessary or advisable for the Properties, the Interests and the activities of the Partnership;

(e)      except with respect to services provided on terms approved by Class A Partners holding 66⅔% of Class A Units that are voted on the matter, where services are supplied to the Partnership by the General Partner or any of its Affiliates or any of their respective directors or officers, such services shall be provided on commercially reasonable terms, given the then existing circumstances, as determined in good faith by the General Partner; and

(f)      the General Partner will use commercially reasonable efforts to conduct the Partnership's affairs in such a way that the Partnership is not deemed to hold the "plan assets" of any employee benefit plan subject to ERISA or any plan or arrangement (including an individual retirement account) subject to Section 4975 of the Code. Without limiting the foregoing, the General Partner shall endeavor either (1) to cause the Partnership to qualify for a plan assets exception under the Department of Labor Plan Asset Regulation, 29 CFR Section 2510.3-101, or (2) to cause the Partnership to qualify for another plan assets exception under such Regulation.

6.14      Indemnification of Partnership

The General Partner shall indemnify and hold harmless the Partnership from and against all Losses incurred by the Partnership as a result of any gross negligence, willful misconduct or fraudulent act by the General Partner.

6.15      No Fiduciary Duties

The Partners agree that, except for any implied covenant of good faith and fair dealing, the provisions of this Agreement are intended to replace any obligations of the Partners to each other that would otherwise be implied by applicable law, including without limitation any implied fiduciary or other duty that might apply to the General Partner, Limited Partners or their relationship to each other as General Partner and Limited Partners of the Partnership absent the provisions of this Section 6.15.

**ARTICLE 7**
**REIMBURSEMENT AND REMUNERATION OF GENERAL PARTNER**

7.1      Expenses

The General Partner may from time to time incur reasonable costs and expenses on behalf of the Partnership, and any such costs and expenses incurred by the General Partner on behalf of the Partnership shall be reimbursed by the Partnership. If the Partnership's funds on hand are insufficient for reimbursement, the General Partner's reimbursable expenses shall be considered an advance to the Partnership from the General Partner. The General Partner shall not be obligated to advance any amount to the Partnership. Notwithstanding anything to the contrary in this Section 7.1, the General Partner will, for its own account and without any reimbursement by the Partnership, incur and pay for all general office overhead for its own staff, personnel, furniture, and equipment used in respect of the performance of its obligations hereunder.

19

7.2 Borrowing Costs

The General Partner is entitled to reimbursement by the Partnership of any advance by the General Partner to the Partnership together with interest at the rate of interest and expense at which such amounts could be borrowed by the General Partner from its bankers.

## ARTICLE 8
## LIABILITY OF LIMITED PARTNERS AND GENERAL PARTNER

8.1 Liability of Limited Partners to Third Parties

No Limited Partner shall be liable for any debts, liabilities, contracts or obligations of the Partnership.

8.2 Limitation on Authority of Limited Partners

Other than as provided in this Agreement, no Limited Partner shall, in its capacity as a Limited Partner:

(a) take part in the control or management of the affairs of the Partnership;

(b) transact any affairs on behalf of the Partnership or execute any document that binds or purports to bind the Partnership, the General Partner or any other Partner as such;

(c) hold such Partner out as having the power or authority to bind the Partnership, the General Partner or any Partner as such;

(d) have any authority to undertake any obligation or responsibility on behalf of the Partnership;

(e) have any right to use or occupy any part of the Properties, or bring any action for partition or sale in connection with the Interests or any other assets of the Partnership, whether real or personal, or register or permit any lien or charge concerning the Units of such Partner to be filed or registered or remain undischarged against the Interests or the Properties in respect of such Partner's interest in the Partnership.

For the avoidance of doubt, the restrictions above shall not apply to the Class B Partner in connection with its role as Tax Matters Partner. The Limited Partners will comply with the provisions of all applicable Laws, including the Act, in force or in effect from time to time and will not take any action that will jeopardize or eliminate the status of the Partnership as a limited partnership.

8.3 Liability of Limited Partners Upon Dissolution

It is acknowledged by the Limited Partners that upon dissolution of the Partnership, the Limited Partners may receive in-kind distributions of the Partnership's assets, including undivided interests in the Properties, and will thereafter no longer have limited liability for the ownership of such assets.

8.4 Maintenance of Limited Liability

The Partnership and the General Partner shall, to the greatest extent practicable, endeavor to maintain the limited liability of the Limited Partners under applicable Laws of the jurisdictions in which the Partnership carries on or is deemed to carry on its affairs.

8.5 General Partner Liability to Partners

Except to the extent that any Losses result from the General Partner's gross negligence, willful misconduct or fraudulent acts, the General Partner shall not be liable to the Limited Partners or the Partnership for any Losses incurred by the Limited Partners or the Partnership, including without limitation such Losses as may result from any mistakes or errors in judgment of the General Partner or any act or omission believed in good faith to be within the scope of authority of the General Partner conferred by this Agreement.

8.6 Other Activities

Nothing contained in this Agreement shall preclude any Partner from purchasing or lending money upon the security of any other property or rights under this Agreement, or in any manner investing in,

participating in, developing or managing any other venture of any kind, without notice to the other Partners, without participation by the other Partners or the Partnership, and without liability to them or any of them.

8.7      Indemnification of the General Partner and Limited Partners

(a)      Subject to any restrictions imposed by applicable Law, the Partnership, its receiver or its trustee, shall indemnify, save harmless and pay all judgments and claims (including costs and reasonable attorneys' and consultants' fees and any amount expended in the settlement of any claim of liability, loss or damage) against an Indemnified Person in respect of any Loss or Losses incurred by any Indemnified Person or by the Partnership by reason of any act performed or omitted to be performed by an Indemnified Person on behalf of the Partnership, provided that such Loss or Losses were not solely the result of such Indemnified Person's fraud, gross negligence or willful misconduct. Any indemnification pursuant to this Section 8.7(a) shall be only from the assets of the Partnership and no Limited Partner shall have or incur any personal liability on such account or be required to make a Capital Contribution to fund such indemnification.

(b)      Subject to the limitations and conditions provided in this Section 8.7, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative (hereinafter a "*Proceeding*"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he, she, or it, or a Person of which he, she or it is the legal representative, is or was a Partner shall be indemnified by the Partnership to the fullest extent permitted by applicable Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Partnership to provide broader indemnification rights than said Law permitted the Partnership to provide prior to such amendment) against all judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including reasonable attorneys' fees and expenses) ("*Expenses*") actually incurred by such Person in connection with such Proceeding, appeal, inquiry or investigation if such Person acted in good faith, and indemnification under this Section 8.7 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The Partnership shall advance Expenses incurred by or on behalf of such an indemnified Person within 20 days after receipt by the Partnership from such Person of a statement requesting such advances from to time; provided such statement provides reasonable documentary evidence of such Expenses and provides a written undertaking by the indemnified Person to repay any and all advanced Expenses in the event such indemnified Person is ultimately determined to not be entitled to indemnification by the Partnership.

(c)      To the extent that, at law or in equity, an Indemnified Person has duties (including fiduciary duties) and liabilities relating thereto to the Partnership or to the Partners, any Indemnified Person acting in connection with the Partnership's business or affairs shall not be liable to the Partnership or to any Partner for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement and any other written agreements to which the Partnership and a Partner are parties, to the extent that they establish the duties and liabilities of an Indemnified Person, are agreed by the Partners to replace such duties and liabilities of such Indemnified Person that would otherwise exist at law or in equity.

(d)      The General Partner and its Affiliates shall not be denied indemnification or exculpation in whole or in part under this Section 8.7 because the General Partner or its Affiliates had an interest in the transaction with respect to which the indemnification or exculpation applies if the transaction was otherwise permitted by the terms of this Agreement.

(e)     The Partnership may enter into agreements with the General Partner or any indemnified person to provide for indemnification consistent with the terms and conditions set forth in this Section. The Partnership may purchase and maintain general partner, director and officer liability insurance on behalf of the General Partner at appropriate levels of coverage as determined by the General Partner.  The rights granted pursuant to this Section 8.7 shall be deemed contract rights, and no amendment, modification or repeal of this Section 8.7 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings, appeals, inquiries or investigations arising prior to any amendment, modification or repeal.    It is expressly acknowledged that the indemnification provided in this Section 8.7 could involve indemnification for negligence or under theories of strict liability, but shall not involve any indemnification of the General Partner or its Affiliates for any matter determined to constitute gross negligence, or willful misconduct, or fraud, on the part of the General Partner.

## ARTICLE 9
## ASSIGNMENTS AND TRANSFERS OF UNITS

9.1     Transfer or Assignment of Unit

A Unit may be transferred or assigned by a Partner or such Partner's agent duly authorized in writing only with the consent of the General Partner.  The transferor and transferee of a Unit must comply with applicable securities Laws in connection with the transfer and the transferor, or his duly authorized agent, shall:

(a)     deliver, or cause to be delivered, to the General Partner and the Registrar and Transfer Agent a duly completed transfer document substantially in the form attached as **Exhibit C** (or such other form as the General Partner may require), completed and executed by the Partner or his agent, as well as such other documents required in such transfer form or required by the General Partner or the Registrar and Transfer Agent;

(b)     if the transfer is being made to a Person other than the Partnership, if required by the General Partner, deliver, or cause to be delivered, to the General Partner and the Registrar and Transfer Agent an opinion of counsel (both the opinion and the counsel being reasonably satisfactory to the General Partner) to the effect that registration for such transfer is not required under the Securities Act of 1933, as amended, and applicable state securities Laws;

(c)     cause the transferee or assignee to deliver to the Registrar and Transfer Agent a duly completed declaration substantially in the form attached as **Exhibit D**; and

(d)     cause the transferee or assignee to pay the reasonable fees and expenses of the Registrar and Transfer Agent for the transfer or assignment, which shall include a non-refundable transfer processing fee of $50.00, which may be retained by the General Partner regardless of whether the transfer is approved, unless the General Partner in its sole discretion agrees to pay the fees and expenses;

and satisfy such other requirements as are reasonably imposed by the General Partner.  The General Partner may waive any of the requirements of this Section 9.1 in its reasonable discretion.

If the transferee or assignee is permitted under this Agreement to become a Limited Partner, the General Partner is authorized to admit the transferee or assignee to the Partnership as a Limited Partner and the Partners hereby consent to the admission of the transferee or assignee to the Partnership as a Partner without further act of the Partners.

If the transferor or assignor of a Unit is not a natural person, or purports to assign such Unit in any representative capacity, or if a transfer or assignment results from the death, mental incapacity or bankruptcy of a Partner or is otherwise involuntary, the assignor or his legal representative shall furnish to the General Partner and the Registrar and Transfer Agent such documents, certificates, assurances, court orders and other materials as the General Partner and the Registrar and Transfer Agent may reasonably require to cause the transfer or assignment to be effected.

The Registrar and Transfer Agent will

(a)    record in the Register and on **Exhibit A** any assignment or transfer made under this Agreement; and

(b)    forward notice of such assignment or transfer to the transferee.

9.2        Rejection of Transfer

Notwithstanding Section 9.1, the General Partner has the right, in its sole and absolute discretion, to reject any transfer.  The General Partner is required under the Securities Act and this Agreement to refuse to register any transfer of the securities not made pursuant to registration under the Securities Act or pursuant to an available exemption from registration.

9.3        Ongoing Obligation of Partner

No transfer or assignment of a Unit made under the foregoing provisions of this Article shall relieve the Partner of any obligation that has accrued or was incurred before the effective date of the transfer or assignment.

9.4        Transferees or Assignees Who Are Not Substituted Partners

A transferee or assignee of a Unit or a Person who has become entitled to a Unit by operation of Law who has not complied with Section 9.1 shall not be admitted as a Partner of the Partnership, shall have no voting rights, no right to access or be provided with any information concerning the affairs of the Partnership and shall only have a right to receive distributions and allocations of profit and loss as accorded to such transferees or assignees under the Act.  For the purpose of this Agreement, references in to a Partner in Article 5 shall be deemed to apply to a Person holding Units who is not admitted as a Partner to the extent such Person is entitled to economic rights with respect to such Units pursuant to the Act.

9.5        Parties Not Bound to See to Trust or Equity

Neither the Registrar and Transfer Agent nor the General Partner shall be bound to see to the execution of any trust (whether express, implied or constructive), charge, pledge, or equity to which any Unit or any interest under this Agreement is subject, nor to ascertain or inquire whether any sale or assignment of any Unit or any interest under this Agreement by any Partner is authorized by such trust, charge, pledge or equity, nor to recognize any Person as having any interest in any Unit, except for the Person recorded on the Register as the holder of such Unit.  The Partnership, the General Partner and the Registrar and Transfer Agent shall be entitled to treat the Person in whose name any Unit is registered as the absolute owner for all purposes.  The receipt by any Person in whose name a Unit is recorded on the Register shall be a sufficient discharge for all monies, securities and other property payable, issuable or deliverable for such Unit and from all liability therefor.

9.6        Effective Date of Transfer or Assignment

A transfer or assignment of a Unit shall be deemed to take effect on the date that the Register is amended to include the assignee as a Partner for such transfer or assignment.

9.7        Compulsory Transfer or Acquisition of Units

(a)    If it shall come to the attention of the General Partner that any Units are or may be owned or held directly or beneficially by any Person whose holding or continued holding of those Units (whether on its own or in conjunction with any other circumstance appearing to the General Partner to be relevant) might in the sole and conclusive determination of the General Partner be likely to cause an Adverse Effect, the General Partner may serve a notice (a "*Transfer Notice*") upon the Person (or any one of such Persons where Units are registered in joint names) appearing in the Register of Partners as the holder (the "*Vendor*") of the Unit, the Units or any of the Units concerned (the "*Relevant Units*") requiring the Vendor within 21 calendar days (or such extended time as in all the circumstances the General Partner shall consider reasonable) to transfer (and/or procure the disposal of interests in) the Relevant Units to another Person whose holding of the Relevant Units, in the sole and conclusive determination of the General Partner, would not be likely to cause an Adverse Effect (such Person, an "*Eligible Transferee*").  On and after the date of the Transfer Notice, and until registration of a transfer of the Relevant Units to which it relates under the provisions of this Section 9.7(a) or Section 9.7(b)

23

below, the rights and privileges attaching to the Relevant Units shall be suspended and not capable of exercise.

(b)    If within 21 calendar days after the giving of a Transfer Notice (or such extended time as in the circumstances the General Partner shall consider reasonable) the Transfer Notice has not been complied with to the satisfaction of the General Partner, the General Partner may arrange for the Partnership to sell the Relevant Units at the best price reasonably obtainable to any Eligible Transferee or Transferees, or the General Partner may arrange for the Partnership to compulsorily reacquire some or all of the Relevant Units for the price per Unit paid by the Vendor without interest.  For the sale of Relevant Units by the General Partner on the Vendor's behalf:

(i)    the General Partner may execute or cause to be executed on behalf of the Vendor a transfer of the Relevant Units to an Eligible Transferee;

(ii)    the net proceeds of the sale shall be received by the Partnership whose receipt shall be a good discharge for the purchase money and shall be paid over by the Partnership to the Vendor (less any amounts required to be withheld under the provisions of the Code or any other similar legislation of any state); and

(iii)    the Partnership may register the transferee or transferees as holder or holders of the Relevant Units and thereupon the transferee or transferees shall become the absolute and sole owner of the Relevant Units.

(c)    A Person who becomes aware that his holding, directly or beneficially, of the Units will, or is likely to, cause an Adverse Effect, and who has not already received a Transfer Notice under Section 9.7(a) above, shall immediately either transfer the Units to an Eligible Transferee or Transferees or give a request in writing to the General Partner for the issue of a Transfer Notice under Section 9.7(a) above.

(d)    Subject to the provisions of this Agreement, the General Partner shall be entitled to assume without inquiry that none of the Units are held in such a way as to entitle the General Partner to serve a Transfer Notice in respect of the Units, unless it has reason to believe otherwise.  However, the General Partner may call upon any holder (or any one of joint holders) of the Units by notice in writing to provide such information and evidence as it shall require upon any matter connected with or in relation to such holder or joint holders of the Units.  If such information and evidence is not provided within such reasonable period (being not less than 21 calendar days after service of the notice requiring the same) as may be specified by the General Partner in the notice, the General Partner may, in its absolute discretion, treat any Unit held by such a holder or joint holders as being held in such a way as to entitle the General Partner to serve a Transfer Notice for the Unit.

(e)    The General Partner shall not be required to give any reasons for any decision, determination or declaration taken or made under this Section 9.7.  The exercise of the powers conferred by this Section 9.7 shall not be questioned or invalidated in any case on the ground that there was insufficient evidence of direct or beneficial ownership of the Units by any Person or that the true direct or beneficial owner of any Units was otherwise than appeared to the General Partner at the relevant date provided that such powers shall have been exercised in good faith.  The General Partner shall exercise its powers under this Section 9.7 in the manner it determines most equitable to the Partners.

9.8    Drag-Along

(a)    In this Section 9.8:

(i)    "*Dissenting Partner*" means a Class A Partner who does not accept an Offer referred to in Section 9.8(b) and includes any transferee or assignee of the Unit

24

of a Partner to whom such an Offer is made, whether or not such transferee or assignee is recognized under this Agreement;

(ii) "*Offer*" means a bona fide offer to acquire, or a bona fide acceptance of an offer to sell, all of the outstanding Class A Units (other than the Offeror's Class A Units);

(iii) "*Offeror*" means a Person, or two or more Persons acting jointly or in concert, who make an Offer;

(iv) "*Offeror's Notice*" means the notice described in Section 9.8(c); and

(v) "*Offeror's Units*" means Class A Units beneficially owned, or over which control or direction is exercised, on the date of an Offer by the Offeror, any Affiliate of the Offeror or any Person or company acting jointly or in concert with the Offeror.

(b) If an Offer is made and

(i) within the time provided in the Offer for its acceptance by Class A Partners (excluding the Offeror) or within 120 days after the date the Offer is made, whichever is shorter, the Offer is accepted by Class A Partners (excluding the Offeror) representing at least 66⅔% of the outstanding Class A Units held by the Class A Partners other than the Offeror;

(ii) the Offeror is irrevocably bound to take up and pay for, or has taken up and paid for, the Class A Units of the Class A Partners who accepted the Offer; and

(iii) the Offeror complies with Sections 9.8(c) and 9.8(e);

the Offeror is entitled to acquire, and the Dissenting Partners are required to sell to the Offeror, the Class A Units held by the Dissenting Partners for the same consideration per Class A Unit payable or paid, as the case may be, under the Offer.

(c) Where an Offeror is entitled to acquire Class A Units held by Dissenting Partners under Section 9.8(b), and the Offeror wishes to exercise such right, the Offeror shall send by registered mail within 30 days after the date of acceptance of the Offer by Class A Partners (excluding the Offeror) a notice (the "**Offeror's Notice**") to each Dissenting Partner stating that:

(i) Class A Partners holding at least 66⅔% of the outstanding Class A Units, other than the Offeror's Class A Units, have accepted the Offer;

(ii) the Offeror is bound to take up and pay for, or has taken up and paid for, the Class A Units of the Class A Partners who accepted the Offer;

(iii) Dissenting Partners must transfer their respective Class A Units to the Offeror on the terms on which the Offeror acquired the Class A Units of the Class A Partners who accepted the Offer within 21 days after the date of the sending of the Offeror's Notice; and

(iv) Dissenting Partners must send a duly executed transfer form or other evidence satisfactory to the General Partner of the transfer of the Dissenting Partner's Class A Units to the Offeror.

(d) A Dissenting Partner to whom an Offeror's Notice is sent under Section 9.8(c) shall, within 21 days after the sending of the Offeror's Notice, send a duly executed transfer form or other evidence satisfactory to the General Partner of the transfer of the Dissenting Partner's Class A Units to the Offeror.

(e) Within 21 days after the Offeror sends an Offeror's Notice under Section 9.8(c), the Offeror shall pay or transfer to the Registrar and Transfer Agent, or to such other Person as the Registrar and Transfer Agent may direct, the cash or other consideration that is payable to Dissenting Partners under Section 9.8(b).

25

(f)     The Registrar and Transfer Agent, or the Person directed by the Registrar and Transfer Agent, shall hold in trust for the Dissenting Partners the cash or other consideration it receives under Section 9.8(e). The Registrar and Transfer Agent, or such Person, shall deposit cash in a separate interest bearing account in a bank that is insured by the Federal Deposit Insurance Corporation, and shall place the other consideration in the custody of such bank for safekeeping.

(g)     Within 30 days after the date of the sending of an Offeror's Notice under Section 9.8(c), the Registrar and Transfer Agent, if the Offeror has complied with Section 9.8(e), shall:

    (i)     do all acts and things and execute and cause to be executed all instruments as in the Registrar and Transfer Agent's opinion may be necessary or desirable to cause the transfer of the Class A Units of the Dissenting Partners to the Offeror,

    (ii)     send to each Dissenting Partner who has complied with Section 9.8(d) the consideration to which such Dissenting Partner is entitled under this Section 9.8, and

    (iii)     send to each Dissenting Partner who has not complied with Section 9.8(d) a notice stating that:

        (i)     his Class A Units have been transferred to the Offeror;

        (ii)     the Registrar and Transfer Agent or some other Person designated in such notice is holding in trust the consideration for such Class A Units; and

        (iii)     the Registrar and Transfer Agent, or such other Person, will send the consideration to such Dissenting Partner as soon as practicable after receiving such Dissenting Partner's documents as the Registrar and Transfer Agent, or such other Person may require.

The Registrar and Transfer Agent is hereby appointed the agent and attorney of the Dissenting Partners for the purposes of giving effect to the foregoing provisions.

(h)     Any Partner receiving an Offer shall promptly notify the General Partner of such Offer and shall provide to the General Partner copies of any written materials relating to such Offer as have been provided to the Partner (provided that the Partner is not precluded from doing so under the terms of a confidentiality or similar agreement relating to the Offer).

9.9     Effect of Bankruptcy, Death, Incompetence or Termination of a Limited Partner.

The occurrence of an Event of Bankruptcy as to a Limited Partner, the death of a Limited Partner or a final adjudication that a Limited Partner is incompetent (which term shall include, but not be limited to, insanity) shall not cause the termination or dissolution of the Partnership, and the business of the Partnership shall continue. If an order for relief in a bankruptcy proceeding is entered against a Limited Partner, the trustee or receiver of his estate or, if he dies, his executor, administrator or trustee, or, if he is finally adjudicated incompetent, his committee, guardian or conservator, shall have the rights of such Limited Partner for the purpose of settling or managing his estate property and such power as the bankrupt, deceased or incompetent Limited Partner possessed to assign all or any part of his Partnership interest and to join with the assignee in satisfying conditions precedent to the admission of the assignee as a substitute Limited Partner.

9.10     Withdrawal of Limited Partner

No Limited Partner may withdraw from the Partnership other than as a result of a transfer or assignment of all of such Limited Partner's Units pursuant to this Article 9. Upon the permitted transfer or assignment of all of a Limited Partner's Units, such Limited Partner shall cease to be a Limited Partner.

<div align="center">

**ARTICLE 10**
**TERM**

</div>

The Partnership will continue until the occurrence of any event described in Section 11.1 and the completion of the liquidation of the Partnership and the distribution of all funds remaining after payment of all of the

<div align="center">26</div>

debts, liabilities and obligations of the Partnership to its creditors, under the provisions of this Agreement and upon compliance with the requirements of the Act and any other applicable Laws.

## ARTICLE 11
## DISSOLUTION AND TERMINATION

11.1        Events of Dissolution

The Partnership shall dissolve upon the occurrence of any of the following events:

(a)        the authorization by the General Partner and by Extraordinary Action of the dissolution of the Partnership;

(b)        at the discretion of the General Partner if the Partnership no longer holds any portion of the Interests;

(c)        the occurrence of an event that makes it unlawful for the affairs of the Partnership to be carried on; or

(d)        the entry of a decree of judicial dissolution under Section 17-802 of the Act

and, in any case, after the completion of the liquidation of the Partnership and distribution to the Partners of all assets of the Partnership remaining after payment of all debts, liabilities and obligations of the Partnership to its creditors.

11.2        Winding Up

Upon dissolution of the Partnership, the General Partner (unless the General Partner is unable or unwilling to act, in which event the Class A Partners shall, by Ordinary Action, select another Person to succeed to the General Partner's powers and obligations set forth in this Article 11) shall proceed diligently to wind up the affairs of the Partnership and distribute the assets of the Partnership under Section 11.3. The General Partner shall be paid its reasonable fees and disbursements in carrying out its obligations in winding up the Partnership. Allocations and distributions shall continue to be made during the period of winding up in the same manner as before dissolution. The General Partner shall have full right and unlimited discretion to determine the time, manner and terms of any sale of Partnership assets in connection with winding up the Partnership's affairs, having due regard to the activity and condition of the relevant market and general financial and economic conditions. The General Partner is hereby authorized to do any and all acts and things authorized by Law for these purposes.

11.3        Distribution of Assets on Dissolution

The General Partner shall settle the Partnership accounts as expeditiously as possible and, in the following order, shall:

(a)        sell and liquidate the assets of the Partnership necessary to pay or compromise the liabilities of the Partnership, including those arising under the Funding Agreement;

(b)        sell and liquidate the remaining assets of the Partnership or retain them to distribute in-kind in the General Partner's discretion;

(c)        pay or compromise the liabilities of the Partnership, including those arising under the Funding Agreement;

(d)        retain a cash reserve fund for contingent liabilities, in an amount determined by the General Partner in its sole discretion to be appropriate, to be held for such period as the General Partner regards as reasonable and then to be distributed under Sections 11.3(e) and 11.3(f) below;

(e)        pay the General Partner the amount of any costs, expenses or other amounts which the General Partner is entitled to receive from the Partnership; and

(f)        distribute the remaining assets, including proceeds of sale, to the Partners in accordance with Section 5.6(a).

11.4        Reports

Within a reasonable time following the completion of the winding up of the Partnership's affairs and the liquidation of the Partnership's assets, the General Partner shall forward to each Limited Partner an audited statement for the assets and liabilities of the Partnership as of the date of the completion of the liquidation, and each Partner's share of the distributions under Section 11.3.

11.5       No Other Right; No Recourse to General Partner

(a)       No Partner shall have any right to demand or receive property, other than cash, or other than as otherwise contemplated by the terms of this Agreement, upon dissolution of the Partnership.

(b)       Upon dissolution and winding up of the Partnership under the Act, each Partner shall look solely to the assets of the Partnership and Limited Partners shall have no recourse against the General Partner or any other Partner.

11.6       Final Filing

Upon completion of the liquidation of the Partnership and the distribution of all Partnership assets, the Partnership shall dissolve and terminate and the General Partner shall execute and file such documents as are required to effect the dissolution and termination of the Partnership.

## ARTICLE 12
## REPRESENTATIONS

12.1       Status of General Partner

The General Partner represents and warrants and covenants to each Partner that:

(a)       it is and will continue to be a corporation duly incorporated under the Laws of the State of Delaware,

(b)       it is or will become registered, and will maintain such registration, to do business, and has or will acquire all requisite licenses and permits to carry on the affairs of the Partnership, in all jurisdictions in which the Partnership's activities render such registration, license or permit necessary, and

(c)       it has the capacity and corporate authority to act as General Partner, and the performance of its obligations under this Agreement as General Partner do not and will not conflict with or breach its charter documents, by-laws, or any agreement by which it is bound.

12.2       Status of Each Limited Partner

Each Limited Partner represents and warrants and covenants to each other Partner and to the General Partner that such Partner:

(a)       if a corporation, is a valid and subsisting corporation, has the necessary corporate capacity and authority to execute and deliver this Agreement and to observe and perform its covenants and obligations under this Agreement, and has taken all necessary corporate action in respect thereof, or, if a partnership, trust, syndicate or other form of unincorporated organization, has the necessary legal capacity and authority to execute and deliver this Agreement and to observe and perform its covenants and obligations under this Agreement, has obtained all necessary approvals in respect thereof, and has purchased the Units as principal for its own account;

(b)       if an individual, is at least 18 years of age and has the legal capacity and competence to execute this Agreement and take all action under this Agreement, and that it has purchased the Units as principal for its own account;

(c)       such Partner (1) is an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act or (2) either (A) is not a "U.S. person" within the meaning of Regulation S under the Securities Act and is not acquiring the Units for the account or benefit of any U.S. person or (B) is a U.S. person who purchased the Units in a transaction that did not require registration under the Securities Act (such Limited Partners, **"Regulation S Investors"**);

28

(d)     such Partner has received and read the Private Placement Memorandum;

(e)     the execution and delivery of this Agreement by such Partner, the consummation of the transactions contemplated hereby and the performance of such Partner's obligations under this Agreement will not conflict with, or result in any violation of or default under, any provision of any governing instrument applicable to such Partner, or any agreement or other instrument to which such Partner is a party or by which such Partner or any of its properties are bound, or any Law applicable to such Partner;

(f)     such Partner understands that the Units have not been, and will not be, registered under the Securities Act or any state or foreign securities Laws, and are being offered and sold in the United States in reliance upon federal and state exemptions from registration requirements for transactions not involving any public offering.  Such Partner understands that the Units are being offered and sold outside of the United States in reliance on federal exemptions from registration requirements available pursuant to Regulation S under the Securities Act. Such Partner recognizes that reliance upon such exemptions is based in part upon the representations of such Partner contained herein. Such Partner represents and warrants that the Units will be acquired by the Partner solely for the account of such Partner, for investment purposes only and not with a view to the distribution thereof;

(g)     such Partner represents and warrants that such Partner (i) is a sophisticated investor with such knowledge and experience in business and financial matters as will enable such Partner to evaluate the merits and risks of investment in the Partnership, (ii) is able to bear the economic risk and lack of liquidity of an investment in the Partnership and (iii) is able to bear the risk of loss of its entire investment in the Partnership;

(h)     such Partner recognizes that (i) an investment in the Partnership involves certain risks, (ii) the Units will be subject to certain restrictions on transferability as described in this Agreement and (iii) as a result of the foregoing, the marketability of the Units will be severely limited;

(i)     unless such Partner is a Regulation S Investor, such Partner confirms that it is not subscribing for any Unit as a result of any form of general solicitation or general advertising, including (i) any advertisement, article, notice or other communications published in any newspaper, magazine or similar media (including any internet site that is not password protected) or broadcast over television or radio or (ii) any seminar or meeting whose attendees were invited by any general solicitation or general advertising;

(j)     if a natural person (or an entity that is an "alter ego" of a natural person (e.g., a revocable grantor trust, an IRA or an estate planning vehicle)), such Partner has received and read a copy of the initial privacy notice in connection with the General Partner's collection and maintenance of non-public personal information with respect to such Partner, and such Partner hereby requests and agrees, to the extent permitted by applicable law, that the General Partner shall refrain from sending to such Partner an annual privacy notice, as contemplated by 16 CAR Part 313, §313.5 (the United States Federal Trade Commission's Final Rules regarding the Privacy of Consumer Financial Information);

(k)     such Partner acknowledges that the Partnership seeks to comply with all applicable anti-money laundering laws and regulations. In furtherance of these efforts, the Partner represents, warrants and agrees that to the best of its knowledge after reasonable inquiry: (i) no part of the funds used by such Partner to acquire the Units or to satisfy its capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene U.S. federal or state or non-U.S. laws or regulations, including anti-money laundering laws and regulations and (ii) no capital commitment, contribution or payment to the Partnership by the Partner and no distribution to such Partner shall cause the Partnership or the General Partner to be in violation of any applicable anti-money laundering laws or regulations including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools

Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. Such Partner acknowledges and agrees that, notwithstanding anything to the contrary contained in this Agreement, any side letter or any other agreement, to the extent required by any anti-money laundering law or regulation, the Partnership and the General Partner may prohibit capital contributions, restrict distributions or take any other reasonably necessary or advisable action with respect to the Units, and such Partner shall have no claim, and shall not pursue any claim, against the Partnership, the General Partner or any other Person in connection therewith;

(l)     will promptly provide such evidence of the foregoing as the General Partner may request from time to time;

(m)     Each Partner covenants that:

(i)     such Partner will ensure that such Partner's status as described in this <u>Section 12.2</u> will not be modified, that such Partner will provide written confirmation of such status to the General Partner upon request and that such Partner will not transfer such Partner's Units in whole or in part to a Person in respect of which the representations and warranties set forth in <u>Section 12.2</u> would be untrue; and

(ii)     such Partner will immediately notify the General Partner in writing if such Partner fails to comply with the covenants in this <u>Section 12.2(m)</u>.

12.3        Survival of Representations

The representations contained in this Article shall survive execution of this Agreement and each party is obligated to ensure the continuing accuracy of each representation made by it throughout the term of the Partnership.

## ARTICLE 13
## CHANGE OF GENERAL PARTNER

13.1        Removal or Withdrawal of General Partner

The General Partner will continue as General Partner of the Partnership until termination of the Partnership unless the General Partner is removed or withdraws under this Agreement.  The General Partner shall not transfer all or any portion of its Units or withdraw as General Partner except as provided in this Article 13.

13.2        Admission of Substitute General Partner

A Person shall be admitted as a substitute General Partner of the Partnership only if the following terms and conditions are satisfied:

(a)     the Person to be admitted as a substitute General Partner shall have accepted and agreed to be bound by all the terms and provisions of this Agreement by executing a counterpart hereof and such other documents or instruments as may be required or appropriate in order to effect the admission of such Person as a General Partner, a certificate evidencing the admission of such Person as a General Partner shall have been filed for recordation and all other actions required by <u>Section 2.4</u> hereof in connection with such admission shall have been performed;

(b)     the Person to be admitted as a substitute General Partner shall pay to the departing General Partner the amount of any costs, expenses or other amounts owed by the Partnership to the departing General Partner and such other amounts to which the departing General Partner is entitled to reimbursement under this Agreement or any other agreement with the Partnership to which the departing General Partner is a party, whether, for such latter agreements, the departing General Partner is entitled to such reimbursement by the Partnership or by a third party and otherwise;

(c)     if the Person to be admitted as a substitute General Partner is a corporation or a partnership, it shall have provided the Partnership with evidence satisfactory to counsel

30

for the Partnership of such Person's authority to become a General Partner and to be bound by the terms and provisions of this Agreement; and

(d)     counsel for the Partnership shall have rendered an opinion (relying on such opinions from other counsel in the state or any other jurisdiction as may be necessary) that the admission of the Person to be admitted as a substitute General Partner is in conformity with the Act, and that none of the actions taken in connection with the admission of such Person as a substitute General Partner will cause (i) the Partnership to be classified other than as a partnership for federal income tax purposes, or (ii) the loss of any Limited Partner's limited liability.

13.3     Effect of Bankruptcy, Withdrawal, Death or Dissolution of a General Partner.

(a)     Upon the occurrence of an Event of Bankruptcy as to a General Partner (and its removal pursuant to Section 13.5(a) hereof) or the death, withdrawal, removal or dissolution of a General Partner (except that, if a General Partner is, on the date of such occurrence a partnership, the withdrawal, death, dissolution, Event of Bankruptcy as to, or removal of a partner in, such partnership shall be deemed not to be a dissolution of such General Partner if the business of such General Partner is continued by the remaining partner or partners thereof), the Partnership shall be dissolved and terminated unless the Partnership is continued pursuant to Section 13.3(b) hereof.

(b)     Following the occurrence of an Event of Bankruptcy as to a General Partner (and its removal pursuant to Section 13.5(a) hereof) or the death, withdrawal, removal or dissolution of a General Partner (except that, if a General Partner is, on the date of such occurrence a partnership, the withdrawal, death, dissolution, Event of Bankruptcy as to, or removal of a partner in, such partnership shall be deemed not to be a dissolution of such General Partner if the business of such General Partner is continued by the remaining partner or partners thereof), the Limited Partners, within 90 days after such occurrence, may elect to continue the business of the Partnership for the balance of the term specified in Article 10 hereof by selecting, subject to Section 13.2 hereof and any other provisions of this Agreement, a substitute General Partner by Ordinary Action. If the Limited Partners elect to continue the business of the Partnership and admit a substitute General Partner, the relationship with the Limited Partners and of any Person who has acquired an interest of a Partner in the Partnership shall be governed by this Agreement.

13.4     Withdrawal

The General Partner may not withdraw from the Partnership as such unless it has given at least 180 days' written notice to the Limited Partners of such intention and nominates a qualified successor whose appointment is approved as an Ordinary Action, who accepts such position within such period and who is admitted as a substitute General Partner pursuant to Section 13.2 within such period.

13.5     Removal of General Partner

(a)     Upon the occurrence of an Event of Bankruptcy as to, or the dissolution of, a General Partner, such General Partner shall be deemed to be removed automatically; provided, however, that if a General Partner is on the date of such occurrence a partnership, the withdrawal, death, dissolution, Event of Bankruptcy as to or removal of a partner in such partnership shall be deemed not to be a dissolution of the General Partner if the business of such General Partner is continued by the remaining partner or partners thereof.

(b)     The General Partner may be removed as general partner of the Partnership at any time by an Extraordinary Action of the Partners, but only for Cause. In addition, the General Partner may only be removed under this Section 13.5(b) if the resolution removing the General Partner also appoints a new general partner as successor, and the General Partner may not be removed until such new general partner is admitted as a substitute General Partner pursuant to Section 13.2.

31

(c)     Regardless of their status as Partners or their ownership of Units, the General Partner, its Affiliates, and their directors and officers, shall not be entitled to vote on the removal of the General Partner as general partner of the Partnership when the General Partner is in default of a material obligation of the General Partner contained in this Agreement and such default has continued for at least 60 days following receipt of notice from any Partner requiring the General Partner to remedy such default.

13.6        Release and Indemnification upon Removal or Withdrawal; Use of Walton Name

Upon the removal or withdrawal of the General Partner, the Partnership shall release and indemnify and hold harmless, and the Limited Partners shall release, the General Partner, its Affiliates and their respective managers, officers, directors, members, partners, shareholders and employees, from any and all Losses incurred by the General Partner or the Partnership in connection with the Partnership's activities or otherwise as a result of or arising out of events occurring after such resignation or removal other than those caused by or deriving from any grossly negligent or fraudulent act or willful misconduct of the General Partner. Upon the removal or withdrawal of the General Partner, the Partnership shall promptly cease using the name "Walton" or any variant thereof.

13.7        Conversion to Limited Partner

If the General Partner is withdraws or is removed pursuant to this Article 13 but continues to own Units, it will be deemed a Limited Partner subject to all the provisions applicable to Limited Partners under this Agreement.

**ARTICLE 14**
**MEETINGS**

14.1        Meetings

(a)     The General Partner may convene meetings of the Partners at any time and, upon the written request of one or more Limited Partners holding at least 33⅓% of the number of all issued and outstanding Class A Units (the "**Requesting Partners**"), will convene a meeting of the Partners. If the General Partner fails to call such a meeting within 60 days of receipt of written request of the Requesting Partners, then any Requesting Partners may convene such meeting by giving written notice to the General Partner and the Limited Partners in accordance with this Agreement, signed by such Person or Persons as the Requesting Partners specify. Every meeting, however convened, will be conducted under the terms of this Agreement. There is no requirement to hold annual general meetings. However, the General Partner may in its discretion call periodic information meetings from time to time to advise the Limited Partners as to the status of the Properties and the Partnership's affairs.

(b)     Excluding the ability of the Partners to remove and/or replace the General Partner pursuant to Section 13, notwithstanding anything to the contrary in this Agreement, Partners may not, without the consent of the General Partner which may be withheld in its sole discretion, make any amendment to this Agreement or cause the Partnership to take any action, including but not limited to:

(i)     a sale, transfer or encumbrance of all or a portion of the Interests or any other assets of the Partnership, unless otherwise required under the Co-Ownership Agreement; or

(ii)     a merger, consolidation or other business combination of the Partnership, dissolution of the Partnership, or other event that would result in the termination of the existence or operations of the Partnership.

14.2        Place of Meeting

Every meeting of Partners will be held at such place inside or outside of the State of Delaware as the General Partner or, with the consent of the General Partner the Limiting Partner calling the meeting may determine.

32

14.3        Notice of Meeting

All notices of meetings of Partners will be given to Limited Partners at least 21 and not more than 60 days before the meeting.  Such notice shall be directed to each Partner at his address as it appears on the Register of the Partnership and will specify the time, date and place where the meeting is to be held and will specify, in reasonable detail, all matters that are to be the subject of a vote at such meeting and provide sufficient information to enable Limited Partners to make a reasoned judgment on all such matters.  It will not be necessary for any such notice to set out the exact text of any resolution proposed to be passed at the meeting, provided that the subject matter of any such resolution is fairly set out in the notice or a schedule to the notice.

14.4        Chairman

The President of the General Partner, or in his absence any officer of the General Partner, shall be the chairman of all meetings.  If no such Person is present or all such persons refuse to act, those Partners present in person or represented by proxy at the meeting shall, as an Ordinary Action, choose some other Person present to be chairman.

14.5        Quorum

Subject to the provisions of Section 14.7, a quorum at any meeting of the Partners shall consist of not less than two Persons present in person and holding or representing by proxy at least thirty-three and one-third percent (33 1/3 %) of the aggregate number of outstanding Class A Units entitled to vote at the meeting.

14.6        Consents Without Meeting

Any action required or permitted to be taken at any annual or special meeting of Partners may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding Units having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voted and shall be delivered to the Partnership at its principal place of business.  Delivery made to the principal place of business of the Partnership shall be by hand or by certified or registered mail, return receipt requested.  Every written consent shall bear the date of signature of each Partner who signs the consent and no written consent shall be effective to take action unless, within sixty days of the earliest dated consent delivered in the manner required by this Section 14.6 to the Partnership, written consents signed by a sufficient number of holders to take action are delivered to the Partnership by delivery to its principal place of business.  The General Partner shall give prompt notice of the taking of such action without a meeting by less than unanimous written consent to those Limited Partners who have not so consented in writing.  Any such written consents may be used in conjunction with votes given at a meeting of Partners or without a meeting of Partners.

14.7        Adjournment

If a quorum referred to in Section 14.5 is not present within 30 minutes from the time fixed for holding any meeting, the meeting may be adjourned from time to time by the chairman of the meeting, without notice other than announcement at the meeting, until a quorum shall be present or represented.  At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified.

14.8        Voting

Except as otherwise required by statute or this Agreement, at every meeting of Partners each Class A Partner of the Partnership entitled to vote at such meeting shall have one vote for each Class A Unit held by him and registered in his name on the books of the Partnership at the record date fixed or otherwise determined for such meeting.  The Class B Partner shall not be entitled to vote at any meeting of Partners except with respect to any Class A Units held by the Class B Partner.

14.9        Record Date

For determining those Partners who are entitled to attend, and vote or act at, any meeting or any adjournment of any meeting, or for any other action, the General Partner or Requesting Partners calling the meeting, as the case may be, shall fix a date not less than 21 or more than 60 days before the date of any meeting of Partners as a record date for determining those Limited Partners entitled to vote at the meeting or any adjournment.  The Persons so determined shall be the Persons deemed to be entitled, except to the extent that a Partner has transferred

any of his Units after the record date and the transferee of the Units: (i) produces properly executed transfer forms or otherwise establishes to the satisfaction of the General Partner that he is the owner of the Units in question, and (ii) requests, not later than ten days before the meeting, or such shorter period before the meeting as the General Partner may deem to be acceptable, that the transferee's name be or be deemed to be included in the Register as at the record date, in which case the transferee shall be treated as a Partner of record for purposes of such entitlement in place of the transferor.  Notwithstanding anything under this Agreement contained, only Partners who are registered as such in the Register on the record date determined for the meeting shall have the right to attend in person or by proxy and to vote on all matters submitted to the meeting.

14.10        Proxies

A Partner may attend any meeting of Partners personally, or may be represented at the meeting by proxy if a proxy has been received by the General Partner or the chairman of the meeting for verification before the meeting.  Votes at meetings of the Partners may be cast personally or by proxy and resolutions shall be passed by a show of hands or, at the request of any Partner, by ballot.  The instrument appointing a proxy shall be in a form reasonably acceptable to the General Partner, shall be in writing executed by the appointer or his attorney duly authorized in writing, or, if the appointer is a corporation, under its seal or by an officer or attorney of the corporation duly authorized, and shall be valid only if it refers to a specific meeting, and then only at that meeting or its adjournments.  Any Person may be appointed a proxy, whether or not he is a Partner.

14.11        Validity of Proxies

A proxy purporting to be executed by or on behalf of a Partner will be considered to be valid unless challenged at the time of or before its exercise, and the Person challenging will have the burden of proving to the satisfaction of the chairman of the meeting that the proxy is invalid, and any decision of the chairman concerning the validity of a proxy will be final.

A vote cast under the terms of an instrument of proxy shall be valid notwithstanding the previous death, incapacity, insolvency, bankruptcy or insanity of the Partner giving the proxy or the revocation of the proxy, provided that no written notice of such death, incapacity, insolvency, bankruptcy, insanity or revocation shall have been received by the General Partner or chairman of the meeting before the time fixed for holding of the meeting.

14.12        Corporations

A Partner that is a corporation may appoint under seal or otherwise, an officer, director or other authorized Person as its representative to attend, vote and act on its behalf at a meeting of Partners.

14.13        Attendance of Others

Any officer or director of the General Partner, counsel to the General Partner or the Partnership and representatives of the Auditors will be entitled to attend any meeting of Partners.

The chairman of the meeting or the General Partner has the right to authorize the presence at a meeting of any Person who is not a Partner.  With the approval of the chairman of the meeting or the General Partner that Person will be entitled to address the meeting.

14.14        Rules

To the extent that the rules and procedures for the conduct of a meeting of the Partners are not prescribed in this Agreement, such rules and procedures shall be determined by the chairman of the meeting.  To the extent practicable, the procedures applicable to meetings of corporations within the meaning of the Delaware General Corporation Law shall apply to meetings of Partners, provided however the Partnership shall not be required to hold annual meetings.

14.15        Waiver of Defaults

In addition to all other powers conferred on them by this Agreement, the Partners may by Extraordinary Action:

(a)        waive any default by the General Partner of its obligations under this Agreement on such terms as they may determine and release the General Partner from any claims relating to the default; and

34

(b)     require the General Partner on behalf of the Partnership to enforce any obligation or covenant on the part of any Partner or all Partners.

14.16     Minutes

The General Partner will have minutes kept of all proceedings and resolutions at every meeting, and copies of any resolutions of the Partnership made and entered in books kept for that purpose. Any minutes, if signed by the chairman of the meeting, will be deemed to be evidence of the matters stated in them. Each meeting for which such minutes are kept will be deemed to have been duly convened and held and all resolutions and proceedings shown in them will be deemed to have been duly passed and taken.

14.17     Resolutions Binding

Any vote, consent or agreement made by Extraordinary Action or Ordinary Action of the Partners under this Agreement shall be binding on all Partners and their respective heirs, executors, administrators or other legal representatives, successors and assigns, whether or not such Partner was present or represented by proxy at the meeting at which such resolution was passed and whether or not such Partner received or signed a written copy of or voted against such resolution.

14.18     Actions Requiring Extraordinary Action

The following actions may be taken only if approved by Extraordinary Action, except as otherwise required by Law or the provisions of the Co-Ownership Agreement:

(a)     consenting to the amendment of this Agreement except as otherwise provided under this Agreement;

(b)     waiving any default by the General Partner of its obligations under this Agreement on such terms as the Partners may determine and releasing the General Partner from any claims relating to the default;

(c)     requiring the General Partner on behalf of the Partnership to enforce any obligation or covenant on the part of any Partner or all Partners (provided, however, that the General Partner may take such action on its own volition without Extraordinary Action);

(d)     removing the General Partner as general partner of the Partnership as provided in Section 13.5(b);

(e)     dissolving the Partnership as provided in Section 11.1(a);

(f)     consenting to extend the Partnership's investment activities for a Property beyond Concept Planning and participating in the physical development of one or more of the Properties;

(g)     creating or recording an Encumbrance other than a Permitted Encumbrance on or against the Properties in favor of any Person, other than (i) Encumbrances granted in favor of Walton USA under the provisions of the Funding Agreement, (ii) any Encumbrance created by Walton USA or an Affiliate with respect to its undivided interests in the Properties and (iii) any Encumbrance permitted under Section 2.9 of the Funding Agreement or Section 8.1 of the Co-Ownership Agreement;

(h)     effecting a sale, transfer or other disposition (excluding third party leases) of a portion of any Property constituting over 10%, in the aggregate, of the total acreage of the Property; provided, that decisions with respect to the sale, transfer or other disposition of Lots shall be made by the General Partner at its sole discretion;

(i)     agreeing to any compromise or arrangement by the Partnership with any creditor, or class or classes of creditors;

(j)     changing the Fiscal Year of the Partnership;

(k)     causing the Partnership to merge with or into another entity;

(l)     creating any equity security of the Partnership senior to the Class A Units;

35

(m)   amending, modifying, altering or repealing any Extraordinary Action previously taken by the Partners; and

(n)   issuing over 10,000,000 Class A Units (plus an overallotment of 0.05% or 5,000 Class A Units).

## ARTICLE 15
## AMENDMENTS

15.1   Amendments to Agreement

Subject to Section 14.1(b), this Agreement may be amended in writing if such amendment (a) is proposed to the Limited Partners by the General Partner, and (b) receives the approval of the Partners by Extraordinary Action, provided that:

(a)   this Article 15 may not be amended without the consent of the General Partner and all Partners;

(b)   this Agreement shall not be amended so as to provide for additional Capital Contributions from any Partner without the approval of such Partner;

(c)   this Agreement shall not be amended so as to adversely affect the rights, preferences, privileges, obligations or liabilities of the General Partner without the consent of the General Partner; and

(d)   this Agreement shall not be amended so as to adversely affect the rights, preferences or privileges of the Class B Partner without the consent of the Class B Partner.

15.2   Amendments In Discretion of General Partner

Notwithstanding Section 14.1 or Section 15.1, but subject to the restriction that this Agreement shall not be amended so as to adversely affect the rights, preferences or privileges of the Class B Partner without the consent of the Class B Partner, the General Partner may, without prior notice to or consent from any Partner, amend any provision of this Agreement from time to time to:

(a)   add, amend or delete provisions of this Agreement which addition, amendment or deletion is, in the opinion of counsel to the Partnership, for the protection of or otherwise to the benefit of the Class A Partners;

(b)   cure an ambiguity or to correct or supplement any provisions contained in this Agreement which, in the opinion of counsel to the Partnership, may be defective or inconsistent with any other provisions contained in this Agreement, provided the cure, correction or supplemental provision does not and will not adversely affect the interests of Class A Partners;

(c)   make such other provisions concerning matters or questions arising under this Agreement that, in the opinion of counsel to the Partnership, do not and will not adversely affect the interests of the Class A Partners;

(d)   reflect the admission of any Partner;

(e)   take any such actions as may be necessary to ensure that the Partnership will be treated as a partnership for federal income tax purposes;

(f)   reflect the proposal or adoption of regulations under Section 704(b) or 704(c) of the Code, provided that such amendment would not have a material adverse effect on the Class A Partners or the Partnership and is consistent with the principles of Section 704 of the Code;

(g)   make any amendment authorized by Section 5.12(b);

(h)   make such amendments or deletions to take into account the effect of any change in, amendment of or repeal of any applicable legislation, that in the opinion of counsel to the Partnership, do not and will not adversely affect the interests of the Class A Partners; or

36

(i)    in the event the taxation of the Class B Unit is adversely affected by any change in law, as determined by the General Partner in its sole discretion, amend the distribution and allocation provisions set forth in <u>Section 5.6</u> and such other provisions of this Agreement as the General Partner reasonably deems necessary or advisable to mitigate such effect, provided that such amendment does not materially adversely affect the economic interest of any Limited Partner.

15.3    Notice to Partners

The General Partner shall notify Limited Partners of the full details of any amendment to this Agreement within 30 days of the effective date of the amendment.

15.4    Limitation On Amendments

Notwithstanding anything to the contrary contained in this Agreement, no amendment of this Agreement shall be made if such amendment would modify the limited liability of any Partner, modify the activities of the Partnership as set forth in <u>Article 3</u>, or modify the right of a Partner to vote or grant or withhold consent for any matter as to which Partners are entitled to vote or grant or withhold consent under this Agreement.

## ARTICLE 16
## NOTICES

16.1    Addresses For Notices

The addresses for notices and other communications required or permitted to be given under this Agreement to the General Partner and Limited Partners are:

| | |
|---|---|
| General Partner: | WUSF 4 GP, LLC, c/o Walton Land Management (USA), Inc. 4800 N. Scottsdale Road, Suite 4000 Scottsdale, Arizona 85251 Attention: President |
| Limited Partners: | The mailing addresses set forth in **Exhibit A**. |

The General Partner may from time to time change its address under this Agreement by notice to the Limited Partners given in accordance with <u>Section 16.2</u>. Each Partner will advise the General Partner and the Registrar and Transfer Agent of any change in such Partner's address as then shown on the Register.

16.2    Notices

(a)    All notices, amendments, waivers, or other communications under this Agreement shall be in writing and shall be deemed to be sufficiently given if delivered personally, telecopied, sent by e-mail, sent by nationally-recognized, overnight courier or mailed by registered or certified mail (return receipt requested), postage prepaid, to the parties at the addresses set forth in <u>Section 16.1</u>.

(b)    All such notices and other communications shall be deemed to have been delivered and received (i) for personal delivery, upon receipt, (ii) for delivery by nationally-recognized, overnight courier, on the first Business Day in Phoenix, Arizona following dispatch, and (iii) for mailing, on the third Business Day in Phoenix, Arizona following such mailing. Notices delivered by telecopy or e-mail shall also be deemed delivered and received upon receipt.

## ARTICLE 17
## POWER OF ATTORNEY

Each Limited Partner hereby grants to the General Partner, its successors and assigns, a power of attorney constituting the General Partner, with full power of substitution, as the Limited Partner's true and lawful attorney and agent, with full power and authority, in the Limited Partner's name, place and stead to execute, under seal or otherwise, swear to, acknowledge, deliver, and record or file, as the case may be, as and where required:

37

(a)     this Agreement, any amendment to this Agreement, any amendment to the Certificate of Formation of the Partnership, or any other certificate or instrument that the General Partner deems necessary or appropriate to qualify, continue the qualification of, or keep in good standing, the Partnership in, or otherwise comply with the Laws of, the State of Delaware or any other jurisdiction under this Agreement in which the Partnership may carry on or be deemed to carry on activities or own property, or in which the General Partner may deem it prudent to register the Partnership, in order to maintain the limited liability of the Limited Partners or to comply with applicable Laws;

(b)     any certificate or other instrument that the General Partner deems necessary or appropriate to reflect any amendment, change or modification of the Partnership under the terms of this Agreement;

(c)     any certificate or other instrument that the General Partner deems necessary or appropriate to comply with applicable Laws;

(d)     any conveyance or other instrument that the General Partner deems necessary or appropriate to effect the sale of all or any part of the assets of the Partnership or the dissolution or termination of the Partnership under the terms of this Agreement;

(e)     any instrument required for any election, designation, application or determination relating to the Partnership under the Code or any other tax legislation;

(f)     any document that the General Partner deems necessary or appropriate to be executed or filed in connection with the activities, assets or undertaking of the Partnership or this Agreement;

(g)     any document required to be filed with any Governmental Authority in connection with the activities, assets or undertaking of the Partnership or this Agreement;

(h)     any application for any grant, incentive or credit under any federal, or state program for any activity of the Partnership;

(i)     any transfer forms or other certificate or instrument on behalf of or in the name of whomsoever as may be necessary to effect the transfer of any Unit under the terms of this Agreement and

(j)     any other document or instrument on behalf of and in the name of the Partnership or the Partner as may be deemed necessary or desirable by the General Partner to carry out fully the provisions of this Agreement or any other agreement of the Partnership under its respective terms;

and to complete, amend or modify any of the foregoing to complete any missing information or correct any clerical or other errors in the completion of any of the foregoing.

To evidence the foregoing, each Limited Partner, in making a subscription for Units or in executing an assignment or transfer of a Unit as assignee or transferee, will be deemed to have executed a power of attorney granting substantially the powers set forth above.  The power of attorney so granted is irrevocable, is coupled with an interest, will survive the death, disability, incapacity, insolvency, bankruptcy, liquidation, dissolution, winding up or other legal incapacity of a Limited Partner and will survive the assignment, to the extent of the obligations of the Limited Partner under this Agreement, by the Limited Partner of the whole or any part of the interest of the Limited Partner in the Partnership and extends to bind the heirs, executors, administrators, personal representatives, successors and assigns of the Limited Partner.  The power of attorney may be exercised by the General Partner, executing on behalf of each Limited Partner, by executing any instrument with a single signature as the general partner of the Partnership or as attorney and agent for all of the Limited Partners executing such instrument, or by such other form of execution as the General Partner may determine, and it will not be necessary for the General Partner to execute any instrument under seal notwithstanding the manner of execution of the power of attorney by the Limited Partner.  The power of attorney will not merge on the dissolution of the Partnership but will continue in full force and effect thereafter to conclude any matters pertaining to the Partnership, to the activities previously carried on by the Partnership or to the dissolution of the Partnership and the winding up of its affairs.

Each Limited Partner hereby ratifies and confirms all that the General Partner shall lawfully do or cause to be done by virtue of the foregoing power of attorney, agrees to be bound by any representation or action made or taken in good faith by the General Partner under the foregoing power of attorney under the terms of this Agreement, and waives any and all defenses that may be available to contest, negate or disaffirm any action of the General Partner taken in good faith under the power of attorney.

## ARTICLE 18
## MISCELLANEOUS

18.1    Governing Law

This Agreement and its application or interpretation shall be governed, construed and enforced exclusively by its terms and by the Law of the State of Delaware.

18.2    Date for Actions

In the event that the date on which any action is required to be taken under this Agreement by any of the parties is not a Business Day in the place where the action is required to be taken, the action shall be required to be taken on the next succeeding day that is a Business Day in such place.

18.3    Headings

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect in any way the meaning, construction or interpretation of this Agreement.

18.4    Number and Gender

In this Agreement, unless the context otherwise requires, words importing the singular include the plural and vice versa; and words importing gender include all genders.

18.5    Currency

Unless otherwise stated, all references in this Agreement to sums of money are expressed in lawful money of the United States of America.

18.6    Statutes

References in this Agreement to any statute or any sections of a statute shall include the statute as amended or substituted and any regulations or other administrative authority adopted under the statue from time to time in effect.

18.7    Provisions Severable

Each provision of this Agreement is intended to be severable. If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held illegal or invalid, the remainder of this Agreement, or the application of such provision to any Person or circumstance other than those to which it is held illegal or invalid, shall not be affected thereby.

18.8    Further Assurances

Each party to this Agreement agrees to execute and deliver such further and other documents and to perform and cause to be performed such further and other acts and things as may be necessary or expedient in order to give full force and effect to this Agreement and every part of this Agreement.

18.9    Binding Effect

Subject to the provisions regarding assignment and transfer under this Agreement contained, this Agreement shall inure to the benefit of and be binding upon its parties and their respective heirs, executors, administrators and other legal representatives, successors and assigns.

18.10    Waiver

No waiver by any party to this Agreement or any breach of, or default under, any provision of this Agreement by any party shall be construed or deemed a waiver of any breach of or default under any other provision

39

of this Agreement, and shall not preclude any party from exercising or asserting any rights under this Agreement for any future breach or default of the same provision of this Agreement.

18.11          Entire Agreement

This Agreement, and the related Subscription Agreement constitute the entire agreement between the parties for the subject matter hereof and supersede any and all prior agreements and representations, either oral or in writing, between the parties regarding the subject matter contained in this Agreement.

18.12          Counterparts; Facsimile or Electronic Signature

This Agreement may be executed in any number of counterparts with the same effect as if all its parties had signed the same document. This Agreement may also be adopted in any subscription or assignment forms or similar instruments signed by a Limited Partner or by the General Partner on his behalf, with the same effect as if such Limited Partner had executed a counterpart of this Agreement. All counterparts and adopting instruments will be construed together and will constitute one and the same agreement. This Agreement may be executed by delivery of a facsimile or electronic signature, which signature will have the same force and effect as an original signature.

18.13          Ownership and Use of Names

Each Limited Partner acknowledges that Walton USA or one of its Affiliates owns the service mark Walton for various services and that the Partnership is using the Walton mark and name on a non-exclusive, royalty-free basis in connection with its authorized activities with the permission of Walton USA. All services rendered by the Partnership under the Walton mark and name shall be rendered in a manner consistent with the high reputation heretofore developed for the Walton mark by Walton USA and its Affiliates and licensees. Each Limited Partner understands that Walton USA or one of its Affiliates may terminate the Partnership's right to use Walton at any time in the sole discretion of Walton USA or such Affiliate by giving the Partnership written notice of termination. Promptly following any such termination, the Partnership shall take all steps necessary to change its company name to one that does not include Walton or any confusingly similar term and cease all use of Walton or any term confusingly similar thereto as a service mark or otherwise.

IN WITNESS WHEREOF, each of the undersigned Partners, intending to be legally bound hereby, has duly executed this Agreement as of the day and year first above written.

**GENERAL PARTNER:**

WUSF 4 GP, LLC, a Delaware limited liability company

By:        WALTON LAND MANAGEMENT (USA), INC., a Delaware corporation, its Manager

By: _____

Name: _Matthew M. Keister_

Its: _C.O.O._

By: _____

Name: _Wayne G. Souza_

Its: _Authorized Signatory_

40

**EXHIBIT A**
**PARTNERS**

General Partner:                                                  Number of Class A Units:
WUSF 4 GP, LLC                                                   0
4800 North Scottsdale Road, Suite 4000
Scottsdale, Arizona 85251
United States of America

Name and Address of Limited Partner holding Class B Unit:         Number of Class B Units:
Walton International Group (USA), Inc. or one of its affiliates   1
4800 North Scottsdale Road, Suite 4000
Scottsdale, Arizona 85251
United States of America

Name and Address of Limited Partners holding Class A Units:       Number of Class A Units:

**[Remainder of page intentionally left blank]**

41

## EXHIBIT B
## TRANSFER FORM

The undersigned, a Class A Partner of WALTON U.S. LAND FUND 4, LP (the "*Partnership*"), hereby transfers to:

_____        _____
(Name of Transferee)                                                    (Address)

_____ Unit(s) in the Partnership registered in the undersigned's name, constitutes the above-named transferee as a substitute Limited Partner for the foregoing number of Class A Unit(s), and agrees to execute and deliver to the General Partner

(a)     any documents required in the sole opinion of the General Partner to effect a valid transfer of the Class A Unit(s),

(b)     any documents required in the sole opinion of the General Partner to comply with applicable Laws in connection with the transfer,

(c)     any documents required in the sole opinion of the General Partner as evidence that the transfer (i) is being made in compliance with exemptions from the registration requirements of the United States Securities Act of 1933, as amended, and applicable state securities Laws, (ii) either (x) is not being made to, and will not result in a Class A Unit being owned in whole or in part by, a "benefit plan investor" as that term is defined in Section 3(42) of the U.S. Employee Retirement Income Security Act of 1974, or (y) if the transfer is being made to a benefit plan investor as so defined (including an "individual retirement account," as defined in Section 408(a) of the Internal Revenue Code of 1986, as amended), the General Partner has provided its written consent to such transfer, taking into account the effect of such transfer on the Partnership's ability to avoid being deemed to hold the "plan assets" of any benefit plan investor, and (iii) if it is being made to an "individual retirement account," as defined in Section 408(a) of the Code, that such transferee qualifies as an "individual retirement account,"

(d)     any such other documents which are necessary or advisable, in the sole opinion of the General Partner, to preserve the status of the Partnership as a limited partnership; and

(e)     **a non-refundable transfer processing fee of US$50.00, payable to Walton International Group (USA), Inc.**

The undersigned ("*Transferor*") agrees that the power of attorney previously granted to the General Partner shall continue to be effective for the purpose of executing all certificates, amendments and other instruments necessary to give effect to this transfer. **Please note: All signatures below must be Medallion Signature Guaranteed.**

DATED at _____, State of _____, this _____ day of _____, 20_____.


_____        _____
Signature of Transferor                                          Signature of Joint Transferor, if any


_____        _____
Name of Transferor – Please Print                          Name of Joint Transferor, if any – Please Print


_____        _____


_____        _____
Mailing Address of Transferor                              Mailing Address of Joint Transferor, if different
**MEDALLION SIGNATURE GUARANTEED BY:**        **MEDALLION SIGNATURE GUARANTEED BY:**

42

**EXHIBIT C**
**FORM OF DECLARATION OF TRANSFEREE**

Capitalized terms used but not defined in this Declaration of Transferee (this "*Declaration*") shall have the same meanings as in the Agreement of Limited Partnership of the Partnership (defined below), as amended or supplemented from time to time (the "*Partnership Agreement*"). The undersigned transferee (the "*Transferee*") of Class A Units (the "*Units*") in Walton U.S. Land Fund 4, LP (the "*Partnership*") hereby represents, warrants and covenants to each Partner of the Partnership and to its General Partner that:

(a)  the Transferee, if a corporation, is a valid and subsisting corporation, has the necessary corporate capacity and authority to execute and deliver the Partnership Agreement and to observe and perform its covenants and obligations under the Partnership Agreement and has taken all necessary corporate action in respect thereof, or, if a partnership, trust, syndicate or other form of unincorporated organization, has the necessary legal capacity and authority to execute and deliver the Partnership Agreement and to observe and perform its covenants and obligations under the Partnership Agreement and has obtained all necessary approvals in respect thereof, and in any case that it has acquired the Units as principal for its own account,

(b)  the Transferee, if an individual, is at least 18 years old and has the legal capacity and competence to execute the Partnership Agreement and take all action under the Partnership Agreement, and that it has acquired the Units as principal for its own account,

(c)  such Transferee (1) is an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act or (2) either (A) is not a "U.S. person" within the meaning of Regulation S under the Securities Act and is not acquiring the Units for the account or benefit of any U.S. person or (B) is a U.S. person who purchased the Units in a transaction that did not require registration under the Securities Act (such Transferees, "*Regulation S Investors*");

(d)  such Transferee has received and read the private placement memorandum pursuant to which the offering of Units is made;

(e)  the execution and delivery of this Agreement by such Transferee, the consummation of the transactions contemplated hereby and the performance of such Transferee's obligations under this Agreement will not conflict with, or result in any violation of or default under, any provision of any governing instrument applicable to such Transferee, or any agreement or other instrument to which such Transferee is a party or by which such Transferee or any of its properties are bound, or any Law applicable to such Transferee;

(f)  such Transferee understands that the Units have not been, and will not be, registered under the Securities Act or any state or foreign securities Laws, and were offered and sold in the United States in reliance upon federal and state exemptions from registration requirements for transactions not involving any public offering.  Such Transferee understands that the Units were offered and sold outside of the United States in reliance on federal exemptions from registration requirements available pursuant to Regulation S under the Securities Act. Such Transferee recognizes that reliance upon such exemptions is based in part upon the representations of such Transferee contained herein. Such Transferee represents and warrants that the Units will be acquired by the Transferee solely for the account of such Transferee, for investment purposes only and not with a view to the distribution thereof;

(g)  such Transferee represents and warrants that such Transferee (i) is a sophisticated investor with such knowledge and experience in business and financial matters as will enable such Transferee to evaluate the merits and risks of investment in the Partnership, (ii) is able to bear the economic risk and lack of liquidity of an investment in the Partnership and (iii) is able to bear the risk of loss of its entire investment in the Partnership;

(h)  such Transferee recognizes that (i) an investment in the Partnership involves certain risks, (ii) the Units will be subject to certain restrictions on transferability as described in the Partnership Agreement and (iii) as a result of the foregoing, the marketability of the Units will be severely limited;

(i)  unless such Transferee is a Regulation S Investor, such Transferee confirms that it is not subscribing for any Unit as a result of any form of general solicitation or general advertising, including (i) any advertisement, article, notice or other communications published in any newspaper, magazine or similar media (including any internet site that is not password protected) or broadcast over television or radio or (ii) any seminar or meeting whose attendees were invited by any general solicitation or general advertising;

(j)   if a natural person (or an entity that is an "alter ego" of a natural person (e.g., a revocable grantor trust, an IRA or an estate planning vehicle)), such Transferee has received and read a copy of the initial privacy notice in connection with the General Partner's collection and maintenance of non-public personal information with respect to such Transferee, and such Transferee hereby requests and agrees, to the extent permitted by applicable law, that the General Partner shall refrain from sending to such Transferee an annual privacy notice, as contemplated by 16 CAR Part 313, §313.5 (the United States Federal Trade Commission's Final Rules regarding the Privacy of Consumer Financial Information);

(k)   such Transferee acknowledges that the Partnership seeks to comply with all applicable anti-money laundering laws and regulations. In furtherance of these efforts, the Transferee represents, warrants and agrees that to the best of its knowledge after reasonable inquiry: (i) no part of any funds used by such Transferee to acquire the Units or to satisfy its capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene U.S. federal or state or non-U.S. laws or regulations, including anti-money laundering laws and regulations and (ii) no capital commitment, contribution or payment to the Partnership by the Transferee and no distribution to such Transferee shall cause the Partnership or the General Partner to be in violation of any applicable anti-money laundering laws or regulations including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. Such Transferee acknowledges and agrees that, notwithstanding anything to the contrary contained in this Agreement, any side letter or any other agreement, to the extent required by any anti-money laundering law or regulation, the Partnership and the General Partner may prohibit capital contributions, restrict distributions or take any other reasonably necessary or advisable action with respect to the Units, and such Transferee shall have no claim, and shall not pursue any claim, against the Partnership, the General Partner or any other Person in connection therewith; and

(l)   such Transferee will promptly provide such evidence of the foregoing as the General Partner may request from time to time.

In consideration of and subject to the amendment of Exhibit A to the Partnership Agreement including the Transferee as a Limited Partner for the Unit(s) assigned, the Transferee hereby agrees to be bound as a Limited Partner by the terms of the Partnership Agreement, and the Transferee hereby grants to the General Partner, its successors and assigns, a power of attorney constituting the General Partner, with full power of substitution, as the Transferee's true and lawful attorney and agent, with full power and authority, in the Transferee's name, place and stead to execute, under seal or otherwise, swear to, acknowledge, deliver, and record or file, as the case may be, as and where required:

(a) the Partnership Agreement, any amendment to the Partnership Agreement, any amendment to the certificate of formation of the Partnership, or any other instrument which the General Partner deems necessary or appropriate to qualify, continue the qualification of, or keep in good standing, the Partnership in, or otherwise comply with the Laws of, the State of Delaware or any other jurisdiction under the Partnership Agreement in which the Partnership may carry on or be deemed to carry on activities or own property, or in which the General Partner may deem it prudent to register the Partnership, in order to maintain the limited liability of the Limited Partners or to comply with applicable Laws;

(b) any certificate or other instrument that the General Partner deems necessary or appropriate to reflect any amendment, change or modification of the Partnership in accordance with the terms of the Partnership Agreement;

(c) any certificate or other instrument that the General Partner deems necessary or appropriate to comply with the Laws of the United States of America or Canada or any political subdivision of the United States of America or Canada;

(d) any conveyance or other instrument that the General Partner deems necessary or appropriate to reflect or in connection with the sale of all or any part of any Property or other assets of the Partnership or the dissolution or termination of the Partnership under the terms of the Partnership Agreement;

(e) any instrument required for any election, designation, application or determination relating to the Partnership under the Code or other tax legislation;

(f) any document that the General Partner deems necessary or appropriate to be executed or filed in connection with the activities, assets or undertaking of the Partnership or the Partnership Agreement;

44

(g) any document required to be filed with any governmental body, agency or authority in connection with the activities, assets or undertaking of the Partnership or the Partnership Agreement;

(h) any application for any grant, incentive or credit under any federal, provincial or state program for any activity of the Partnership;

(i) any transfer forms or other certificate or instrument on behalf of or in the name of whomsoever as may be necessary to effect the transfer of any Unit in under the terms of the Partnership Agreement;

(j) any other document or instrument on behalf of and in the name of the Partnership or the Limited Partners as may be deemed necessary or desirable by the General Partner to carry out fully the provisions of the Partnership Agreement or any other agreement of the Partnership in under its respective terms; and

(k) to complete, amend or modify any of the foregoing to complete any missing information or correct any clerical or other errors in the completion of any of the foregoing.

The power of attorney hereby granted is irrevocable, is coupled with an interest, will survive the death, disability, incapacity, insolvency, bankruptcy, liquidation, dissolution, winding up or other legal incapacity of the Transferee and will survive the further assignment, to the extent of the obligations of the Transferee under the Partnership Agreement, by the Transferee of the whole or any part of the interest of the Transferee in the Partnership and extends to bind the heirs, executors, administrators, personal representatives, successors and assigns of the Transferee, and may be exercised by the General Partner, executing on behalf of the Transferee, by executing any instrument with a single signature as the General Partner of the Partnership or as attorney and agent for all of the Limited Partners executing such instrument, or by such other form of execution as the General Partner may determine, and it will not be necessary for the General Partner to execute any instrument under seal notwithstanding the manner of execution of the power of attorney by the Transferee. This power of attorney will not merge on the dissolution of the Partnership but will continue in full force and effect thereafter for the purposes of concluding any matters pertaining to the Partnership, to the activities previously carried on by the Partnership or to the dissolution of the Partnership and the winding up of its affairs.

The Transferee hereby ratifies and confirms all that the General Partner shall lawfully do or cause to be done by virtue of the foregoing power of attorney, agrees to be bound by any representation or action made or taken in good faith by the General Partner pursuant to the foregoing power of attorney in accordance with the terms hereof, and waives any and all defenses which may be available to contest, negate or disaffirm any action of the General Partner taken in good faith under such power of attorney.

This document shall be governed by and construed in accordance with the Laws of the State of Delaware.

| ☐ | Check here if the Transferee's Registered Representative and Broker Dealer are the same as those of the Transferor. If not, please provide information with respect to Transferee's Registered Representative and Broker Dealer below.<br>Registered Representative:_____<br>Broker Dealer:_____ |
|---|---|

**For Transferees who are natural persons, please indicate how the Units are to be registered:**

| ☐ | (a) | **Separate or individual property.** *(A married Subscriber who resides in a community property state must submit written consent from his or her spouse to purchase Units using community funds.)* |
|---|---|---|
| ☐ | (b) | **Tenants in Common.** *(Both parties must sign this Declaration.)* |
| ☐ | (c) | **Joint Tenants with right of survivorship.** *(Both parties must sign this Declaration.)* |
| ☐ | (d) | **Husband and Wife Tenants by the Entirety.** *(Both parties must sign this Declaration.)* |
| ☐ | (e) | **Husband and Wife Community Property.** *(Community property states only. Both husband and wife must sign this Declaration.)* |
| ☐ | (f) | **Trust.** *(Include the name of trust, the name of trustee and the date on which the trust was formed. Please include a copy of the Trust documents.)* |
| ☐ | (g) | **Other** *(Describe and, if applicable, include a copy of entity governing documents):* |

**[Signature Page Follows]**

45

**Please note:  All Transferee signatures below must be Medallion Signature Guaranteed.**

DATED this _____ day of _____, 20____ .


_____          _____
Signature of Transferee                    Signature of Joint Transferee, if any


_____          _____
Name of Transferee – Please Print          Name of Joint Transferee, if any – Please Print


_____          _____


_____          _____
Mailing Address of Transferee              Mailing Address of Joint Transferee, if different

Social Security or Taxpayer Identification Number of     Social Security or Taxpayer Identification Number of
Transferee:                                Joint Transferee, if any:


_____          _____

**MEDALLION SIGNATURE GUARANTEED BY:**    **MEDALLION SIGNATURE GUARANTEED BY:**

# Exhibit 2

THE PARTNERSHIP INTERESTS EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES LAWS OF ANY STATE IN THE UNITED STATES OR THE LAWS OF ANY OTHER JURISDICTION AND MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH APPLICABLE UNITED STATES FEDERAL AND STATE SECURITIES LAWS, OR ANY APPLICABLE NON-U.S. SECURITIES LAWS.  IN ADDITION, TRANSFER OR OTHER DISPOSITION OF THE INTERESTS IS RESTRICTED AS PROVIDED IN THIS AGREEMENT.

**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**WALTON U.S. LAND FUND 5, LP**

TABLE OF CONTENTS

ARTICLE 1    DEFINITIONS AND INTERPRETATION ................................................................. 1
    1.1    Definitions ................................................................................... 1
ARTICLE 2    THE PARTNERSHIP .................................................................................. 7
    2.1    Formation of the Partnership .......................................................... 7
    2.2    Name ........................................................................................ 7
    2.3    Foreign Qualification .................................................................... 7
    2.4    Maintaining Status of the Partnership ............................................... 7
    2.5    Principal Place of Business ............................................................. 8
    2.6    Registered Agent and Registered Office ............................................. 8
    2.7    Addresses .................................................................................. 8
ARTICLE 3    PURPOSES AND POWERS OF THE PARTNERSHIP ........................................... 8
    3.1    Purposes of the Partnership ........................................................... 8
    3.2    Powers ..................................................................................... 8
ARTICLE 4    ADMISSION OF LIMITED PARTNERS AND CAPITAL CONTRIBUTIONS ................ 8
    4.1    Division into Units ....................................................................... 8
    4.2    Additional Limited Partners ........................................................... 9
    4.3    Refusal of Subscriptions ................................................................ 9
    4.4    Capital Contributions – Class A Partners ........................................... 9
    4.5    No Additional Capital Contributions - Partners .................................... 9
    4.6    Capital Contribution – General Partner and Class B Partner ..................... 9
    4.7    Book-Entry Evidence of Ownership ................................................... 9
    4.8    Joint Holders of Units ................................................................... 9
ARTICLE 5    ACCOUNTS, ALLOCATIONS AND DISTRIBUTIONS ......................................... 10
    5.1    Capital Accounts ......................................................................... 10
    5.2    Allocations of Net Profits and Net Losses .......................................... 10
    5.3    Regulatory Allocations ................................................................. 10
    5.4    Tax Allocations .......................................................................... 11
    5.5    Other Provisions ........................................................................ 11
    5.6    Distributions ............................................................................. 12
    5.7    Return of Capital ........................................................................ 12
    5.8    No Interest Payable on Accounts ..................................................... 12
    5.9    Limitation on Distributions ............................................................ 12
    5.10    Unclaimed Interest or Distribution .................................................. 13
    5.11    Withholding .............................................................................. 13
    5.12    Code Section 83 Safe Harbor Election ............................................... 13
ARTICLE 6    POWERS, RIGHTS AND OBLIGATIONS OF THE GENERAL PARTNER .................. 13
    6.1    Management of the Partnership ....................................................... 13
    6.2    Obligations of the General Partner ................................................... 14
    6.3    Transactions Involving Affiliates ..................................................... 14
    6.4    Safekeeping of Assets ................................................................... 14
    6.5    Powers of General Partner ............................................................. 14
    6.6    Records of the Partnership ............................................................. 17
    6.7    Fiscal Year ................................................................................ 17
    6.8    Auditors ................................................................................... 17
    6.9    Reporting ................................................................................. 17
    6.10    Registrar and Transfer Agent ......................................................... 17
    6.11    Conflict of Interest ...................................................................... 18
    6.12    Consent to Conflict ..................................................................... 18
    6.13    Conduct of Partnership Affairs ....................................................... 19
    6.14    Indemnification of Partnership ....................................................... 19
    6.15    No Fiduciary Duties ..................................................................... 19
REIMBURSEMENT AND REMUNERATION OF GENERAL PARTNER ............................... 19
    7.1    Expenses .................................................................................. 19
    7.2    Borrowing Costs ......................................................................... 20

| | | |
|---|---|---|
| ARTICLE 8 | LIABILITY OF LIMITED PARTNERS AND GENERAL PARTNER | 20 |
| 8.1 | Liability of Limited Partners to Third Parties | 20 |
| 8.2 | Limitation on Authority of Limited Partners | 20 |
| 8.3 | Liability of Limited Partners Upon Dissolution | 20 |
| 8.4 | Maintenance of Limited Liability | 20 |
| 8.5 | General Partner Liability to Partners | 20 |
| 8.6 | Other Activities | 20 |
| 8.7 | Indemnification of the General Partner and Limited Partners | 21 |
| ARTICLE 9 | ASSIGNMENTS AND TRANSFERS OF UNITS | 22 |
| 9.1 | Transfer or Assignment of Unit | 22 |
| 9.2 | Rejection of Transfer | 23 |
| 9.3 | Ongoing Obligation of Partner | 23 |
| 9.4 | Transferees or Assignees Who Are Not Substituted Partners | 23 |
| 9.5 | Parties Not Bound to See to Trust or Equity | 23 |
| 9.6 | Effective Date of Transfer or Assignment | 23 |
| 9.7 | Compulsory Transfer or Acquisition of Units | 23 |
| 9.8 | Drag-Along | 24 |
| 9.9 | Effect of Bankruptcy, Death, Incompetence or Termination of a Limited Partner | 26 |
| 9.10 | Withdrawal of Limited Partner | 26 |
| ARTICLE 10 | TERM | 26 |
| ARTICLE 11 | DISSOLUTION AND TERMINATION | 27 |
| 11.1 | Events of Dissolution | 27 |
| 11.2 | Winding Up | 27 |
| 11.3 | Distribution of Assets on Dissolution | 27 |
| 11.4 | Reports | 27 |
| 11.5 | No Other Right; No Recourse to General Partner | 28 |
| 11.6 | Final Filing | 28 |
| ARTICLE 12 | REPRESENTATIONS | 28 |
| 12.1 | Status of General Partner | 28 |
| 12.2 | Status of Each Limited Partner | 28 |
| 12.3 | Survival of Representations | 30 |
| ARTICLE 13 | CHANGE OF GENERAL PARTNER | 30 |
| 13.1 | Removal or Withdrawal of General Partner | 30 |
| 13.2 | Admission of Substitute General Partner | 30 |
| 13.3 | Effect of Bankruptcy, Withdrawal, Death or Dissolution of a General Partner | 31 |
| 13.4 | Withdrawal | 31 |
| 13.5 | Removal of General Partner | 31 |
| 13.6 | Release and Indemnification upon Removal or Withdrawal; Use of Walton Name | 32 |
| 13.7 | Conversion to Limited Partner | 32 |
| ARTICLE 14 | MEETINGS | 32 |
| 14.1 | Meetings | 32 |
| 14.2 | Place of Meeting | 32 |
| 14.3 | Notice of Meeting | 33 |
| 14.4 | Chairman | 33 |
| 14.5 | Quorum | 33 |
| 14.6 | Consents Without Meeting | 33 |
| 14.7 | Adjournment | 33 |
| 14.8 | Voting | 33 |
| 14.9 | Record Date | 33 |
| 14.10 | Proxies | 34 |
| 14.11 | Validity of Proxies | 34 |
| 14.12 | Corporations | 34 |
| 14.13 | Attendance of Others | 34 |
| 14.14 | Rules | 34 |
| 14.15 | Waiver of Defaults | 34 |
| 14.16 | Minutes | 35 |

| 14.17 | Resolutions Binding | 35 |
| 14.18 | Actions Requiring Extraordinary Action | 35 |
| ARTICLE 15 | AMENDMENTS | 36 |
| 15.1 | Amendments to Agreement | 36 |
| 15.2 | Amendments In Discretion of General Partner | 36 |
| 15.3 | Notice to Partners | 37 |
| 15.4 | Limitation On Amendments | 37 |
| ARTICLE 16 | NOTICES | 37 |
| 16.1 | Addresses For Notices | 37 |
| 16.2 | Notices | 37 |
| ARTICLE 17 | POWER OF ATTORNEY | 37 |
| ARTICLE 18 | MISCELLANEOUS | 39 |
| 18.1 | Governing Law | 39 |
| 18.2 | Date for Actions | 39 |
| 18.3 | Headings | 39 |
| 18.4 | Number and Gender | 39 |
| 18.5 | Currency | 39 |
| 18.6 | Statutes | 39 |
| 18.7 | Provisions Severable | 39 |
| 18.8 | Further Assurances | 39 |
| 18.9 | Binding Effect | 39 |
| 18.10 | Waiver | 39 |
| 18.11 | Entire Agreement | 40 |
| 18.12 | Counterparts | 40 |
| 18.13 | Ownership and Use of Names | 40 |
| EXHIBIT A - PARTNERS | | 41 |
| EXHIBIT B - TRANSFER FORM | | 42 |
| EXHIBIT C - FORM OF DECLARATION OF TRANSFEREE | | 43 |

[This space intentionally left blank.]

**WALTON U.S. LAND FUND 5, LP**
**AGREEMENT OF LIMITED PARTNERSHIP**

This Agreement of Limited Partnership of Walton U.S. Land Fund 5, LP, a limited partnership formed under the laws of the State of Delaware (the *"Partnership"*), is made and entered into as of December 9, 2013 by and among WUSF 5 GP, LLC, a Delaware limited liability company (the *"General Partner"*) and those Persons who from time to time are accepted as limited partners of the Partnership in accordance with this Agreement, and who are listed on **Exhibit A**, as such exhibit may be amended from time to time (each individually a *"Limited Partner,"* collectively the *"Limited Partners"* and collectively with the General Partner, the *"Partners"*), and

NOW, THEREFORE, the Partners hereby agree as follows:

**ARTICLE 1**
**DEFINITIONS AND INTERPRETATION**

1.1        Definitions

In this Agreement, unless the context otherwise requires:

"**Act**" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. §§ 17-101, et seq., as amended from time to time;

"**Adjusted Capital Account Deficit**" means, with respect to any Partner at any time, the deficit balance, if any, in such Partner's Capital Account as of such time, after giving effect to the following adjustments:

(1)        Add to such Capital Account the amount that such Partner is obligated to restore or is deemed to be obligated to restore pursuant to Regulations Section 1.704-1(b)(2)(ii)(c) or the penultimate sentence of each of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(2)        Subtract from such Capital Account such Partner's share of the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently with those provisions;

"**Adverse Effect**" means (i) the Partnership being classified as a "publicly traded partnership" under the Code, (ii) the assets of the Partnership being considered "plan assets" within the meaning of regulations adopted under ERISA or Section 4975 of the Code, (iii) the Units being required to be registered under the Securities Exchange Act of 1934, as amended, or (iv) some other legal, regulatory, pecuniary, tax or material administrative disadvantage to the Partnership or Partners;

"**Affiliate**" of a Person means another Person who controls, is controlled by, or is under common control with, such Person;

"**Agreement**" means this agreement, including the schedules and exhibits, as amended or supplemented from time to time and "herein", "hereby", "hereof", "hereunder", "hereto" and similar expressions mean or refer to this Agreement and not to any particular provision of this Agreement;

"**Auditors**" means the certified public accounting firm appointed by the General Partner from time to time to audit the financial statements of the Partnership;

"**Business Day**" means, with respect to any particular location, any day other than a Saturday, Sunday or federal holiday of the United States of America, on which national banks doing business in such location are open to the public for the conduct of retail, walk-in banking business and not merely electronic banking business;

"**Capital Account**" means the capital account maintained for each Partner on the Partnership's books and records under the following provisions:

(1)        To each Partner's Capital Account there shall be added (a) the Partner's Capital Contributions, (b) the Partner's allocable share of Net Profits and any items in the nature of income or gain that are specially allocated to the Partner under Article 5 or any other provision of this Agreement, and (c) the amount of any Partnership liabilities assumed by the Partner or that are secured by any property distributed to the Partner;

1

(2)    From each Partner's Capital Account there shall be subtracted (a) the amount of (i) cash and (ii) the Gross Asset Value of any Partnership assets (other than cash) distributed to the Partner under this Agreement in its capacity as a Partner, (b) the Partner's allocable share of Net Losses and any other items in the nature of expenses or losses that are specially allocated to the Partner under Article 5 or any other provision of this Agreement, and (c) liabilities of the Partner assumed by the Partnership or that are secured by any property contributed by such Partner;

(3)    If any Unit or fractional Unit in the Partnership is transferred under this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Unit or fractional Unit;

(4)    In determining the amount of any liability for purposes of subsections (1) and (2) of this definition, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations; and

(5)    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Regulations;

"**Capital Contribution**," with respect to any Partner, means the total amount of cash and the Gross Asset Value of property (other than cash) contributed or deemed to have been contributed, to the capital of the Partnership by the Partner (or by a predecessor Partner in the case of a Partner who acquires Units from a predecessor Partner in accordance with this Agreement) for the Units held by such Partner;

"**Cause**" means any act or failure to act by the General Partner relating to the performance of its duties under this Agreement that constitutes gross negligence, fraud, willful misconduct, or a breach of any of its material obligations under this Agreement which breach has a material adverse effect on the Partnership or the Limited Partners and such breach is not substantially cured within 60 days (or is not in the process of being substantially cured within 60 days and is not substantially cured within 120 days) after receipt by the General Partner of written notice from a Limited Partner with respect thereto;

"**Certificate**" means any instrument or document that is required under the laws of the State of Delaware, or any other jurisdiction in which the Partnership conducts business, to filed for recording in the appropriate public offices within the State of Delaware or such other jurisdiction to perfect or maintain the Partnership as a limited partnership, to effect the admission, withdrawal, or substitution of any Partner from or to the Partnership, or to protect the limited liability of the Limited Partners as limited partners under the laws of the State of Delaware or such other jurisdiction;

"**Class A Unit**" means a unit of equal and undivided interest in the Partnership entitling the holder thereof to the rights of a holder of Class A Units pursuant to the terms of this Agreement;

"**Class A Partner**" means a Partner holding Class A Units;

"**Class B Unit**" means a unit of equal and undivided interest in the Partnership entitling the holder thereof to the rights of a holder of the Class B Unit pursuant to the terms of this Agreement;

"**Class B Partner**" means the Partner holding the Class B Unit;

"**Code**" means the United States Internal Revenue Code of 1986, as amended;

"**Concept Planning**" means those preliminary development activities with respect to a Property during its preliminary development phase, intended to protect the value of the Property and prepare the Property for physical development, such as one or more of the following without limitation: performing development feasibility assessments, preparing a conceptual master plan for the Property, seeking appropriate planning, land use and other regulatory approvals, formation of improvement districts, negotiating service agreements, and preparing and seeking approval of subdivision plats;

"**Concept Planning Allocation**" means that portion of the Reserve established pursuant to the terms of the Private Placement Memorandum to pay for the Partnership's allocable share of Concept Planning costs;

"**Co-Ownership Agreement**" means, for each Property, the Co-Ownership Agreement between the Partnership, the Fund Subsidiary (if applicable), the Walton Acquisition Entity and Walton USA, to be entered into when the Partnership and/or the applicable Fund Subsidiary first acquires all or part of the Interest in the Property, which will govern the rights and responsibilities of such parties with respect to the Property;

2

"**Depreciation**" means, for each Fiscal Year of the Partnership or other period, the amount of federal income tax depreciation, amortization or other cost recovery deduction allowable for an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner;

"**Dissenting Partner**" is defined in Section 9.8(a);

"**Eligible Transferee**" is defined in Section 9.7(a);

"**Encumbrance**" means any charge, claim, mortgage, servitude, easement, right of way, community or other marital property interest, covenant, equitable interest, license, lease or other possessory interest, lien, option, pledge, security interest, preference, priority, right of first refusal, restriction (other than any restriction on transferability imposed by federal, state or foreign securities Laws) or other encumbrance of any kind or nature whatsoever (whether absolute or contingent);

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations adopted pursuant thereto;

"**Event of Bankruptcy**" as to any Person means (i) the filing of a petition for relief as to such Person as debtor or bankrupt under Title 11, United States Code, as amended (or any successor statute) or similar provision of law of any jurisdiction (except if such petition is contested by such Person and has been dismissed within 90 days); (ii) the insolvency or bankruptcy of such Person as finally determined by a court proceeding; (iii) the filing by such Person of a petition or application to accomplish the same or for the appointment of a receiver or a trustee for such Person or a substantial part of his assets; and (iv) the commencement of any proceedings relating to such Person as a debtor under any other reorganization, arrangement, insolvency, adjustment of debt or liquidation law of any jurisdiction, whether now in existence or hereinafter in effect, either by such Person or by another, provided, that if such proceeding is commenced by another, such Person indicates his approval of such proceeding, consents thereto or acquiesces therein, or such proceeding is contested by such Person and has not been finally dismissed within 90 days;

"**Expenses**" is defined in Section 8.7(b);

"**Extraordinary Action**" means an action approved by a vote of Class A Partners holding at least 66⅔% of the Class A Units that are voted on the matter;

"**Fiscal Year**" is defined in Section 6.7;

"**Funding Agreement**" means the agreement between the Partnership, each Fund Subsidiary that becomes a party thereto, and Walton USA relating to the Properties, under which Walton USA will agree to fund certain expenses and other costs of the Partnership, and under which Walton USA will agree to pay, without reimbursement, certain expenses pertaining to the Partnership;

"**Fund Subsidiary**" means a wholly-owned subsidiary of the Partnership formed to acquire the Partnership's undivided interest in a Property.

"**General Partner**" is defined in the preamble, or any substitute general partner under Section 13.2;

"**Gross Offering Proceeds**" means the gross proceeds of the offering of Units before deduction of commissions, offering expenses and reserves;

"**Governmental Authority**" means any government or political subdivision thereof, whether federal, state, local or foreign, international, multinational or any agency or instrumentality of any such government or political subdivision, or any other similar board quasi-governmental regulating body (to the extent that the rules, regulations or orders of such body have the force of Law) or any court or arbitration tribunal;

"**Gross Asset Value**" means, for any asset, the asset's adjusted basis for United States federal income tax purposes, except as follows:

3

(1)     the Gross Asset Value of all the Partnership's assets immediately before the occurrence of any event described in subsections (a) through (e) hereof shall be adjusted to equal their respective gross fair market values, as determined by the General Partner using such reasonable method of valuation as the General Partner may adopt, upon the occurrence of the following events and in accordance with the applicable Regulations:

(a)     the acquisition of Units in the Partnership by a new or existing Partner in exchange for more than a de minimis Capital Contribution if the General Partner reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Partners of the Partnership;

(b)     the distribution by the Partnership to a Partner of more than a de minimis amount of assets in the Partnership as consideration for a whole or partial interest in the Partnership, if the General Partner reasonably determines that such adjustment is necessary or appropriate;

(c)     the liquidation of the Partnership within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g);

(d)     the grant of more than a de minimis number of Units in the Partnership in consideration for the provision of services to or for the benefit of the Partnership; or

(e)     at such other times as the General Partner shall reasonably determine necessary or advisable to comply with Regulations Sections 1.704-1(b) and 1.704-2;

(2)     the Gross Asset Value of any asset of the Partnership distributed to a Partner shall be the gross fair market value of the asset on the date of distribution as determined by the General Partner;

(3)     the Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets under Code Section 734(b) or 743(b), but only to the extent that the adjustments are taken into account in determining Capital Accounts under Regulations Section 1.704-1(b)(2)(iv)(m); *provided, however,* that Gross Asset Values shall not be adjusted under this subsection (3) to the extent that the General Partner reasonably determines that an adjustment under subsection (1) of this definition above is necessary or appropriate for a transaction that would otherwise result in an adjustment under this subsection; and

(4)     if the Gross Asset Value of a Partnership asset has been determined or adjusted under subsection (1) or (3) of this definition, the Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such Partnership asset for purposes of computing Net Profits and Net Losses;

"**Indemnified Person**" means each of the General Partner together with its successors in interest by merger, dissolution or otherwise and its officers, directors, managers, members, employees, agents and advisors and Limited Partners together with their respective heirs, devisees, legatees, personal representatives, trustees, executors, administrators, successors in interest by merger, dissolution or otherwise;

"**Interests**" means, collectively, the proportionate undivided interests in the Properties to be acquired by the Partnership, directly or indirectly, pursuant to the terms described in the Private Placement Memorandum;

"**Issuer Expense Allocation**" means that portion of the Reserve established pursuant to the terms of the Private Placement Memorandum for payment of Issuer Expenses (as defined in the Private Placement Memorandum);

"**Land Purchase Financing**" means any financing incurred by the Partnership for purposes of acquiring Interests in any of the Properties, the terms of which financing shall provide for repayment in full of the obligations in respect of such financing first out of the proceeds of the Private Placement conducted pursuant to the Private Placement Memorandum, and thereafter, to the extent the proceeds of the Private Placement are insufficient, extinguishment of all remaining outstanding obligations in respect of such financing pursuant to the exercise of the Option;

"**Law**" means any federal, state, county, local, municipal, foreign, international, multinational, or other constitution, law, statute, treaty, rule, regulation, ordinance, code, binding case law or principle of common law;

"**Limited Partners**" is defined in the preamble;

"**Losses**" means losses, liabilities, judgments, claims, damages, fees, costs and expenses of any kind, including fees, disbursements and costs of legal counsel and advisors and liabilities under state and federal securities Laws;

4

"**Lots**" means partially or completely finished lots or improvements;

"**Management Fee Allocation**" means that portion of the Reserve established pursuant to the terms of the Private Placement Memorandum for the payment of the Management Fee (as defined in the Private Placement Memorandum);

"**Net Profits**" or "**Net Losses**" means, for each Fiscal Year or other period, the Partnership's taxable income or loss for such year or period determined under Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately under Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(1)    any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses under this definition shall be added to the taxable income or loss;

(2)    any expenditure of the Partnership described in Code Section 705(a)(2)(B) or treated as a Code Section 705(a)(2)(B) expenditure under Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profits or Net Losses, shall be subtracted from such taxable income or loss;

(3)    gain or loss resulting from any disposition of Partnership assets where such gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Partnership assets disposed of, notwithstanding that the adjusted tax basis of the Partnership assets differs from its Gross Asset Value;

(4)    in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing the taxable income or loss, there shall be taken into account Depreciation for the Fiscal Year;

(5)    to the extent an adjustment to the adjusted tax basis of any asset included in Partnership assets under Code Section 734(b) or 743(b) is required under Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Partner's interest, the amount of the adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for computing Net Profits and Net Losses;

(6)    if the Gross Asset Value of any Partnership asset is adjusted under subsection (1) or subsection (2) of the definition of "Gross Asset Value," the amount of the adjustment shall be taken into account in the taxable year of the adjustment as gain or loss from the disposition of the asset for computing Net Profits or Net Losses; and

(7)    notwithstanding any other provision of this definition, any items of income, gain, loss or deduction that are specially allocated under Section 5.3 shall not be taken into account in computing Net Profits or Net Losses. The amount of items of income, gain, loss and deduction available to be specially allocated shall be determined using principles analogous to those set forth in this definition;

"**Nonrecourse Deductions**" is defined in Regulations Sections 1.704-2(b)(1) and 1.704-2(c);

"**Offer**" is defined in Section 9.8(a);

"**Offeror**" is defined in Section 9.8(a);

"**Offeror's Notice**" is defined in Section 9.8(a);

"**Offeror's Units**" is defined in Section 9.8(a);

"**Option**" means the option by the lender in connection with any Land Purchase Financing, in the event proceeds of the Private Placement are insufficient to repay in full the Partnership's obligations under any such financing, to acquire from the Partnership (at the same price per acre paid by the Partnership) such portion of the Interests in the applicable Property acquired with the proceeds of such financing and not repaid with the proceeds of the Private Placement, and thereby extinguish all amounts owed by the Partnership to such lender under such Land Purchase Financing;

"**Ordinary Action**" means an action approved by the Class A Partners holding at least a majority of the Class A Units that are voted on the matter;

"**Partner**" or "**Partners**" is defined in the preamble;

5

"**Partner Minimum Gain**" means "partner nonrecourse debt minimum gain" as defined in Regulations Section 1.704-2(i)(2);

"**Partnership Minimum Gain**" has the meaning set forth in Regulations Sections 1.704-2(b)(2) and 1.704-2(d)(1) for the phrase "partnership minimum gain";

"**Partner Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Regulations Section 1.704-2(b)(4);

"**Partner Nonrecourse Deductions**" means "partner nonrecourse deductions" as defined in Regulations Section 1.704-2(i);

"**Partnership**" is defined in the preamble;

"**Permitted Encumbrance**" means, for each Property, any (i) statutory encumbrance for current taxes or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings by the entity alleged to owe such tax or charge; (ii) encumbrance arising or incurred in the ordinary course of business for amounts which are not overdue for a period of more than 60 days and which are not, individually or in the aggregate, significant; (iii) zoning, entitlement, building and other land use regulations imposed by Governmental Authorities having jurisdiction over the Property; (iv) covenants, conditions, restrictions, easements and other encumbrances affecting title to the Property which do not materially impair the ability of the Partnership to sell the Property; (v) public roads and highways; and (vi) encumbrances regarding deposits made to secure obligations arising from statutory, regulatory, contractual or warranty requirements, including rights of setoff;

"**Person**" means any natural person, any corporation, company, association, partnership, limited liability company, trust, unincorporated organization or other entity, or any government, political subdivision, agency or instrumentality of a government;

"**Private Placement**" means the offering, through a "private placement," of Units of the Partnership pursuant to Rule 506 of Regulation D and Rules 901 through 905 of Regulation S under the Securities Act of 1933, as amended;

"**Private Placement Memorandum**" means the Confidential Private Placement Memorandum dated April 1, 2014, pursuant to which the Partnership will conduct concurrent offerings and acquire interests in the Properties;

"**Proceeding**" is defined in Section 8.7(b);

"**Properties**" means the parcels, which may include Lots, in which the Partnership directly or indirectly acquires ownership interests in connection with the Private Placement as described in the Private Placement Memorandum, and each of such Properties individually, a "**Property**";

"**Register**" means the register of Partners maintained under Section 6.10;

"**Registrar and Transfer Agent**" means the registrar and transfer agent for the Partnership referred to in Section 6.10, which shall be the General Partner if no other registrar and transfer agent is appointed under Section 6.10;

"**Regulations**" means the U.S. Department of Treasury Regulations adopted under the Code. Any and all references herein to specific provisions of the Regulations shall be deemed to refer to any corresponding successor provision;

"**Regulatory Allocations**" is defined in Section 5.3(h);

"**Regulation S Investor**" is defined in Section 12.2(c);

"**Relevant Units**" is defined in Section 9.7(a);

"**Requesting Partners**" is defined in Section 14.1;

"**Reserve**" means a portion of the Gross Offering Proceeds which shall be set aside in a segregated account and which is comprised of the Concept Planning Allocation, the Issuer Expense Allocation and the Management Fee Allocation;

6

"**Securities Act**" means the Securities Act of 1933 as amended, including the rules and regulations promulgated thereunder;

"**Selling Group**" means the broker-dealers registered with the Financial Industry Regulatory Authority, Inc. who may be selected by the Partnership and by any other agents or sub-agents as the Partnership may appoint to offer the sale of Units and promote the formation of the Partnership's relationships with investment advisers;

"**Sharing Ratio**" means for any Class A Partner at any time, the percentage obtained by dividing the number of Class A Units held by the Partner by the aggregate number of outstanding Class A Units held by all Partners;

"**Subscription Agreement**" means a subscription agreement for the acquisition of Class A Units from the Partnership in such form as is approved from time to time by the General Partner;

"**Tax Matters Partner**" is defined in Section 6.9(b);

"**Transfer Notice**" is defined in Section 9.7(a);

"**Unit**" means either a Class A Unit or Class B Unit;

"**Unpaid Preference Amount**" means, for each Property and with respect to any Partner, (i) a 10.5% annual cumulative non-compounded preferred return on such Partner's Capital Contributions allocable to such Property, calculated on a daily basis with respect to the total amount of such Partner's Capital Contributions allocable to such Property in the possession of the Partnership on such day, where such total is (A) increased when a Capital Contribution allocable to such Property is accepted by the Partnership (increased in an amount equal to such accepted Capital Contribution) and (B) decreased when Capital Contributions allocable to such Property are returned to such Partner through a payment made by the Partnership to return all or part of such Partner's Unreturned Capital Contributions (decreased in an amount equal to such payment) (ii) less all prior distributions made by the Partnership to pay all or part of the Unpaid Preference Amount to such Partner;

"**Unreturned Capital Contributions**" means, for each Property and with respect to any Partner, (i) an amount equal to the Capital Contributions of such Partner allocable to such Property (ii) less all prior distributions made by the Partnership to return all or part of the Unreturned Capital Contributions allocable to such Property to such Partner;

"**Vendor**" is defined in Section 9.7(a);

"**Walton Acquisition Entity**" means, for each Property, the wholly-owned subsidiary of Walton USA that initially acquires the Property and from which the Partnership will acquire its interest in such Property;

"**Walton USA**" means Walton International Group (USA), Inc., an Arizona corporation.

## ARTICLE 2
## THE PARTNERSHIP

2.1          Formation of the Partnership

The Partnership is a limited partnership formed under the laws of the State of Delaware, pursuant to a Certificate of Limited Partnership filed with the Office of the Secretary of State of the State of Delaware on December 9, 2013, and upon the terms and conditions set forth in this Agreement.

2.2          Name

The name of the Partnership is "**Walton U.S. Land Fund 5, LP.**" The affairs of the Partnership shall be conducted under that name or under any other name or names as the General Partner may from time to time determine.

2.3          Foreign Qualification

The Partnership shall apply for authority to transact activities in those jurisdictions where the Partnership is required to do so by virtue of its operations or ownership of assets. The Partnership shall file any other certificates and instruments as may be necessary or desirable in connection with its formation, existence and operation, all as determined by the General Partner.

2.4          Maintaining Status of the Partnership

The General Partner shall execute, acknowledge, record and file, at the expense of the Partnership, the Certificate and any and all amendments thereto and all requisite fictitious name statements and notices in such places and jurisdictions as may be necessary to cause the Partnership to be treated as a limited partnership under, and otherwise to comply with, the laws of each state or other jurisdiction in which the Partnership conducts business. The General Partner shall do all things and shall cause to be executed and filed any certificates, declarations, instruments and documents as may be required under the Laws of the State of Delaware and the applicable Laws of any other jurisdiction to reflect the constitution of the Partnership from time to time. The General Partner and each Partner will execute and deliver as promptly as possible any documents that may be necessary or desirable to accomplish the purposes of this Agreement or to give effect to the formation and continued existence of the Partnership under any and all applicable Laws. The General Partner will take all necessary actions on the basis of information available to it in order to maintain the status of the Partnership as a limited partnership under the Act.

2.5        Principal Place of Business

The principal place of business of the Partnership shall be located at 4800 North Scottsdale Road, Suite 4000, Scottsdale, Arizona 85251 or at any other place or places as the General Partner may determine from time to time.

2.6        Registered Agent and Registered Office

The initial registered agent of the Partnership in Delaware shall be The Corporation Trust Company. The address of the initial registered office of the Partnership in Delaware shall be Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The registered office and registered agent of the Partnership in Delaware may be changed by the General Partner from time to time.

2.7        Addresses

The addresses of the General Partner and the Limited Partners shall be the addresses referred to in Article 16, as such addresses may be changed from time to time under Article 16.

## ARTICLE 3
## PURPOSES AND POWERS OF THE PARTNERSHIP

3.1        Purposes of the Partnership

The Partnership is formed for the purposes of making an offering of its Class A Units in a Private Placement and using the proceeds thereof to purchase the Interests, holding the Interests as an investment, including, as applicable, while engaged in the management and preliminary development of the Properties, and eventually selling or otherwise disposing of the Interests, and performing any other activities as may be incidental to, arising from or related to the foregoing purposes as may be reasonably determined by the General Partner, including participating in Concept Planning before the sale or other disposition of the Interests.

3.2        Powers

The purposes of the Partnership set forth in Section 3.1 and the powers vested in the General Partner described in Section 6.5 shall be construed as both purposes and powers of the Partnership. The Partnership shall have, without limitation, the power to do, or cause to be done, any and all acts and things necessary, convenient or incidental to the accomplishment of the purposes of the Partnership, and the enumeration in Section 6.5 of any means by which the purposes of the Partnership may be accomplished shall not limit or be construed so as to limit the powers which may be exercised by the Partnership.

## ARTICLE 4
## ADMISSION OF LIMITED PARTNERS AND CAPITAL CONTRIBUTIONS

4.1        Division into Units

The interests of the Partners in the Partnership shall be divided into, and the Partnership is authorized to issue, up to 10,000,000 Class A Units (plus an overallotment of 0.05% or 5,000 Class A Units) and 1 Class B Unit. The Partnership, in the discretion of the General Partner, may issue fractional portions of whole Units. Each outstanding Class A Unit shall be of one class and have attached to it the same rights and obligations as, and shall rank equally and pari passu with, each other Class A Unit for distributions, allocations and voting. Each Class

8

A Unit shall initially be issued to a Partner for up to $10.00. The Class B Unit will be issued to Walton USA or one of its Affiliates for $0.01 at the initial closing of the Private Placement.

4.2         Additional Limited Partners

The General Partner may, subject to the other provisions of this Agreement, admit Limited Partners from time to time by the offering, sale and issuance of further Class A Units, or fractional portions thereof, pursuant to an offering conducted by the Partnership. The General Partner may determine the terms and conditions of such offering and sale of Class A Units thereunder and may do all such things as may be necessary or advisable to give effect to such offering and sale, and any such acts done are hereby ratified and confirmed by the Partners. Each Person subscribing for Class A Units pursuant to the offering must complete, execute and deliver to, or to the order of, the General Partner, a Subscription Agreement and any other documents deemed necessary by the General Partner to comply with applicable securities Laws and the terms and conditions of issue. A subscriber for Class A Units shall become a Limited Partner upon the acceptance by the General Partner of the subscriber's Subscription Agreement and payment of such Limited Partner's initial Capital Contribution. Thereupon, the Partners hereby consent to the admission of, and will admit, additional Limited Partners to the Partnership without further act of the Partners. Notwithstanding anything to the contrary set forth herein, the total number of Class A Units shall not exceed 10,000,000 (plus an overallotment of 0.05% or 5,000 Class A Units) without the consent of the Class A Partners by an Extraordinary Action.

4.3         Refusal of Subscriptions

The General Partner may, for any reason in its absolute discretion, refuse to accept any subscription for a Unit. In the event of any such refusal, the General Partner shall cause the return of the subscriber's Subscription Agreement, accompanying documents and any contribution of capital to the subscriber.

4.4         Capital Contributions – Class A Partners

Each original Class A Partner's Capital Contribution shall equal the purchase price of such Class A Units, inclusive of all commissions and fees payable by the Partnership to members of the Selling Group in connection with such purchase. For a Partner (successor Partner) who acquires Class A Units from a predecessor Partner under this Agreement, the successor Partner's original Capital Contribution shall be deemed to equal that of the initial Class A Partner who acquired each Class A Unit that is transferred to the successor Partner.

4.5         No Additional Capital Contributions - Partners

No Partner shall be required to make any Capital Contribution in excess of the amount provided for in Section 4.4.

4.6         Capital Contribution – General Partner and Class B Partner

Except for the $0.01 to be contributed by the Class B Partner at the initial closing of the Private Placement, neither the General Partner nor the Class B Partner shall be required to make any Capital Contribution, except that it may subscribe for and purchase Class A Units on the same terms and conditions as if it were not the General Partner or the Class B Partner.

4.7         Book-Entry Evidence of Ownership

The Units will be issued only in fully-registered book-entry form. Ownership of Units will be shown in, and transfer of Units will be effected only through, the Register. Certificates evidencing ownership of Units will not be issued. Units shall be transferable in the manner prescribed by Law and in this Agreement, subject to restrictions set forth under Article 9. Assuming all restrictions on transfers have been met, transfers of Units shall be made in the Register.

4.8         Joint Holders of Units

Where a Unit is subscribed for by or assigned to two or more Persons:

(a)    the name of each Person shall be shown on the Register for the Unit;

(b)    the Unit shall be presumed by the Partnership to be held jointly;

(c)    amounts distributed by the Partnership for the Unit will be in both names but may be sent to the Person whose name appears first on the Register for the Unit or to such one of

9

them as the joint holders direct in writing, and any one of such Persons may give effectual receipts for any distributions for the Unit with the other of such Persons having no further recourse against the Partnership; and

(d)  any one of such Persons may vote for the Unit as if that Person were solely entitled to the Unit, but if more than one of such Persons is present or is represented at a meeting, the Person whose name appears first on the Register for the Unit shall alone be entitled to vote in respect of the Unit.

## ARTICLE 5
## ACCOUNTS, ALLOCATIONS AND DISTRIBUTIONS

5.1  Capital Accounts

A Capital Account shall be established and maintained on the books of the Partnership for each Partner.

5.2  Allocations of Net Profits and Net Losses

Except as otherwise provided for in Section 5.3 or Section 5.5, Net Income and Net Losses shall be allocated amongst the Partners in such a manner that the sum of (i) the Capital Account of each Partner, (ii) such Partner's share of Partnership Minimum Gain, and (iii) such Partner's share of Partner Minimum Gain shall be equal to the respective amounts (positive or negative) which would be distributed to such Partner if the Partnership were to liquidate its assets for an amount equal to their Gross Asset Value and distribute the proceeds of such liquidation in accordance with Section 5.6(a).

5.3  Regulatory Allocations.

Notwithstanding Section 5.2, the following special allocations shall be made in the following order of priority:

(a)  If there is a net decrease in Partnership Minimum Gain during a Fiscal Year, then, to the extent required by Regulations Section 1.704-2(f), each Partner shall be allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, for subsequent years) in an amount equal to the Partner's share of the net decrease in Partnership Minimum Gain, determined under Regulations Section 1.704-2(g)(2). This Section 5.3(a) is intended to comply with the minimum gain chargeback requirement of Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)  If there is a net decrease in Partner Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Partner who has a share of the Partner Minimum Gain attributable to such Partner Nonrecourse Debt, determined under Regulations Section 1.704-2(i)(5), shall, to the extent required by Regulations Section 1.704-2(i)(4), be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent years) in an amount equal to the Partner's share of the net decrease in Partner Minimum Gain attributable to the Partner Nonrecourse Debt, determined in a manner consistent with the provisions of Regulations Section 1.704-2(g)(2). This Section 5.3(b) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirement of Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)  If any Partner unexpectedly receives an adjustment, allocation, or distribution of the type contemplated by Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), and after receiving such adjustment, allocation, or distribution, the Partner has an Adjusted Capital Account Deficit, items of income and gain shall be allocated to all the Partners (in proportion to the amounts of their respective Adjusted Capital Account Deficits) in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of the Partner as quickly as possible. This Section 5.3(c) is intended to constitute a "qualified income offset" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d)  If the allocation of Net Loss to a Partner as provided in Section 5.2 would create or increase an Adjusted Capital Account Deficit for the Partner, there shall be allocated to the Partner only that amount of Net Loss as will not create or increase an Adjusted Capital Account Deficit. The Net Loss that would, absent the application of the preceding sentence, otherwise be allocated to the Partner shall be allocated to the other Partners in accordance with Section 5.2, subject to the limitations of this Section 5.3(d). If, after the allocation of Net Loss under the preceding two sentences, no additional amount of Net Loss can be allocated to any Partner without creating or increasing an Adjusted Capital Account Deficit for the Partner, then Net Loss shall be allocated to the

10

General Partner. This <u>Section 5.3(d)</u> is intended to implement the alternate test for economic effect set forth in Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(e)    To the extent that an adjustment to the adjusted tax basis of any Partnership asset under Code Section 734(b) or Code Section 743(b) is required, under Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss shall be specially allocated to the Partners in accordance with this Article 5 if Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Partners to whom such distribution was made if that Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(f)    The Nonrecourse Deductions for each Fiscal Year of the Partnership shall be allocated to the Class A Partners in proportion to their Sharing Ratios.

(g)    The Partner Nonrecourse Deductions shall be allocated each year to the Partner that bears the economic risk of loss (within the meaning of Regulations Section 1.752-2) for the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable.

(h)    The allocations set forth in <u>Sections 5.3(a) through (g)</u> (the "***Regulatory Allocations***") are intended to comply with the requirements of Regulations Sections 1.704-1(b) and 1.704-2. Notwithstanding the provisions of <u>Section 5.2</u>, the Regulatory Allocations shall be taken into account by the General Partner in specially allocating other items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Regulatory Allocations had not occurred. In exercising its discretion under this <u>Section 5.3(h)</u>, the General Partner shall take into account future Regulatory Allocations that, although not yet made, are likely to offset other Regulatory Allocations previously made.

5.4    Tax Allocations.

(a)    Except as provided in <u>Section 5.4(b)</u>, for income tax purposes under the Code and the Regulations and for applicable state, local and foreign Law, each Partnership item of income, gain, loss and deduction shall be allocated between the Partners in the same manner as its correlative item of "book" income, gain, loss or deduction is allocated under this <u>Article 5</u>.

(b)    Tax items concerning assets contributed to the Partnership with a Gross Asset Value that varies from its basis in the hands of the contributing Partner immediately preceding the date of contribution shall be allocated between the Partners for income tax purposes under Regulations promulgated under Code Section 704(c) or, if applicable, corresponding provisions of applicable state or local Law so as to take into account such variation. The Partnership shall account for such variation under any permissible method set forth in Regulations Section 1.704-3 as determined by the General Partner. If the Gross Asset Value of any Partnership asset is adjusted under subsection (1) or (3) of the definition of "Gross Asset Value," subsequent allocations of income, gain, loss and deduction for such Partnership asset shall take account of any variation between the adjusted basis of the Partnership asset for federal income tax purposes and its Gross Asset Value under any permissible method in Regulations Section 1.704-3 as determined by the General Partner. Any tax credits will be allocated to the Class A Partners in proportion to their Sharing Ratios, unless otherwise required by applicable tax Law. Allocations under this <u>Section 5.4(b)</u> are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Net Profits, Net Losses and any other items or distributions under any provision of this Agreement.

5.5    Other Provisions

(a)    For any Fiscal Year during which any Units are transferred between the Partners or to another Person or are otherwise disposed of or acquired, or there is for any reason a change in the Partners' respective Sharing Ratios, Net Profits, Net Losses and other items of income, gain, loss, deduction and credit shall be allocated and, to the extent necessary apportioned, under any method allowed under Section 706 of the Code and related Regulations, as reasonably determined by the General Partner; provided, that the General Partner shall use consistent methods for the same or substantially similar transactions and items in making such allocations or apportionments for all such changes in the Partners' respective Unit ownership or respective Sharing Ratios, whether occurring within a single Fiscal Year or in different Fiscal Years.

11

(b)     If the Code or any Regulations require allocations of items of income, gain, loss, deduction or credit different from those in this <u>Article 5</u>, the General Partner is authorized to make new allocations relying on the Code and such Regulations, and no such new allocation shall give rise to any claim or cause of action by any Partner, *provided* that the allocations are consistent with the advice of the Partnership accountant or tax counsel and are not likely to alter materially the amounts that each Partner is entitled to receive under the terms of this Agreement.

(c)     Solely for purposes of allocating excess nonrecourse liabilities of the Partnership among the Partners in connection with the determination of the Partners' adjusted tax bases for their interests in the Partnership, in accordance with Section 752 of the Code and the Regulations from time to time promulgated thereunder, the Partners agree that each Partner's interest in Partnership profits equals the Partner's Sharing Ratio, if any.

5.6        Distributions

(a)     After payment and reservation of all amounts necessary for payment for all expenses of the Partnership (including all amounts owing by the Partnership under the Funding Agreement and any tax withholding obligations) and reservation of such amounts as in the opinion of the General Partner are necessary having regard to the then current and anticipated resources of the Partnership and its commitments and anticipated commitments, distributions of cash of the Partnership (whether resulting from revenue or income earned by the Partnership or from the proceeds of the sale of all or any part of one or more Properties or the Interests or other assets of the Partnership including any amounts distributed under <u>Section 11.3</u>) will be made upon the sale or other disposition of a Property, at the sole discretion of the General Partner, to the Partners of record on the date the General Partner declares such distribution as follows:

(i)     100% to the Class A Partners in proportion to and to the extent of each Class A Partner's Unreturned Capital Contributions allocable to such Property;

(ii)    100% to the Class A Partners in proportion to and to the extent of each Class A Partner's Unpaid Preference Amount allocable to such Property; and

(iii)   thereafter, 60% to the Class A Partners (to be distributed to them in accordance with their respective Sharing Ratios) and 40% to the Class B Partner on account of its Class B Unit.

(b)     The manner and timing of all distributions will be in the sole discretion of the General Partner.

5.7        Return of Capital

(a)     No Partner shall be personally liable for the return of the Capital Contributions of the Partners, or any portion thereof, it being expressly understood that any such return of contributions shall be made solely from the Partnership assets.

(b)     No Partner shall be entitled to a return, or to demand a return, of any part of such Partner's Capital Contribution or be entitled to any distribution or allocation except as provided in this Agreement.

(c)     Notwithstanding anything else in the Agreement to the contrary, no Partner shall have an obligation to contribute additional capital to the Partnership in order to restore his Adjusted Capital Account Deficit or any deficit balance in his Capital Account.

5.8        No Interest Payable on Accounts

Except as provided in this Agreement, no Partner has the right to receive interest on any credit balance in its Capital Account and no Partner is liable to pay interest to the Partnership on any deficit in its Capital Account.

5.9        Limitation on Distributions

No distributions shall be made unless, after making the distribution, the Partnership retains sufficient assets to satisfy all liabilities of the Partnership (including any amounts owing by the Partnership under the

12

Funding Agreement).   Notwithstanding anything contained under this Agreement to the contrary, including Section 4.6, the General Partner may require the Partners to return (in proportion to the distribution made) all or part of such distributions as have rendered the Partnership unable to satisfy all its liabilities and may require any Partner to forthwith return to the Partnership any amount otherwise distributed to any Partner in excess of the Partner's entitlement.

5.10       Unclaimed Interest or Distribution

If the General Partner shall hold any otherwise distributable amount that is unclaimed or that cannot be paid to a Partner for any reason, the General Partner shall be under no obligation to invest or reinvest the same but shall only be obliged to hold the same in a current non-interest-bearing account pending payment to the Person or Persons entitled to the distributable amount for a period commencing on the date upon which the amount became due and payable to such Partner and ending five years following the date of the dissolution of the Partnership under the provisions of this Agreement.

5.11       Withholding

Notwithstanding any other provision of this Agreement, the General Partner is authorized to take any action that it determines to be necessary or appropriate to cause the Partnership to comply with any withholding requirements established under the Code or any other federal, state or local Law including, without limitation, under Sections 1441, 1442, 1445 and 1446 of the Code.  To the extent that the Partnership is required to withhold and pay over to any taxing authority any amount resulting from the allocation or distribution of income to any Partner or its assignee (including, without limitation, by reason of Section 1446 of the Code), the amount withheld shall be treated as a distribution of cash under Section 5.6 in the amount of the withholding from such Partner.  Any amount withheld by the General Partner and paid over to a taxing authority shall be treated as actually distributed to the Partner in respect of whom such withholding and payment was made.

5.12       Code Section 83 Safe Harbor Election

(a)       Each Partner authorizes and directs the Partnership to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in IRS Notice 2005-43 (the "*Notice*") apply to any Units or other interest in the Partnership transferred to a service provider by the Partnership on or after the effective date of such Revenue Procedure in connection with services provided to the Partnership.  For purposes of making such Safe Harbor election, the General Partner is hereby designated as the "partner who has responsibility for federal income tax reporting" by the Partnership and, accordingly, execution of such Safe Harbor election by the General Partner constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the Notice.   The Partnership and each Partner hereby agree to comply with all requirements of the Safe Harbor described in the Notice, including, without limitation, the requirement that each Partner shall prepare and file all federal income tax returns reporting the income tax effects of each interest in the Partnership issued by the Partnership covered by the Safe Harbor in a manner consistent with the requirements of the Notice.

(b)       Each partner authorizes the General Partner to amend Section 5.12(a) to the extent necessary to achieve substantially the same tax treatment with respect to any Units or other interest in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership as set forth in Section 4 of the Notice (e.g., to reflect changes from the rules set forth in the Notice in subsequent IRS guidance), provided that such amendment is not adverse to such Partner (as compared with the after-tax consequences that would result to such Partner if the provisions of the Notice applied to all interests in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership).

## ARTICLE 6
## POWERS, RIGHTS AND OBLIGATIONS OF THE GENERAL PARTNER

6.1       Management of the Partnership

Management of the Partnership is vested in the General Partner.  The General Partner, subject to Sections 6.5 and 14.18 and other provisions of this Agreement, shall manage and control the affairs of the

13

Partnership, represent the Partnership, and make all decisions regarding the affairs of the Partnership. No Person dealing with the Partnership shall be required to inquire into the authority of the General Partner to take any action or to make any decision in the name of the Partnership.

6.2        Obligations of the General Partner

The General Partner covenants that it will exercise its powers and discharge its obligations under this Agreement, in good faith. The General Partner shall put before the Partners for their consideration and acceptance or rejection, together with the applicable quorum and voting requirements, any offer to purchase one or more of the Partnership's Interests that the General Partner deems in its reasonable discretion to be a bona fide offer on terms equal to or better than those generally available in the market. The General Partner will exercise the care, diligence and skill of a reasonably prudent person, and it will devote such of its time to the Partnership's affairs as it determines, in good faith, to be reasonably necessary. The General Partner will be entitled to retain, at the expense of the Partnership, advisors, experts and consultants to assist it in the exercise of its powers and the performance of its obligations under this Agreement.

6.3        Transactions involving Affiliates

The validity of a transaction, agreement or payment involving the Partnership or its Affiliate, on the one hand, and the General Partner or its Affiliate, on the other hand, is not affected by reason of the relationships between the General Partner and the Partnership or their respective Affiliates or by reason of the approval or lack thereof of the transaction, agreement or payment by the officers of the General Partner or the officers or directors of the General Partner's manager, any or all of whom may be officers, directors, or employees of, or otherwise interested in or related to its Affiliates.

6.4        Safekeeping of Assets

The General Partner is responsible for the safekeeping and use of all of the funds of the Partnership, whether or not in its immediate possession or control, and will not employ or permit another to employ the funds or assets of the Partnership except for the exclusive benefit of the Partnership.

6.5        Powers of General Partner

(a)        In addition to the powers and authorities possessed by the General Partner under the Act or otherwise conferred by Law or elsewhere in this Agreement, the General Partner shall have the exclusive power and authority to manage and control the affairs of the Partnership and to do, or cause to be done, on behalf of and in the name of the Partnership any and all acts necessary, convenient or incidental to the activities of the Partnership without, except as otherwise provided in the Act or in this Agreement, further approval of the Partners including, without limitation, the power and authority:

(i)        to acquire the Interests in the Properties on behalf of the Partnership;

(ii)       to enter into the Funding Agreement and the Co-Ownership Agreements;

(iii)      to establish and disburse funds from the Reserve;

(iv)      to pay all real estate taxes or special assessments imposed on the Properties or the Interests;

(v)       to apply for and obtain any and all necessary financing required to carry out the purposes of the Partnership (including, without limitation, Land Purchase Financing), and to grant such Encumbrances on the Properties or the Partnership's Interests and any other assets of the Partnership as the General Partner may deem necessary or advisable in connection with such financing;

(vi)      to procure such insurance for the Partnership, the Interests and the Properties as it deems necessary or advisable;

(vii)     to pay all debts and financial obligations of the Partnership;

14

(viii)   to negotiate, enter into, execute and carry out agreements by or on behalf of the Partnership involving matters or transactions that are necessary or appropriate for or incidental to carrying on the Partnership's affairs;

(ix)   to manage and control all of the activities of the Partnership and to take all measures necessary or appropriate for the Partnership's property or ancillary to the property and to ensure that the Partnership complies with all necessary reporting and administrative requirements;

(x)   to manage, administer, conserve and dispose of (subject to the provisions of Section 6.5(b)) the Interests and any and all other assets of the Partnership, and in general to engage in any and all phases of the Partnership's affairs and to delegate, if the General Partner so chooses in its sole discretion, the management and administration of the Properties or the Interests and to enter into the Co-Ownership Agreements or similar agreements with any other Person;

(xi)   if the Partnership's participation in the development of all or a part of any Property beyond Concept Planning is approved by Extraordinary Action of the Partners, to reinvest all or any part of the income of the Partnership received from such Property or the Interest or from the sale of parts of such Property or the Interest (and that would have otherwise been available for distribution to the Partners under this Agreement) in such development;

(xii)   to conclude agreements with third parties, including Affiliates of and any other parties related to the General Partner, so that services may be rendered to the Partnership, and to delegate to any such Person any power or authority of the General Partner under this Agreement where, in the discretion of the General Partner, it would be in the best interests of the Partnership to do so (provided that such agreement or delegation will not relieve the General Partner of any of its obligations under this Agreement);

(xiii)   to decide in its sole and entire discretion the time when assets of the Partnership shall be distributed to the Partners and the amount of any such distribution;

(xiv)   notwithstanding Section 6.13(b), where the General Partner determines that it is not appropriate or advisable for the assets of the Partnership to be held or registered in the name of the Partnership, to hold the assets of the Partnership in the name of the General Partner or another nominee as nominee for the Partnership;

(xv)   to employ such Persons necessary or appropriate to carry out the affairs of the Partnership or to assist it in the exercise of its powers and the performance of its obligations under this Agreement and to pay such fees, expenses, salaries, wages and other compensation to such Persons as it shall in its sole discretion determine;

(xvi)   to make any and all expenditures and payments that it, in its sole discretion, deems necessary or appropriate in connection with the management of the affairs of the Partnership and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, (A) all legal, accounting and other related expenses incurred in connection with the organization and financing of the Partnership and the ongoing operation and administration of the Partnership and (B) any fees payable to the General Partner, and to

15

<div style="margin-left:2em">

borrow on behalf of the Partnership such funds necessary or advisable to fund such expenditures and payments;

(xvii)  subject to <u>Section 6.13(a)</u>, to open and operate one or more bank accounts to deposit and distribute funds of the Partnership and to appoint from time to time signing authorities and to draw checks and other payment of monies;

(xviii)  to arrange for the preparation and timely filing of all tax and informational returns required of the Partnership;

(xix)  to maintain adequate books and records reflecting the activities of the Partnership;

(xx)  subject to the provisions of this Agreement, to admit any Person as a Partner;

(xxi)  to make or revoke any election, determination, application or designation on behalf of the Partnership that may be made under the Code (including an election to adjust the basis of the Partnership's property under Section 754 of the Code and an election to amortize the Partnership's organizational expenditures under Section 709 of the Code where the General Partner determines, in its sole discretion, that such an election would be appropriate), any other similar federal, state or local legislation, or any and all applications for governmental grants or other incentives;

(xxii)  to (A) adopt such conventions as it deems appropriate in determining the amount of depreciation, amortization and cost recovery deductions, and (B) make special allocations for federal income tax purposes of income (including, without limitation, gross income) or deductions, provided that such conventions and allocations would not have a material adverse effect on the Partners or the Partnership and are consistent with the principles of Section 704 of the Code;

(xxiii)  to execute any and all deeds, documents and instruments and to do all acts as may be necessary or desirable in the opinion of the General Partner to carry out the intent and the purpose of this Agreement;

(xxiv)  to cause the Partnership to make any necessary withholdings of taxes for allocations or distributions to the Partners;

(xxv)  to attend to all required registrations, accounting, filing and reporting obligations, collections, remittances and other activities of the Partnership; and

(xxvi)  to commence and defend any and all legal proceedings for and on behalf of the Partnership as the General Partner may deem necessary or advisable;

and the General Partner may contract with any Person on behalf of the Partnership, including an Affiliate of the General Partner, to carry out any of the obligations of the General Partner and may delegate to such Person any power and authority of the General Partner under this Agreement, but no such contract or delegation shall relieve the General Partner of any of its obligations under this Agreement.

</div>

(b)  The General Partner, on behalf of the Partnership, may not take any action enumerated in <u>Section 14.18</u> of this Agreement unless such action shall have been approved by Extraordinary Action of the Class A Partners.

16

6.6          Records of the Partnership

The General Partner shall maintain or cause to be maintained complete and adequate books (including those referred to in Section 5.1) and records of the affairs of the Partnership. Subject to applicable Laws, such books and records shall (until the expiry of one year following the termination of the Partnership) be kept available for inspection and audit by any Partner or his duly authorized representatives (at the expense of such Partner), for any purpose reasonably related to such Partner's interest as a Partner hereunder, on not less than 48 hours (excluding Saturdays, Sundays, and legal holidays) advance notice to the General Partner, during normal business hours at the principal place of business of the Partnership. Notwithstanding the foregoing, but subject to applicable Law, the General Partner may keep confidential any information the disclosure of which is prohibited by Law or agreement or the disclosure of which the General Partner reasonably believes is not in the best interests of the Partnership or could damage the Partnership or its interest in the Property.

6.7          Fiscal Year

Each Fiscal Year of the Partnership shall end on December 31 and unless otherwise determined by the General Partner, each period from and including January 1 to and including December 31 shall be referred to as a *"Fiscal Year."*

6.8          Auditors

The General Partner shall appoint the Auditors of the Partnership, which shall review and report to the Limited Partners on the financial statements of the Partnership as at the end of, and for, each Fiscal Year provided that the General Partner may, at any time and from time to time, change the Auditors of the Partnership.

6.9          Reporting

        (a)     The General Partner shall forward or otherwise make available:

            (i)     to each Limited Partner, within 120 days of the end of each Fiscal Year, audited financial statements of the Partnership accompanied by a brief narrative report on the operations of the Partnership; and

            (ii)    to each Limited Partner and former Limited Partner, where applicable, within 90 days of the end of each Fiscal Year, all income tax reporting information for the Units held by the Limited Partner necessary to enable the Limited Partner or former Limited Partner to file U.S. federal and state income tax returns for the Fiscal Year.

The documents and information to be provided pursuant to this Section 6.9(a) may be provided electronically to any Limited Partner or former Limited Partner, as applicable, to the extent such Limited Partner or former Limited Partner has provided an email address to the General Partner. Notwithstanding the foregoing, upon the written request of any Limited Partner or former Limited Partner, the General Partner shall forward hard copies of such documents and information to the requesting Limited Partner or former Limited Partner.

        (b)     The Class B Partner is hereby designated as the Partnership's *"Tax Matters Partner"* under Code Section 6231(a)(7) and shall have all of the powers and responsibilities of such position as provided in the Code. The General Partner is specifically directed and authorized to take whatever steps the General Partner, in its discretion, deems necessary or desirable to perfect such designation, including filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under the Regulations. Expenses incurred by the Tax Matters Partner, in its capacity as such, will be Partnership expenses.

6.10         Registrar and Transfer Agent

The General Partner shall either act as registrar and transfer agent for the Partnership or appoint a duly qualified and properly licensed trust or other company for such purpose and in such capacity the Registrar and Transfer Agent shall maintain and keep a Register comprised of:

        (a)     a list of the name and last known residence address of each Partner, and the number of Units held by such Partner;

17

(b)    particulars of the registration of Units;

(c)    particulars of the assignment of Units;

(d)    a copy of the Certificate of Formation of the Partnership and any amendments;

(e)    a copy of this Agreement and any amendments; and

(f)    any other records required by Law.

Upon request, a Limited Partner or his duly authorized representative shall be entitled to inspect, and at its expense receive a copy of, the Register.

6.11    Conflict of Interest

The Limited Partners acknowledge that the General Partner and its Affiliates and their respective directors and officers may be engaged in other businesses in which the Partnership will not have an interest and which may be competitive with the activities of the Partnership. The General Partner and its Affiliates and their respective managers, directors and officers may be a manager, member, partner, shareholder, director, officer, employee, consultant, joint venturer, advisor or act in any other capacity, of, with or to other entities, including limited partnerships and limited liability companies or other entities, that may compete with the Partnership. Some or all of the officers and directors of the manager of the General Partner (i) are directors and/or officers of Walton USA, which proposes to (a) enter into the Funding Agreement in respect of the Properties with the Partnership, and (b) with respect to each Property, enter into the Co-Ownership Agreement with the Partnership and the Walton Acquisition Entity, under which, among other things, the Partnership will be the manager of the Property and engage Walton USA to perform, at the direction of the Partnership, the duties of the Partnership as manager of the Property, (ii) with respect to each Property, control the Walton Acquisition Entity, the Affiliate of Walton USA that will continue to hold an interest in the Property after the Partnership acquires its Interest and will enter into the Co-Ownership Agreement with the Partnership; (iii) with respect to each Property, have negotiated the terms pursuant to which the Partnership will acquire its Interest, which terms include payments from the Partnership to the Walton Acquisition Entity; (iv) are managers, directors and/or officers of Affiliates of Walton USA to which Walton USA may delegate certain activities in respect of Concept Planning, and (v) are managers, directors and/or officers of other Affiliates of the General Partner and Walton USA. The General Partner may propose from time to time that the Partnership enter into contractual arrangements with Walton USA and/or its Affiliates for the provision of certain services and/or for other purposes.

6.12    Consent to Conflict

Subject to the General Partner's express obligations under this Agreement, the Limited Partners agree that the activities and facts described in Section 6.11, including the payment of fees to Affiliates of the General Partner for services provided to or on behalf of the Partnership or the Properties, shall not constitute a breach by the General Partner of any implied covenant of good faith and fair dealing to the Partnership or the Limited Partners, the Limited Partners hereby consent to such activities and the Limited Partners waive, relinquish and renounce any right to participate in, and any other claim whatsoever concerning, those activities. The Limited Partners further agree that neither the General Partner nor any other party referred to in Section 6.11 will be required to account to the Partnership or any Partner for any benefit or profit derived from any such activities or from such similar or competing activity or any related transactions by reason of any conflict of interest or any implied covenant of good faith and fair dealing unless such activity is contrary to the express terms of this Agreement or the Act. Each Limited Partner waives any right he may have against the General Partner for using for its own benefit information received as a consequence of the General Partner's management of the affairs of the Partnership.

18

6.13        Conduct of Partnership Affairs

The General Partner agrees to conduct the affairs of the Partnership as follows:

(a)    funds of the Partnership will not be commingled with any other funds of the General Partner or any other Person;

(b)    subject to <u>Section 6.5(a)(xiv)</u>, assets of the Partnership shall be held in the name of the Partnership;

(c)    unless approved by Extraordinary Action, the Partnership shall not make loans to, nor guarantee the obligations of, the General Partner or any Affiliate of the General Partner or any of their respective directors or officers;

(d)    to the extent available on reasonable terms to the Partnership, the General Partner will obtain and maintain on behalf of the Partnership insurance in such amounts and with such coverage as in the judgment of the General Partner may be necessary or advisable for the Properties, the Interests and the activities of the Partnership;

(e)    except with respect to services provided on terms approved by Class A Partners holding 66⅔% of Class A Units that are voted on the matter, where services are supplied to the Partnership by the General Partner or any of its Affiliates or any of their respective directors or officers, such services shall be provided on commercially reasonable terms, given the then existing circumstances, as determined in good faith by the General Partner; and

(f)    the General Partner will use commercially reasonable efforts to conduct the Partnership's affairs in such a way that the Partnership is not deemed to hold the "plan assets" of any employee benefit plan subject to ERISA or any plan or arrangement (including an individual retirement account) subject to Section 4975 of the Code. Without limiting the foregoing, the General Partner shall endeavor either (1) to cause the Partnership to qualify for a plan assets exception under the Department of Labor Plan Asset Regulation, 29 CFR Section 2510.3-101, or (2) to cause the Partnership to qualify for another plan assets exception under such Regulation.

6.14        Indemnification of Partnership

The General Partner shall indemnify and hold harmless the Partnership from and against all Losses incurred by the Partnership as a result of any gross negligence, willful misconduct or fraudulent act by the General Partner.

6.15        No Fiduciary Duties

The Partners agree that, except for any implied covenant of good faith and fair dealing, the provisions of this Agreement are intended to replace any obligations of the Partners to each other that would otherwise be implied by applicable law, including without limitation any implied fiduciary or other duty that might apply to the General Partner, Limited Partners or their relationship to each other as General Partner and Limited Partners of the Partnership absent the provisions of this <u>Section 6.15</u>.

## ARTICLE 7
## REIMBURSEMENT AND REMUNERATION OF GENERAL PARTNER

7.1        Expenses

The General Partner may from time to time incur reasonable costs and expenses on behalf of the Partnership, and any such costs and expenses incurred by the General Partner on behalf of the Partnership shall be reimbursed by the Partnership. If the Partnership's funds on hand are insufficient for reimbursement, the General Partner's reimbursable expenses shall be considered an advance to the Partnership from the General Partner. The General Partner shall not be obligated to advance any amount to the Partnership. Notwithstanding anything to the contrary in this <u>Section 7.1</u>, the General Partner will, for its own account and without any reimbursement by the Partnership, incur and pay for all general office overhead for its own staff, personnel, furniture, and equipment used in respect of the performance of its obligations hereunder.

19

7.2        Borrowing Costs

The General Partner is entitled to reimbursement by the Partnership of any advance by the General Partner to the Partnership together with interest at the rate of interest and expense at which such amounts could be borrowed by the General Partner from its bankers.

## ARTICLE 8
## LIABILITY OF LIMITED PARTNERS AND GENERAL PARTNER

8.1        Liability of Limited Partners to Third Parties

No Limited Partner shall be liable for any debts, liabilities, contracts or obligations of the Partnership.

8.2        Limitation on Authority of Limited Partners

Other than as provided in this Agreement, no Limited Partner shall, in its capacity as a Limited Partner:

      (a)        take part in the control or management of the affairs of the Partnership;

      (b)        transact any affairs on behalf of the Partnership or execute any document that binds or purports to bind the Partnership, the General Partner or any other Partner as such;

      (c)        hold such Partner out as having the power or authority to bind the Partnership, the General Partner or any Partner as such;

      (d)        have any authority to undertake any obligation or responsibility on behalf of the Partnership;

      (e)        have any right to use or occupy any part of the Properties, or bring any action for partition or sale in connection with the Interests or any other assets of the Partnership, whether real or personal, or register or permit any lien or charge concerning the Units of such Partner to be filed or registered or remain undischarged against the Interests or the Properties in respect of such Partner's interest in the Partnership.

For the avoidance of doubt, the restrictions above shall not apply to the Class B Partner in connection with its role as Tax Matters Partner. The Limited Partners will comply with the provisions of all applicable Laws, including the Act, in force or in effect from time to time and will not take any action that will jeopardize or eliminate the status of the Partnership as a limited partnership.

8.3        Liability of Limited Partners Upon Dissolution

It is acknowledged by the Limited Partners that upon dissolution of the Partnership, the Limited Partners may receive in-kind distributions of the Partnership's assets, including undivided interests in the Properties, and will thereafter no longer have limited liability for the ownership of such assets.

8.4        Maintenance of Limited Liability

The Partnership and the General Partner shall, to the greatest extent practicable, endeavor to maintain the limited liability of the Limited Partners under applicable Laws of the jurisdictions in which the Partnership carries on or is deemed to carry on its affairs.

8.5        General Partner Liability to Partners

Except to the extent that any Losses result from the General Partner's gross negligence, willful misconduct or fraudulent acts, the General Partner shall not be liable to the Limited Partners or the Partnership for any Losses incurred by the Limited Partners or the Partnership, including without limitation such Losses as may result from any mistakes or errors in judgment of the General Partner or any act or omission believed in good faith to be within the scope of authority of the General Partner conferred by this Agreement.

8.6        Other Activities

Nothing contained in this Agreement shall preclude any Partner from purchasing or lending money upon the security of any other property or rights under this Agreement, or in any manner investing in,

20

participating in, developing or managing any other venture of any kind, without notice to the other Partners, without participation by the other Partners or the Partnership, and without liability to them or any of them.

8.7     Indemnification of the General Partner and Limited Partners

(a)     Subject to any restrictions imposed by applicable Law, the Partnership, its receiver or its trustee, shall indemnify, save harmless and pay all judgments and claims (including costs and reasonable attorneys' and consultants' fees and any amount expended in the settlement of any claim of liability, loss or damage) against an Indemnified Person in respect of any Loss or Losses incurred by any Indemnified Person or by the Partnership by reason of any act performed or omitted to be performed by an Indemnified Person on behalf of the Partnership, provided that such Loss or Losses were not solely the result of such Indemnified Person's fraud, gross negligence or willful misconduct. Any indemnification pursuant to this Section 8.7(a) shall be only from the assets of the Partnership and no Limited Partner shall have or incur any personal liability on such account or be required to make a Capital Contribution to fund such indemnification.

(b)     Subject to the limitations and conditions provided in this Section 8.7, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative (hereinafter a "*Proceeding*"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he, she, or it, or a Person of which he, she or it is the legal representative, is or was a Partner shall be indemnified by the Partnership to the fullest extent permitted by applicable Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Partnership to provide broader indemnification rights than said Law permitted the Partnership to provide prior to such amendment) against all judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including reasonable attorneys' fees and expenses) ("*Expenses*") actually incurred by such Person in connection with such Proceeding, appeal, inquiry or investigation if such Person acted in good faith, and indemnification under this Section 8.7 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The Partnership shall advance Expenses incurred by or on behalf of such an indemnified Person within 20 days after receipt by the Partnership from such Person of a statement requesting such advances from to time; provided such statement provides reasonable documentary evidence of such Expenses and provides a written undertaking by the indemnified Person to repay any and all advanced Expenses in the event such indemnified Person is ultimately determined to not be entitled to indemnification by the Partnership.

(c)     To the extent that, at law or in equity, an Indemnified Person has duties (including fiduciary duties) and liabilities relating thereto to the Partnership or to the Partners, any Indemnified Person acting in connection with the Partnership's business or affairs shall not be liable to the Partnership or to any Partner for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement and any other written agreements to which the Partnership and a Partner are parties, to the extent that they establish the duties and liabilities of an Indemnified Person, are agreed by the Partners to replace such duties and liabilities of such Indemnified Person that would otherwise exist at law or in equity.

(d)     The General Partner and its Affiliates shall not be denied indemnification or exculpation in whole or in part under this Section 8.7 because the General Partner or its Affiliates had an interest in the transaction with respect to which the indemnification or exculpation applies if the transaction was otherwise permitted by the terms of this Agreement.

21

(e)     The Partnership may enter into agreements with the General Partner or any indemnified person to provide for indemnification consistent with the terms and conditions set forth in this Section. The Partnership may purchase and maintain general partner, director and officer liability insurance on behalf of the General Partner at appropriate levels of coverage as determined by the General Partner.  The rights granted pursuant to this Section 8.7 shall be deemed contract rights, and no amendment, modification or repeal of this Section 8.7 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings, appeals, inquiries or investigations arising prior to any amendment, modification or repeal.    It is expressly acknowledged that the indemnification provided in this Section 8.7 could involve indemnification for negligence or under theories of strict liability, but shall not involve any indemnification of the General Partner or its Affiliates for any matter determined to constitute gross negligence, or willful misconduct, or fraud, on the part of the General Partner.

# ARTICLE 9
## ASSIGNMENTS AND TRANSFERS OF UNITS

9.1     Transfer or Assignment of Unit

A Unit may be transferred or assigned by a Partner or such Partner's agent duly authorized in writing only with the consent of the General Partner.  The transferor and transferee of a Unit must comply with applicable securities Laws in connection with the transfer and the transferor, or his duly authorized agent, shall:

(a)     deliver, or cause to be delivered, to the General Partner and the Registrar and Transfer Agent a duly completed transfer document substantially in the form attached as **Exhibit C** (or such other form as the General Partner may require), completed and executed by the Partner or his agent, as well as such other documents required in such transfer form or required by the General Partner or the Registrar and Transfer Agent;

(b)     if the transfer is being made to a Person other than the Partnership, if required by the General Partner, deliver, or cause to be delivered, to the General Partner and the Registrar and Transfer Agent an opinion of counsel (both the opinion and the counsel being reasonably satisfactory to the General Partner) to the effect that registration for such transfer is not required under the Securities Act of 1933, as amended, and applicable state securities Laws;

(c)     cause the transferee or assignee to deliver to the Registrar and Transfer Agent a duly completed declaration substantially in the form attached as **Exhibit D**; and

(d)     cause the transferee or assignee to pay the reasonable fees and expenses of the Registrar and Transfer Agent for the transfer or assignment, which shall include a non-refundable transfer processing fee of $50.00, which may be retained by the General Partner regardless of whether the transfer is approved, unless the General Partner in its sole discretion agrees to pay the fees and expenses;

and satisfy such other requirements as are reasonably imposed by the General Partner.  The General Partner may waive any of the requirements of this Section 9.1 in its reasonable discretion.

If the transferee or assignee is permitted under this Agreement to become a Limited Partner, the General Partner is authorized to admit the transferee or assignee to the Partnership as a Limited Partner and the Partners hereby consent to the admission of the transferee or assignee to the Partnership as a Partner without further act of the Partners.

If the transferor or assignor of a Unit is not a natural person, or purports to assign such Unit in any representative capacity, or if a transfer or assignment results from the death, mental incapacity or bankruptcy of a Partner or is otherwise involuntary, the assignor or his legal representative shall furnish to the General Partner and the Registrar and Transfer Agent such documents, certificates, assurances, court orders and other materials as the General Partner and the Registrar and Transfer Agent may reasonably require to cause the transfer or assignment to be effected.

The Registrar and Transfer Agent will

22

(a)     record in the Register and on **Exhibit A** any assignment or transfer made under this Agreement; and

(b)     forward notice of such assignment or transfer to the transferee.

9.2     Rejection of Transfer

Notwithstanding Section 9.1, the General Partner has the right, in its sole and absolute discretion, to reject any transfer. The General Partner is required under the Securities Act and this Agreement to refuse to register any transfer of the securities not made pursuant to registration under the Securities Act or pursuant to an available exemption from registration.

9.3     Ongoing Obligation of Partner

No transfer or assignment of a Unit made under the foregoing provisions of this Article shall relieve the Partner of any obligation that has accrued or was incurred before the effective date of the transfer or assignment.

9.4     Transferees or Assignees Who Are Not Substituted Partners

A transferee or assignee of a Unit or a Person who has become entitled to a Unit by operation of Law who has not complied with Section 9.1 shall not be admitted as a Partner of the Partnership, shall have no voting rights, no right to access or be provided with any information concerning the affairs of the Partnership and shall only have a right to receive distributions and allocations of profit and loss as accorded to such transferees or assignees under the Act. For the purpose of this Agreement, references in to a Partner in Article 5 shall be deemed to apply to a Person holding Units who is not admitted as a Partner to the extent such Person is entitled to economic rights with respect to such Units pursuant to the Act.

9.5     Parties Not Bound to See to Trust or Equity

Neither the Registrar and Transfer Agent nor the General Partner shall be bound to see to the execution of any trust (whether express, implied or constructive), charge, pledge, or equity to which any Unit or any interest under this Agreement is subject, nor to ascertain or inquire whether any sale or assignment of any Unit or any interest under this Agreement by any Partner is authorized by such trust, charge, pledge or equity, nor to recognize any Person as having any interest in any Unit, except for the Person recorded on the Register as the holder of such Unit. The Partnership, the General Partner and the Registrar and Transfer Agent shall be entitled to treat the Person in whose name any Unit is registered as the absolute owner for all purposes. The receipt by any Person in whose name a Unit is recorded on the Register shall be a sufficient discharge for all monies, securities and other property payable, issuable or deliverable for such Unit and from all liability therefor.

9.6     Effective Date of Transfer or Assignment

A transfer or assignment of a Unit shall be deemed to take effect on the date that the Register is amended to include the assignee as a Partner for such transfer or assignment.

9.7     Compulsory Transfer or Acquisition of Units

(a)     If it shall come to the attention of the General Partner that any Units are or may be owned or held directly or beneficially by any Person whose holding or continued holding of those Units (whether on its own or in conjunction with any other circumstance appearing to the General Partner to be relevant) might in the sole and conclusive determination of the General Partner be likely to cause an Adverse Effect, the General Partner may serve a notice (a *"Transfer Notice"*) upon the Person (or any one of such Persons where Units are registered in joint names) appearing in the Register of Partners as the holder (the "Vendor") of the Unit, the Units or any of the Units concerned (the *"Relevant Units"*) requiring the Vendor within 21 calendar days (or such extended time as in all the circumstances the General Partner shall consider reasonable) to transfer (and/or procure the disposal of interests in) the Relevant Units to another Person whose holding of the Relevant Units, in the sole and conclusive determination of the General Partner, would not be likely to cause an Adverse Effect (such Person, an *"Eligible Transferee"*). On and after the date of the Transfer Notice, and until registration of a transfer of the Relevant Units to which it relates under the provisions of this Section 9.7(a) or Section 9.7(b)

23

below, the rights and privileges attaching to the Relevant Units shall be suspended and not capable of exercise.

(b)     If within 21 calendar days after the giving of a Transfer Notice (or such extended time as in the circumstances the General Partner shall consider reasonable) the Transfer Notice has not been complied with to the satisfaction of the General Partner, the General Partner may arrange for the Partnership to sell the Relevant Units at the best price reasonably obtainable to any Eligible Transferee or Transferees, or the General Partner may arrange for the Partnership to compulsorily reacquire some or all of the Relevant Units for the price per Unit paid by the Vendor without interest. For the sale of Relevant Units by the General Partner on the Vendor's behalf:

(i)     the General Partner may execute or cause to be executed on behalf of the Vendor a transfer of the Relevant Units to an Eligible Transferee;

(ii)    the net proceeds of the sale shall be received by the Partnership whose receipt shall be a good discharge for the purchase money and shall be paid over by the Partnership to the Vendor (less any amounts required to be withheld under the provisions of the Code or any other similar legislation of any state); and

(iii)   the Partnership may register the transferee or transferees as holder or holders of the Relevant Units and thereupon the transferee or transferees shall become the absolute and sole owner of the Relevant Units.

(c)     A Person who becomes aware that his holding, directly or beneficially, of the Units will, or is likely to, cause an Adverse Effect, and who has not already received a Transfer Notice under Section 9.7(a) above, shall immediately either transfer the Units to an Eligible Transferee or Transferees or give a request in writing to the General Partner for the issue of a Transfer Notice under Section 9.7(a) above.

(d)     Subject to the provisions of this Agreement, the General Partner shall be entitled to assume without inquiry that none of the Units are held in such a way as to entitle the General Partner to serve a Transfer Notice in respect of the Units, unless it has reason to believe otherwise. However, the General Partner may call upon any holder (or any one of joint holders) of the Units by notice in writing to provide such information and evidence as it shall require upon any matter connected with or in relation to such holder or joint holders of the Units. If such information and evidence is not provided within such reasonable period (being not less than 21 calendar days after service of the notice requiring the same) as may be specified by the General Partner in the notice, the General Partner may, in its absolute discretion, treat any Unit held by such a holder or joint holders as being held in such a way as to entitle the General Partner to serve a Transfer Notice for the Unit.

(e)     The General Partner shall not be required to give any reasons for any decision, determination or declaration taken or made under this Section 9.7. The exercise of the powers conferred by this Section 9.7 shall not be questioned or invalidated in any case on the ground that there was insufficient evidence of direct or beneficial ownership of the Units by any Person or that the true direct or beneficial owner of any Units was otherwise than appeared to the General Partner at the relevant date provided that such powers shall have been exercised in good faith. The General Partner shall exercise its powers under this Section 9.7 in the manner it determines most equitable to the Partners.

9.8     Drag-Along

(a)     In this Section 9.8:

(i)     "*Dissenting Partner*" means a Class A Partner who does not accept an Offer referred to in Section 9.8(b) and includes any transferee or assignee of the Unit

24

of a Partner to whom such an Offer is made, whether or not such transferee or assignee is recognized under this Agreement;

(ii)    *"Offer"* means a bona fide offer to acquire, or a bona fide acceptance of an offer to sell, all of the outstanding Class A Units (other than the Offeror's Class A Units);

(iii)    *"Offeror"* means a Person, or two or more Persons acting jointly or in concert, who make an Offer;

(iv)    *"Offeror's Notice"* means the notice described in Section 9.8(c); and

(v)    *"Offeror's Units"* means Class A Units beneficially owned, or over which control or direction is exercised, on the date of an Offer by the Offeror, any Affiliate of the Offeror or any Person or company acting jointly or in concert with the Offeror.

(b)    If an Offer is made and

(i)    within the time provided in the Offer for its acceptance by Class A Partners (excluding the Offeror) or within 120 days after the date the Offer is made, whichever is shorter, the Offer is accepted by Class A Partners (excluding the Offeror) representing at least 66⅔% of the outstanding Class A Units held by the Class A Partners other than the Offeror;

(ii)    the Offeror is irrevocably bound to take up and pay for, or has taken up and paid for, the Class A Units of the Class A Partners who accepted the Offer; and

(iii)    the Offeror complies with Sections 9.8(c) and 9.8(e);

the Offeror is entitled to acquire, and the Dissenting Partners are required to sell to the Offeror, the Class A Units held by the Dissenting Partners for the same consideration per Class A Unit payable or paid, as the case may be, under the Offer.

(c)    Where an Offeror is entitled to acquire Class A Units held by Dissenting Partners under Section 9.8(b), and the Offeror wishes to exercise such right, the Offeror shall send by registered mail within 30 days after the date of acceptance of the Offer by Class A Partners (excluding the Offeror) a notice (the **"Offeror's Notice"**) to each Dissenting Partner stating that:

(i)    Class A Partners holding at least 66⅔% of the outstanding Class A Units, other than the Offeror's Class A Units, have accepted the Offer;

(ii)    the Offeror is bound to take up and pay for, or has taken up and paid for, the Class A Units of the Class A Partners who accepted the Offer;

(iii)    Dissenting Partners must transfer their respective Class A Units to the Offeror on the terms on which the Offeror acquired the Class A Units of the Class A Partners who accepted the Offer within 21 days after the date of the sending of the Offeror's Notice; and

(iv)    Dissenting Partners must send a duly executed transfer form or other evidence satisfactory to the General Partner of the transfer of the Dissenting Partner's Class A Units to the Offeror.

(d)    A Dissenting Partner to whom an Offeror's Notice is sent under Section 9.8(c) shall, within 21 days after the sending of the Offeror's Notice, send a duly executed transfer form or other evidence satisfactory to the General Partner of the transfer of the Dissenting Partner's Class A Units to the Offeror.

(e)    Within 21 days after the Offeror sends an Offeror's Notice under Section 9.8(c), the Offeror shall pay or transfer to the Registrar and Transfer Agent, or to such other Person as the Registrar and Transfer Agent may direct, the cash or other consideration that is payable to Dissenting Partners under Section 9.8(b).

25

(f) The Registrar and Transfer Agent, or the Person directed by the Registrar and Transfer Agent, shall hold in trust for the Dissenting Partners the cash or other consideration it receives under Section 9.8(e). The Registrar and Transfer Agent, or such Person, shall deposit cash in a separate interest bearing account in a bank that is insured by the Federal Deposit Insurance Corporation, and shall place the other consideration in the custody of such bank for safekeeping.

(g) Within 30 days after the date of the sending of an Offeror's Notice under Section 9.8(c), the Registrar and Transfer Agent, if the Offeror has complied with Section 9.8(e), shall:

(i) do all acts and things and execute and cause to be executed all instruments as in the Registrar and Transfer Agent's opinion may be necessary or desirable to cause the transfer of the Class A Units of the Dissenting Partners to the Offeror,

(ii) send to each Dissenting Partner who has complied with Section 9.8(d) the consideration to which such Dissenting Partner is entitled under this Section 9.8, and

(iii) send to each Dissenting Partner who has not complied with Section 9.8(d) a notice stating that:

(i) his Class A Units have been transferred to the Offeror;

(ii) the Registrar and Transfer Agent or some other Person designated in such notice is holding in trust the consideration for such Class A Units; and

(iii) the Registrar and Transfer Agent, or such other Person, will send the consideration to such Dissenting Partner as soon as practicable after receiving such Dissenting Partner's documents as the Registrar and Transfer Agent, or such other Person may require.

The Registrar and Transfer Agent is hereby appointed the agent and attorney of the Dissenting Partners for the purposes of giving effect to the foregoing provisions.

(h) Any Partner receiving an Offer shall promptly notify the General Partner of such Offer and shall provide to the General Partner copies of any written materials relating to such Offer as have been provided to the Partner (provided that the Partner is not precluded from doing so under the terms of a confidentiality or similar agreement relating to the Offer).

9.9    Effect of Bankruptcy, Death, Incompetence or Termination of a Limited Partner.

The occurrence of an Event of Bankruptcy as to a Limited Partner, the death of a Limited Partner or a final adjudication that a Limited Partner is incompetent (which term shall include, but not be limited to, insanity) shall not cause the termination or dissolution of the Partnership, and the business of the Partnership shall continue. If an order for relief in a bankruptcy proceeding is entered against a Limited Partner, the trustee or receiver of his estate or, if he dies, his executor, administrator or trustee, or, if he is finally adjudicated incompetent, his committee, guardian or conservator, shall have the rights of such Limited Partner for the purpose of settling or managing his estate property and such power as the bankrupt, deceased or incompetent Limited Partner possessed to assign all or any part of his Partnership interest and to join with the assignee in satisfying conditions precedent to the admission of the assignee as a substitute Limited Partner.

9.10    Withdrawal of Limited Partner

No Limited Partner may withdraw from the Partnership other than as a result of a transfer or assignment of all of such Limited Partner's Units pursuant to this Article 9. Upon the permitted transfer or assignment of all of a Limited Partner's Units, such Limited Partner shall cease to be a Limited Partner.

## ARTICLE 10
## TERM

The Partnership will continue until the occurrence of any event described in Section 11.1 and the completion of the liquidation of the Partnership and the distribution of all funds remaining after payment of all of the

26

debts, liabilities and obligations of the Partnership to its creditors, under the provisions of this Agreement and upon compliance with the requirements of the Act and any other applicable Laws.

## ARTICLE 11
## DISSOLUTION AND TERMINATION

11.1        Events of Dissolution

The Partnership shall dissolve upon the occurrence of any of the following events:

(a)        the authorization by the General Partner and by Extraordinary Action of the dissolution of the Partnership;

(b)        at the discretion of the General Partner if the Partnership no longer holds any portion of the Interests;

(c)        the occurrence of an event that makes it unlawful for the affairs of the Partnership to be carried on; or

(d)        the entry of a decree of judicial dissolution under Section 17-802 of the Act

and, in any case, after the completion of the liquidation of the Partnership and distribution to the Partners of all assets of the Partnership remaining after payment of all debts, liabilities and obligations of the Partnership to its creditors.

11.2        Winding Up

Upon dissolution of the Partnership, the General Partner (unless the General Partner is unable or unwilling to act, in which event the Class A Partners shall, by Ordinary Action, select another Person to succeed to the General Partner's powers and obligations set forth in this Article 11) shall proceed diligently to wind up the affairs of the Partnership and distribute the assets of the Partnership under Section 11.3. The General Partner shall be paid its reasonable fees and disbursements in carrying out its obligations in winding up the Partnership. Allocations and distributions shall continue to be made during the period of winding up in the same manner as before dissolution. The General Partner shall have full right and unlimited discretion to determine the time, manner and terms of any sale of Partnership assets in connection with winding up the Partnership's affairs, having due regard to the activity and condition of the relevant market and general financial and economic conditions. The General Partner is hereby authorized to do any and all acts and things authorized by Law for these purposes.

11.3        Distribution of Assets on Dissolution

The General Partner shall settle the Partnership accounts as expeditiously as possible and, in the following order, shall:

(a)        sell and liquidate the assets of the Partnership necessary to pay or compromise the liabilities of the Partnership, including those arising under the Funding Agreement;

(b)        sell and liquidate the remaining assets of the Partnership or retain them to distribute in-kind in the General Partner's discretion;

(c)        pay or compromise the liabilities of the Partnership, including those arising under the Funding Agreement;

(d)        retain a cash reserve fund for contingent liabilities, in an amount determined by the General Partner in its sole discretion to be appropriate, to be held for such period as the General Partner regards as reasonable and then to be distributed under Sections 11.3(e) and 11.3(f) below;

(e)        pay the General Partner the amount of any costs, expenses or other amounts which the General Partner is entitled to receive from the Partnership; and

(f)        distribute the remaining assets, including proceeds of sale, to the Partners in accordance with Section 5.6(a).

11.4        Reports

27

Within a reasonable time following the completion of the winding up of the Partnership's affairs and the liquidation of the Partnership's assets, the General Partner shall forward to each Limited Partner an audited statement for the assets and liabilities of the Partnership as of the date of the completion of the liquidation, and each Partner's share of the distributions under Section 11.3.

11.5        No Other Right; No Recourse to General Partner

(a)        No Partner shall have any right to demand or receive property, other than cash, or other than as otherwise contemplated by the terms of this Agreement, upon dissolution of the Partnership.

(b)        Upon dissolution and winding up of the Partnership under the Act, each Partner shall look solely to the assets of the Partnership and Limited Partners shall have no recourse against the General Partner or any other Partner.

11.6        Final Filing

Upon completion of the liquidation of the Partnership and the distribution of all Partnership assets, the Partnership shall dissolve and terminate and the General Partner shall execute and file such documents as are required to effect the dissolution and termination of the Partnership.

## ARTICLE 12
## REPRESENTATIONS

12.1        Status of General Partner

The General Partner represents and warrants and covenants to each Partner that:

(a)        it is and will continue to be a corporation duly incorporated under the Laws of the State of Delaware,

(b)        it is or will become registered, and will maintain such registration, to do business, and has or will acquire all requisite licenses and permits to carry on the affairs of the Partnership, in all jurisdictions in which the Partnership's activities render such registration, license or permit necessary, and

(c)        it has the capacity and corporate authority to act as General Partner, and the performance of its obligations under this Agreement as General Partner do not and will not conflict with or breach its charter documents, by-laws, or any agreement by which it is bound.

12.2        Status of Each Limited Partner

Each Limited Partner represents and warrants and covenants to each other Partner and to the General Partner that such Partner:

(a)        if a corporation, is a valid and subsisting corporation, has the necessary corporate capacity and authority to execute and deliver this Agreement and to observe and perform its covenants and obligations under this Agreement, and has taken all necessary corporate action in respect thereof, or, if a partnership, trust, syndicate or other form of unincorporated organization, has the necessary legal capacity and authority to execute and deliver this Agreement and to observe and perform its covenants and obligations under this Agreement, has obtained all necessary approvals in respect thereof, and has purchased the Units as principal for its own account;

(b)        if an individual, is at least 18 years of age and has the legal capacity and competence to execute this Agreement and take all action under this Agreement, and that it has purchased the Units as principal for its own account;

(c)        such Partner (1) is an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act or (2) either (A) is not a "U.S. person" within the meaning of Regulation S under the Securities Act and is not acquiring the Units for the account or benefit of any U.S. person or (B) is a U.S. person who purchased the Units in a transaction that did not require registration under the Securities Act (such Limited Partners, **"Regulation S Investors"**);

28

(d)     such Partner has received and read the Private Placement Memorandum;

(e)     the execution and delivery of this Agreement by such Partner, the consummation of the transactions contemplated hereby and the performance of such Partner's obligations under this Agreement will not conflict with, or result in any violation of or default under, any provision of any governing instrument applicable to such Partner, or any agreement or other instrument to which such Partner is a party or by which such Partner or any of its properties are bound, or any Law applicable to such Partner;

(f)     such Partner understands that the Units have not been, and will not be, registered under the Securities Act or any state or foreign securities Laws, and are being offered and sold in the United States in reliance upon federal and state exemptions from registration requirements for transactions not involving any public offering.  Such Partner understands that the Units are being offered and sold outside of the United States in reliance on federal exemptions from registration requirements available pursuant to Regulation S under the Securities Act. Such Partner recognizes that reliance upon such exemptions is based in part upon the representations of such Partner contained herein. Such Partner represents and warrants that the Units will be acquired by the Partner solely for the account of such Partner, for investment purposes only and not with a view to the distribution thereof;

(g)     such Partner represents and warrants that such Partner (i) is a sophisticated investor with such knowledge and experience in business and financial matters as will enable such Partner to evaluate the merits and risks of investment in the Partnership, (ii) is able to bear the economic risk and lack of liquidity of an investment in the Partnership and (iii) is able to bear the risk of loss of its entire investment in the Partnership;

(h)     such Partner recognizes that (i) an investment in the Partnership involves certain risks, (ii) the Units will be subject to certain restrictions on transferability as described in this Agreement and (iii) as a result of the foregoing, the marketability of the Units will be severely limited;

(i)     unless such Partner is a Regulation S Investor, such Partner confirms that it is not subscribing for any Unit as a result of any form of general solicitation or general advertising, including (i) any advertisement, article, notice or other communications published in any newspaper, magazine or similar media (including any internet site that is not password protected) or broadcast over television or radio or (ii) any seminar or meeting whose attendees were invited by any general solicitation or general advertising;

(j)     if a natural person (or an entity that is an "alter ego" of a natural person (e.g., a revocable grantor trust, an IRA or an estate planning vehicle)), such Partner has received and read a copy of the initial privacy notice in connection with the General Partner's collection and maintenance of non-public personal information with respect to such Partner, and such Partner hereby requests and agrees, to the extent permitted by applicable law, that the General Partner shall refrain from sending to such Partner an annual privacy notice, as contemplated by 16 CAR Part 313, §313.5 (the United States Federal Trade Commission's Final Rules regarding the Privacy of Consumer Financial Information);

(k)     such Partner acknowledges that the Partnership seeks to comply with all applicable anti-money laundering laws and regulations. In furtherance of these efforts, the Partner represents, warrants and agrees that to the best of its knowledge after reasonable inquiry: (i) no part of the funds used by such Partner to acquire the Units or to satisfy its capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene U.S. federal or state or non-U.S. laws or regulations, including anti-money laundering laws and regulations and (ii) no capital commitment, contribution or payment to the Partnership by the Partner and no distribution to such Partner shall cause the Partnership or the General Partner to be in violation of any applicable anti-money laundering laws or regulations including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools

29

Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. Such Partner acknowledges and agrees that, notwithstanding anything to the contrary contained in this Agreement, any side letter or any other agreement, to the extent required by any anti-money laundering law or regulation, the Partnership and the General Partner may prohibit capital contributions, restrict distributions or take any other reasonably necessary or advisable action with respect to the Units, and such Partner shall have no claim, and shall not pursue any claim, against the Partnership, the General Partner or any other Person in connection therewith;

(l)     will promptly provide such evidence of the foregoing as the General Partner may request from time to time;

(m)     Each Partner covenants that:

(i)     such Partner will ensure that such Partner's status as described in this Section 12.2 will not be modified, that such Partner will provide written confirmation of such status to the General Partner upon request and that such Partner will not transfer such Partner's Units in whole or in part to a Person in respect of which the representations and warranties set forth in Section 12.2 would be untrue; and

(ii)     such Partner will immediately notify the General Partner in writing if such Partner fails to comply with the covenants in this Section 12.2(m).

12.3          Survival of Representations

The representations contained in this Article shall survive execution of this Agreement and each party is obligated to ensure the continuing accuracy of each representation made by it throughout the term of the Partnership.

## ARTICLE 13
## CHANGE OF GENERAL PARTNER

13.1          Removal or Withdrawal of General Partner

The General Partner will continue as General Partner of the Partnership until termination of the Partnership unless the General Partner is removed or withdraws under this Agreement.  The General Partner shall not transfer all or any portion of its Units or withdraw as General Partner except as provided in this Article 13.

13.2          Admission of Substitute General Partner

A Person shall be admitted as a substitute General Partner of the Partnership only if the following terms and conditions are satisfied:

(a)     the Person to be admitted as a substitute General Partner shall have accepted and agreed to be bound by all the terms and provisions of this Agreement by executing a counterpart hereof and such other documents or instruments as may be required or appropriate in order to effect the admission of such Person as a General Partner, a certificate evidencing the admission of such Person as a General Partner shall have been filed for recordation and all other actions required by Section 2.4 hereof in connection with such admission shall have been performed;

(b)     the Person to be admitted as a substitute General Partner shall pay to the departing General Partner the amount of any costs, expenses or other amounts owed by the Partnership to the departing General Partner and such other amounts to which the departing General Partner is entitled to reimbursement under this Agreement or any other agreement with the Partnership to which the departing General Partner is a party, whether, for such latter agreements, the departing General Partner is entitled to such reimbursement by the Partnership or by a third party and otherwise;

(c)     if the Person to be admitted as a substitute General Partner is a corporation or a partnership, it shall have provided the Partnership with evidence satisfactory to counsel

30

for the Partnership of such Person's authority to become a General Partner and to be bound by the terms and provisions of this Agreement; and

(d)     counsel for the Partnership shall have rendered an opinion (relying on such opinions from other counsel in the state or any other jurisdiction as may be necessary) that the admission of the Person to be admitted as a substitute General Partner is in conformity with the Act, and that none of the actions taken in connection with the admission of such Person as a substitute General Partner will cause (i) the Partnership to be classified other than as a partnership for federal income tax purposes, or (ii) the loss of any Limited Partner's limited liability.

13.3     Effect of Bankruptcy, Withdrawal, Death or Dissolution of a General Partner.

(a)     Upon the occurrence of an Event of Bankruptcy as to a General Partner (and its removal pursuant to Section 13.5(a) hereof) or the death, withdrawal, removal or dissolution of a General Partner (except that, if a General Partner is, on the date of such occurrence a partnership, the withdrawal, death, dissolution, Event of Bankruptcy as to, or removal of a partner in, such partnership shall be deemed not to be a dissolution of such General Partner if the business of such General Partner is continued by the remaining partner or partners thereof), the Partnership shall be dissolved and terminated unless the Partnership is continued pursuant to Section 13.3(b) hereof.

(b)     Following the occurrence of an Event of Bankruptcy as to a General Partner (and its removal pursuant to Section 13.5(a) hereof) or the death, withdrawal, removal or dissolution of a General Partner (except that, if a General Partner is, on the date of such occurrence a partnership, the withdrawal, death, dissolution, Event of Bankruptcy as to, or removal of a partner in, such partnership shall be deemed not to be a dissolution of such General Partner if the business of such General Partner is continued by the remaining partner or partners thereof), the Limited Partners, within 90 days after such occurrence, may elect to continue the business of the Partnership for the balance of the term specified in Article 10 hereof by selecting, subject to Section 13.2 hereof and any other provisions of this Agreement, a substitute General Partner by Ordinary Action. If the Limited Partners elect to continue the business of the Partnership and admit a substitute General Partner, the relationship with the Limited Partners and of any Person who has acquired an interest of a Partner in the Partnership shall be governed by this Agreement.

13.4     Withdrawal

The General Partner may not withdraw from the Partnership as such unless it has given at least 180 days' written notice to the Limited Partners of such intention and nominates a qualified successor whose appointment is approved as an Ordinary Action, who accepts such position within such period and who is admitted as a substitute General Partner pursuant to Section 13.2 within such period.

13.5     Removal of General Partner

(a)     Upon the occurrence of an Event of Bankruptcy as to, or the dissolution of, a General Partner, such General Partner shall be deemed to be removed automatically; provided, however, that if a General Partner is on the date of such occurrence a partnership, the withdrawal, death, dissolution, Event of Bankruptcy as to or removal of a partner in such partnership shall be deemed not to be a dissolution of the General Partner if the business of such General Partner is continued by the remaining partner or partners thereof.

(b)     The General Partner may be removed as general partner of the Partnership at any time by an Extraordinary Action of the Partners, but only for Cause. In addition, the General Partner may only be removed under this Section 13.5(b) if the resolution removing the General Partner also appoints a new general partner as successor, and the General Partner may not be removed until such new general partner is admitted as a substitute General Partner pursuant to Section 13.2.

31

(c)    Regardless of their status as Partners or their ownership of Units, the General Partner, its Affiliates, and their directors and officers, shall not be entitled to vote on the removal of the General Partner as general partner of the Partnership when the General Partner is in default of a material obligation of the General Partner contained in this Agreement and such default has continued for at least 60 days following receipt of notice from any Partner requiring the General Partner to remedy such default.

13.6    Release and Indemnification upon Removal or Withdrawal; Use of Walton Name

Upon the removal or withdrawal of the General Partner, the Partnership shall release and indemnify and hold harmless, and the Limited Partners shall release, the General Partner, its Affiliates and their respective managers, officers, directors, members, partners, shareholders and employees, from any and all Losses incurred by the General Partner or the Partnership in connection with the Partnership's activities or otherwise as a result of or arising out of events occurring after such resignation or removal other than those caused by or deriving from any grossly negligent or fraudulent act or willful misconduct of the General Partner. Upon the removal or withdrawal of the General Partner, the Partnership shall promptly cease using the name "Walton" or any variant thereof.

13.7    Conversion to Limited Partner

If the General Partner is withdraws or is removed pursuant to this Article 13 but continues to own Units, it will be deemed a Limited Partner subject to all the provisions applicable to Limited Partners under this Agreement.

## ARTICLE 14
## MEETINGS

14.1    Meetings

(a)    The General Partner may convene meetings of the Partners at any time and, upon the written request of one or more Limited Partners holding at least 33⅓% of the number of all issued and outstanding Class A Units (the "**Requesting Partners**"), will convene a meeting of the Partners. If the General Partner fails to call such a meeting within 60 days of receipt of written request of the Requesting Partners, then any Requesting Partners may convene such meeting by giving written notice to the General Partner and the Limited Partners in accordance with this Agreement, signed by such Person or Persons as the Requesting Partners specify. Every meeting, however convened, will be conducted under the terms of this Agreement. There is no requirement to hold annual general meetings. However, the General Partner may in its discretion call periodic information meetings from time to time to advise the Limited Partners as to the status of the Properties and the Partnership's affairs.

(b)    Excluding the ability of the Partners to remove and/or replace the General Partner pursuant to Section 13, notwithstanding anything to the contrary in this Agreement, Partners may not, without the consent of the General Partner which may be withheld in its sole discretion, make any amendment to this Agreement or cause the Partnership to take any action, including but not limited to:

(i)    a sale, transfer or encumbrance of all or a portion of the Interests or any other assets of the Partnership, unless otherwise required under the Co-Ownership Agreement; or

(ii)    a merger, consolidation or other business combination of the Partnership, dissolution of the Partnership, or other event that would result in the termination of the existence or operations of the Partnership.

14.2    Place of Meeting

Every meeting of Partners will be held at such place inside or outside of the State of Delaware as the General Partner or, with the consent of the General Partner the Limiting Partner calling the meeting may determine.

32

14.3        Notice of Meeting

All notices of meetings of Partners will be given to Limited Partners at least 21 and not more than 60 days before the meeting. Such notice shall be directed to each Partner at his address as it appears on the Register of the Partnership and will specify the time, date and place where the meeting is to be held and will specify, in reasonable detail, all matters that are to be the subject of a vote at such meeting and provide sufficient information to enable Limited Partners to make a reasoned judgment on all such matters. It will not be necessary for any such notice to set out the exact text of any resolution proposed to be passed at the meeting, provided that the subject matter of any such resolution is fairly set out in the notice or a schedule to the notice.

14.4        Chairman

The President of the General Partner, or in his absence any officer of the General Partner, shall be the chairman of all meetings. If no such Person is present or all such persons refuse to act, those Partners present in person or represented by proxy at the meeting shall, as an Ordinary Action, choose some other Person present to be chairman.

14.5        Quorum

Subject to the provisions of Section 14.7, a quorum at any meeting of the Partners shall consist of not less than two Persons present in person and holding or representing by proxy at least thirty-three and one-third percent (33 1/3 %) of the aggregate number of outstanding Class A Units entitled to vote at the meeting.

14.6        Consents Without Meeting

Any action required or permitted to be taken at any annual or special meeting of Partners may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding Units having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voted and shall be delivered to the Partnership at its principal place of business. Delivery made to the principal place of business of the Partnership shall be by hand or by certified or registered mail, return receipt requested. Every written consent shall bear the date of signature of each Partner who signs the consent and no written consent shall be effective to take action unless, within sixty days of the earliest dated consent delivered in the manner required by this Section 14.6 to the Partnership, written consents signed by a sufficient number of holders to take action are delivered to the Partnership by delivery to its principal place of business. The General Partner shall give prompt notice of the taking of such action without a meeting by less than unanimous written consent to those Limited Partners who have not so consented in writing. Any such written consents may be used in conjunction with votes given at a meeting of Partners or without a meeting of Partners.

14.7        Adjournment

If a quorum referred to in Section 14.5 is not present within 30 minutes from the time fixed for holding any meeting, the meeting may be adjourned from time to time by the chairman of the meeting, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented any business may be transacted which might have been transacted at the meeting as originally notified.

14.8        Voting

Except as otherwise required by statute or this Agreement, at every meeting of Partners each Class A Partner of the Partnership entitled to vote at such meeting shall have one vote for each Class A Unit held by him and registered in his name on the books of the Partnership at the record date fixed or otherwise determined for such meeting. The Class B Partner shall not be entitled to vote at any meeting of Partners except with respect to any Class A Units held by the Class B Partner.

14.9        Record Date

For determining those Partners who are entitled to attend, and vote or act at, any meeting or any adjournment of any meeting, or for any other action, the General Partner or Requesting Partners calling the meeting, as the case may be, shall fix a date not less than 21 or more than 60 days before the date of any meeting of Partners as a record date for determining those Limited Partners entitled to vote at the meeting or any adjournment. The Persons so determined shall be the Persons deemed to be entitled, except to the extent that a Partner has transferred

33

any of his Units after the record date and the transferee of the Units: (i) produces properly executed transfer forms or otherwise establishes to the satisfaction of the General Partner that he is the owner of the Units in question, and (ii) requests, not later than ten days before the meeting, or such shorter period before the meeting as the General Partner may deem to be acceptable, that the transferee's name be or be deemed to be included in the Register as at the record date, in which case the transferee shall be treated as a Partner of record for purposes of such entitlement in place of the transferor. Notwithstanding anything under this Agreement contained, only Partners who are registered as such in the Register on the record date determined for the meeting shall have the right to attend in person or by proxy and to vote on all matters submitted to the meeting.

14.10        Proxies

A Partner may attend any meeting of Partners personally, or may be represented at the meeting by proxy if a proxy has been received by the General Partner or the chairman of the meeting for verification before the meeting. Votes at meetings of the Partners may be cast personally or by proxy and resolutions shall be passed by a show of hands or, at the request of any Partner, by ballot. The instrument appointing a proxy shall be in a form reasonably acceptable to the General Partner, shall be in writing executed by the appointer or his attorney duly authorized in writing, or, if the appointer is a corporation, under its seal or by an officer or attorney of the corporation duly authorized, and shall be valid only if it refers to a specific meeting, and then only at that meeting or its adjournments. Any Person may be appointed a proxy, whether or not he is a Partner.

14.11        Validity of Proxies

A proxy purporting to be executed by or on behalf of a Partner will be considered to be valid unless challenged at the time of or before its exercise, and the Person challenging will have the burden of proving to the satisfaction of the chairman of the meeting that the proxy is invalid, and any decision of the chairman concerning the validity of a proxy will be final.

A vote cast under the terms of an instrument of proxy shall be valid notwithstanding the previous death, incapacity, insolvency, bankruptcy or insanity of the Partner giving the proxy or the revocation of the proxy, provided that no written notice of such death, incapacity, insolvency, bankruptcy, insanity or revocation shall have been received by the General Partner or chairman of the meeting before the time fixed for holding of the meeting.

14.12        Corporations

A Partner that is a corporation may appoint under seal or otherwise, an officer, director or other authorized Person as its representative to attend, vote and act on its behalf at a meeting of Partners.

14.13        Attendance of Others

Any officer or director of the General Partner, counsel to the General Partner or the Partnership and representatives of the Auditors will be entitled to attend any meeting of Partners.

The chairman of the meeting or the General Partner has the right to authorize the presence at a meeting of any Person who is not a Partner. With the approval of the chairman of the meeting or the General Partner that Person will be entitled to address the meeting.

14.14        Rules

To the extent that the rules and procedures for the conduct of a meeting of the Partners are not prescribed in this Agreement, such rules and procedures shall be determined by the chairman of the meeting. To the extent practicable, the procedures applicable to meetings of corporations within the meaning of the Delaware General Corporation Law shall apply to meetings of Partners, provided however the Partnership shall not be required to hold annual meetings.

14.15        Waiver of Defaults

In addition to all other powers conferred on them by this Agreement, the Partners may by Extraordinary Action:

> (a)        waive any default by the General Partner of its obligations under this Agreement on such terms as they may determine and release the General Partner from any claims relating to the default; and

34

(b)　require the General Partner on behalf of the Partnership to enforce any obligation or covenant on the part of any Partner or all Partners.

14.16　Minutes

The General Partner will have minutes kept of all proceedings and resolutions at every meeting, and copies of any resolutions of the Partnership made and entered in books kept for that purpose. Any minutes, if signed by the chairman of the meeting, will be deemed to be evidence of the matters stated in them. Each meeting for which such minutes are kept will be deemed to have been duly convened and held and all resolutions and proceedings shown in them will be deemed to have been duly passed and taken.

14.17　Resolutions Binding

Any vote, consent or agreement made by Extraordinary Action or Ordinary Action of the Partners under this Agreement shall be binding on all Partners and their respective heirs, executors, administrators or other legal representatives, successors and assigns, whether or not such Partner was present or represented by proxy at the meeting at which such resolution was passed and whether or not such Partner received or signed a written copy of or voted against such resolution.

14.18　Actions Requiring Extraordinary Action

The following actions may be taken only if approved by Extraordinary Action, except as otherwise required by Law or the provisions of the Co-Ownership Agreement:

(a)　consenting to the amendment of this Agreement except as otherwise provided under this Agreement;

(b)　waiving any default by the General Partner of its obligations under this Agreement on such terms as the Partners may determine and releasing the General Partner from any claims relating to the default;

(c)　requiring the General Partner on behalf of the Partnership to enforce any obligation or covenant on the part of any Partner or all Partners (provided, however, that the General Partner may take such action on its own volition without Extraordinary Action);

(d)　removing the General Partner as general partner of the Partnership as provided in Section 13.5(b);

(e)　dissolving the Partnership as provided in Section 11.1(a);

(f)　consenting to extend the Partnership's investment activities for a Property beyond Concept Planning and participating in the physical development of one or more of the Properties;

(g)　creating or recording an Encumbrance other than a Permitted Encumbrance on or against the Properties in favor of any Person, other than (i) Encumbrances granted in favor of Walton USA under the provisions of the Funding Agreement, (ii) any Encumbrance created by Walton USA or an Affiliate with respect to its undivided interests in the Properties and (iii) any Encumbrance permitted under Section 2.9 of the Funding Agreement or Section 8.1 of the Co-Ownership Agreement;

(h)　effecting a sale, transfer or other disposition (excluding third party leases) of a portion of any Property constituting over 10%, in the aggregate, of the total acreage of the Property; provided, that decisions with respect to the sale, transfer or other disposition of Lots shall be made by the General Partner at its sole discretion;

(i)　agreeing to any compromise or arrangement by the Partnership with any creditor, or class or classes of creditors;

(j)　changing the Fiscal Year of the Partnership;

(k)　causing the Partnership to merge with or into another entity;

(l)　creating any equity security of the Partnership senior to the Class A Units;

35

(m)     amending, modifying, altering or repealing any Extraordinary Action previously taken by the Partners; and

(n)     issuing over 10,000,000 Class A Units (plus an overallotment of 0.05% or 5,000 Class A Units).

## ARTICLE 15
## AMENDMENTS

15.1     Amendments to Agreement

Subject to Section 14.1(b), this Agreement may be amended in writing if such amendment (a) is proposed to the Limited Partners by the General Partner, and (b) receives the approval of the Partners by Extraordinary Action, provided that:

(a)     this Article 15 may not be amended without the consent of the General Partner and all Partners;

(b)     this Agreement shall not be amended so as to provide for additional Capital Contributions from any Partner without the approval of such Partner;

(c)     this Agreement shall not be amended so as to adversely affect the rights, preferences, privileges, obligations or liabilities of the General Partner without the consent of the General Partner; and

(d)     this Agreement shall not be amended so as to adversely affect the rights, preferences or privileges of the Class B Partner without the consent of the Class B Partner.

15.2     Amendments In Discretion of General Partner

Notwithstanding Section 14.1 or Section 15.1, but subject to the restriction that this Agreement shall not be amended so as to adversely affect the rights, preferences or privileges of the Class B Partner without the consent of the Class B Partner, the General Partner may, without prior notice to or consent from any Partner, amend any provision of this Agreement from time to time to:

(a)     add, amend or delete provisions of this Agreement which addition, amendment or deletion is, in the opinion of counsel to the Partnership, for the protection of or otherwise to the benefit of the Class A Partners;

(b)     cure an ambiguity or to correct or supplement any provisions contained in this Agreement which, in the opinion of counsel to the Partnership, may be defective or inconsistent with any other provisions contained in this Agreement, provided the cure, correction or supplemental provision does not and will not adversely affect the interests of Class A Partners;

(c)     make such other provisions concerning matters or questions arising under this Agreement that, in the opinion of counsel to the Partnership, do not and will not adversely affect the interests of the Class A Partners;

(d)     reflect the admission of any Partner;

(e)     take any such actions as may be necessary to ensure that the Partnership will be treated as a partnership for federal income tax purposes;

(f)     reflect the proposal or adoption of regulations under Section 704(b) or 704(c) of the Code, provided that such amendment would not have a material adverse effect on the Class A Partners or the Partnership and is consistent with the principles of Section 704 of the Code;

(g)     make any amendment authorized by Section 5.12(b);

(h)     make such amendments or deletions to take into account the effect of any change in, amendment of or repeal of any applicable legislation, that in the opinion of counsel to the Partnership, do not and will not adversely affect the interests of the Class A Partners; or

36

(i) in the event the taxation of the Class B Unit is adversely affected by any change in law, as determined by the General Partner in its sole discretion, amend the distribution and allocation provisions set forth in Section 5.6 and such other provisions of this Agreement as the General Partner reasonably deems necessary or advisable to mitigate such effect, provided that such amendment does not materially adversely affect the economic interest of any Limited Partner.

15.3        Notice to Partners

The General Partner shall notify Limited Partners of the full details of any amendment to this Agreement within 30 days of the effective date of the amendment.

15.4        Limitation On Amendments

Notwithstanding anything to the contrary contained in this Agreement, no amendment of this Agreement shall be made if such amendment would modify the limited liability of any Partner, modify the activities of the Partnership as set forth in Article 3, or modify the right of a Partner to vote or grant or withhold consent for any matter as to which Partners are entitled to vote or grant or withhold consent under this Agreement.

## ARTICLE 16
## NOTICES

16.1        Addresses For Notices

The addresses for notices and other communications required or permitted to be given under this Agreement to the General Partner and Limited Partners are:

| | |
|---|---|
| General Partner: | WUSF 5 GP, LLC, c/o Walton Land Management (USA), Inc. 4800 North Scottsdale Road, Suite 4000 Scottsdale, Arizona 85251 Attention: President |
| Limited Partners: | The mailing addresses set forth in **Exhibit A**. |

The General Partner may from time to time change its address under this Agreement by notice to the Limited Partners given in accordance with Section 16.2. Each Partner will advise the General Partner and the Registrar and Transfer Agent of any change in such Partner's address as then shown on the Register.

16.2        Notices

(a) All notices, amendments, waivers, or other communications under this Agreement shall be in writing and shall be deemed to be sufficiently given if delivered personally, telecopied, sent by e-mail, sent by nationally-recognized, overnight courier or mailed by registered or certified mail (return receipt requested), postage prepaid, to the parties at the addresses set forth in Section 16.1.

(b) All such notices and other communications shall be deemed to have been delivered and received (i) for personal delivery, upon receipt, (ii) for delivery by nationally-recognized, overnight courier, on the first Business Day in Phoenix, Arizona following dispatch, and (iii) for mailing, on the third Business Day in Phoenix, Arizona following such mailing. Notices delivered by telecopy or e-mail shall also be deemed delivered and received upon receipt.

## ARTICLE 17
## POWER OF ATTORNEY

Each Limited Partner hereby grants to the General Partner, its successors and assigns, a power of attorney constituting the General Partner, with full power of substitution, as the Limited Partner's true and lawful attorney and agent, with full power and authority, in the Limited Partner's name, place and stead to execute, under seal or otherwise, swear to, acknowledge, deliver, and record or file, as the case may be, as and where required:

37

(a)     this Agreement, any amendment to this Agreement, any amendment to the Certificate of Formation of the Partnership, or any other certificate or instrument that the General Partner deems necessary or appropriate to qualify, continue the qualification of, or keep in good standing, the Partnership in, or otherwise comply with the Laws of, the State of Delaware or any other jurisdiction under this Agreement in which the Partnership may carry on or be deemed to carry on activities or own property, or in which the General Partner may deem it prudent to register the Partnership, in order to maintain the limited liability of the Limited Partners or to comply with applicable Laws;

(b)     any certificate or other instrument that the General Partner deems necessary or appropriate to reflect any amendment, change or modification of the Partnership under the terms of this Agreement;

(c)     any certificate or other instrument that the General Partner deems necessary or appropriate to comply with applicable Laws;

(d)     any conveyance or other instrument that the General Partner deems necessary or appropriate to effect the sale of all or any part of the assets of the Partnership or the dissolution or termination of the Partnership under the terms of this Agreement;

(e)     any instrument required for any election, designation, application or determination relating to the Partnership under the Code or any other tax legislation;

(f)     any document that the General Partner deems necessary or appropriate to be executed or filed in connection with the activities, assets or undertaking of the Partnership or this Agreement;

(g)     any document required to be filed with any Governmental Authority in connection with the activities, assets or undertaking of the Partnership or this Agreement;

(h)     any application for any grant, incentive or credit under any federal, or state program for any activity of the Partnership;

(i)     any transfer forms or other certificate or instrument on behalf of or in the name of whomsoever as may be necessary to effect the transfer of any Unit under the terms of this Agreement and

(j)     any other document or instrument on behalf of and in the name of the Partnership or the Partner as may be deemed necessary or desirable by the General Partner to carry out fully the provisions of this Agreement or any other agreement of the Partnership under its respective terms;

and to complete, amend or modify any of the foregoing to complete any missing information or correct any clerical or other errors in the completion of any of the foregoing.

To evidence the foregoing, each Limited Partner, in making a subscription for Units or in executing an assignment or transfer of a Unit as assignee or transferee, will be deemed to have executed a power of attorney granting substantially the powers set forth above. The power of attorney so granted is irrevocable, is coupled with an interest, will survive the death, disability, incapacity, insolvency, bankruptcy, liquidation, dissolution, winding up or other legal incapacity of a Limited Partner and will survive the assignment, to the extent of the obligations of the Limited Partner under this Agreement, by the Limited Partner of the whole or any part of the interest of the Limited Partner in the Partnership and extends to bind the heirs, executors, administrators, personal representatives, successors and assigns of the Limited Partner. The power of attorney may be exercised by the General Partner, executing on behalf of each Limited Partner, by executing any instrument with a single signature as the general partner of the Partnership or as attorney and agent for all of the Limited Partners executing such instrument, or by such other form of execution as the General Partner may determine, and it will not be necessary for the General Partner to execute any instrument under seal notwithstanding the manner of execution of the power of attorney by the Limited Partner. The power of attorney will not merge on the dissolution of the Partnership but will continue in full force and effect thereafter to conclude any matters pertaining to the Partnership, to the activities previously carried on by the Partnership or to the dissolution of the Partnership and the winding up of its affairs.

38

Each Limited Partner hereby ratifies and confirms all that the General Partner shall lawfully do or cause to be done by virtue of the foregoing power of attorney, agrees to be bound by any representation or action made or taken in good faith by the General Partner under the foregoing power of attorney under the terms of this Agreement, and waives any and all defenses that may be available to contest, negate or disaffirm any action of the General Partner taken in good faith under the power of attorney.

## ARTICLE 18
## MISCELLANEOUS

18.1       Governing Law

This Agreement and its application or interpretation shall be governed, construed and enforced exclusively by its terms and by the Law of the State of Delaware.

18.2       Date for Actions

In the event that the date on which any action is required to be taken under this Agreement by any of the parties is not a Business Day in the place where the action is required to be taken, the action shall be required to be taken on the next succeeding day that is a Business Day in such place.

18.3       Headings

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect in any way the meaning, construction or interpretation of this Agreement.

18.4       Number and Gender

In this Agreement, unless the context otherwise requires, words importing the singular include the plural and vice versa; and words importing gender include all genders.

18.5       Currency

Unless otherwise stated, all references in this Agreement to sums of money are expressed in lawful money of the United States of America.

18.6       Statutes

References in this Agreement to any statute or any sections of a statute shall include the statute as amended or substituted and any regulations or other administrative authority adopted under the statue from time to time in effect.

18.7       Provisions Severable

Each provision of this Agreement is intended to be severable.  If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held illegal or invalid, the remainder of this Agreement, or the application of such provision to any Person or circumstance other than those to which it is held illegal or invalid, shall not be affected thereby.

18.8       Further Assurances

Each party to this Agreement agrees to execute and deliver such further and other documents and to perform and cause to be performed such further and other acts and things as may be necessary or expedient in order to give full force and effect to this Agreement and every part of this Agreement.

18.9       Binding Effect

Subject to the provisions regarding assignment and transfer under this Agreement contained, this Agreement shall inure to the benefit of and be binding upon its parties and their respective heirs, executors, administrators and other legal representatives, successors and assigns.

18.10      Waiver

No waiver by any party to this Agreement or any breach of, or default under, any provision of this Agreement by any party shall be construed or deemed a waiver of any breach of or default under any other provision

39

of this Agreement, and shall not preclude any party from exercising or asserting any rights under this Agreement for any future breach or default of the same provision of this Agreement.

18.11          Entire Agreement

This Agreement, and the related Subscription Agreement constitute the entire agreement between the parties for the subject matter hereof and supersede any and all prior agreements and representations, either oral or in writing, between the parties regarding the subject matter contained in this Agreement.

18.12          Counterparts; Facsimile or Electronic Signature

This Agreement may be executed in any number of counterparts with the same effect as if all its parties had signed the same document. This Agreement may also be adopted in any subscription or assignment forms or similar instruments signed by a Limited Partner or by the General Partner on his behalf, with the same effect as if such Limited Partner had executed a counterpart of this Agreement. All counterparts and adopting instruments will be construed together and will constitute one and the same agreement. This Agreement may be executed by delivery of a facsimile or electronic signature, which signature will have the same force and effect as an original signature.

18.13          Ownership and Use of Names

Each Limited Partner acknowledges that Walton USA or one of its Affiliates owns the service mark Walton for various services and that the Partnership is using the Walton mark and name on a non-exclusive, royalty-free basis in connection with its authorized activities with the permission of Walton USA. All services rendered by the Partnership under the Walton mark and name shall be rendered in a manner consistent with the high reputation heretofore developed for the Walton mark by Walton USA and its Affiliates and licensees. Each Limited Partner understands that Walton USA or one of its Affiliates may terminate the Partnership's right to use Walton at any time in the sole discretion of Walton USA or such Affiliate by giving the Partnership written notice of termination. Promptly following any such termination, the Partnership shall take all steps necessary to change its company name to one that does not include Walton or any confusingly similar term and cease all use of Walton or any term confusingly similar thereto as a service mark or otherwise.

IN WITNESS WHEREOF, each of the undersigned Partners, intending to be legally bound hereby, has duly executed this Agreement as of the day and year first above written.

**GENERAL PARTNER:**

WUSF 5 GP, LLC, a Delaware limited liability company

By:     WALTON LAND MANAGEMENT (USA), INC., a Delaware corporation, its Manager

By:     _____
Name:     Wayne G. Souza
Its:     Secretary

By:     _____
Name:     MATT KEISTER
Its:     PRESIDENT

40

**EXHIBIT A**
**PARTNERS**

General Partner:                                                          Number of Class A Units:
WUSF 5 GP, LLC                                                           0
4800 North Scottsdale Road, Suite 4000
Scottsdale, Arizona 85251
United States of America

Name and Address of Limited Partner holding Class B Unit:               Number of Class B Units:
Walton International Group (USA), Inc. or one of its affiliates          1
4800 North Scottsdale Road, Suite 4000
Scottsdale, Arizona 85251
United States of America

Name and Address of Limited Partners holding Class A Units:             Number of Class A Units:


**[Remainder of page intentionally left blank]**

41

**EXHIBIT B**
**TRANSFER FORM**

The undersigned, a Class A Partner of WALTON U.S. LAND FUND 5, LP (the "*Partnership*"), hereby transfers to:

---

(Name of Transferee)                                (Address)

_____ Unit(s) in the Partnership registered in the undersigned's name, constitutes the above-named transferee as a substitute Limited Partner for the foregoing number of Class A Unit(s), and agrees to execute and deliver to the General Partner

     (a)    any documents required in the sole opinion of the General Partner to effect a valid transfer of the Class A Unit(s),

     (b)    any documents required in the sole opinion of the General Partner to comply with applicable Laws in connection with the transfer,

     (c)    any documents required in the sole opinion of the General Partner as evidence that the transfer (i) is being made in compliance with exemptions from the registration requirements of the United States Securities Act of 1933, as amended, and applicable state securities Laws, (ii) either (x) is not being made to, and will not result in a Class A Unit being owned in whole or in part by, a "benefit plan investor" as that term is defined in Section 3(42) of the U.S. Employee Retirement Income Security Act of 1974, or (y) if the transfer is being made to a benefit plan investor as so defined (including an "individual retirement account," as defined in Section 408(a) of the Internal Revenue Code of 1986, as amended), the General Partner has provided its written consent to such transfer, taking into account the effect of such transfer on the Partnership's ability to avoid being deemed to hold the "plan assets" of any benefit plan investor, and (iii) if it is being made to an "individual retirement account," as defined in Section 408(a) of the Code, that such transferee qualifies as an "individual retirement account,"

     (d)    any such other documents which are necessary or advisable, in the sole opinion of the General Partner, to preserve the status of the Partnership as a limited partnership; and

     (e)    **a non-refundable transfer processing fee of US$50.00, payable to Walton International Group (USA), Inc.**

The undersigned ("*Transferor*") agrees that the power of attorney previously granted to the General Partner shall continue to be effective for the purpose of executing all certificates, amendments and other instruments necessary to give effect to this transfer. **Please note: All signatures below must be Medallion Signature Guaranteed.**

DATED at _____, State of _____, this _____ day of _____, 20_____.

---

Signature of Transferor                            Signature of Joint Transferor, if any

---

Name of Transferor – Please Print                  Name of Joint Transferor, if any – Please Print

---

Mailing Address of Transferor                      Mailing Address of Joint Transferor, if different

**MEDALLION SIGNATURE GUARANTEED BY:**       **MEDALLION SIGNATURE GUARANTEED BY:**

42

**EXHIBIT C**
**FORM OF DECLARATION OF TRANSFEREE**

Capitalized terms used but not defined in this Declaration of Transferee (this *"Declaration"*) shall have the same meanings as in the Agreement of Limited Partnership of the Partnership (defined below), as amended or supplemented from time to time (the *"Partnership Agreement"*). The undersigned transferee (the *"Transferee"*) of Class A Units (the *"Units"*) in Walton U.S. Land Fund 5, LP (the *"Partnership"*) hereby represents, warrants and covenants to each Partner of the Partnership and to its General Partner that:

(a) the Transferee, if a corporation, is a valid and subsisting corporation, has the necessary corporate capacity and authority to execute and deliver the Partnership Agreement and to observe and perform its covenants and obligations under the Partnership Agreement and has taken all necessary corporate action in respect thereof, or, if a partnership, trust, syndicate or other form of unincorporated organization, has the necessary legal capacity and authority to execute and deliver the Partnership Agreement and to observe and perform its covenants and obligations under the Partnership Agreement and has obtained all necessary approvals in respect thereof, and in any case that it has acquired the Units as principal for its own account,

(b) the Transferee, if an individual, is at least 18 years old and has the legal capacity and competence to execute the Partnership Agreement and take all action under the Partnership Agreement, and that it has acquired the Units as principal for its own account,

(c) such Transferee (1) is an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act or (2) either (A) is not a "U.S. person" within the meaning of Regulation S under the Securities Act and is not acquiring the Units for the account or benefit of any U.S. person or (B) is a U.S. person who purchased the Units in a transaction that did not require registration under the Securities Act (such Transferees, *"Regulation S Investors"*);

(d) such Transferee has received and read the private placement memorandum pursuant to which the offering of Units is made;

(e) the execution and delivery of this Agreement by such Transferee, the consummation of the transactions contemplated hereby and the performance of such Transferee's obligations under this Agreement will not conflict with, or result in any violation of or default under, any provision of any governing instrument applicable to such Transferee, or any agreement or other instrument to which such Transferee is a party or by which such Transferee or any of its properties are bound, or any Law applicable to such Transferee;

(f) such Transferee understands that the Units have not been, and will not be, registered under the Securities Act or any state or foreign securities Laws, and were offered and sold in the United States in reliance upon federal and state exemptions from registration requirements for transactions not involving any public offering. Such Transferee understands that the Units were offered and sold outside of the United States in reliance on federal exemptions from registration requirements available pursuant to Regulation S under the Securities Act. Such Transferee recognizes that reliance upon such exemptions is based in part upon the representations of such Transferee contained herein. Such Transferee represents and warrants that the Units will be acquired by the Transferee solely for the account of such Transferee, for investment purposes only and not with a view to the distribution thereof;

(g) such Transferee represents and warrants that such Transferee (i) is a sophisticated investor with such knowledge and experience in business and financial matters as will enable such Transferee to evaluate the merits and risks of investment in the Partnership, (ii) is able to bear the economic risk and lack of liquidity of an investment in the Partnership and (iii) is able to bear the risk of loss of its entire investment in the Partnership;

(h) such Transferee recognizes that (i) an investment in the Partnership involves certain risks, (ii) the Units will be subject to certain restrictions on transferability as described in the Partnership Agreement and (iii) as a result of the foregoing, the marketability of the Units will be severely limited;

(i) unless such Transferee is a Regulation S Investor, such Transferee confirms that it is not subscribing for any Unit as a result of any form of general solicitation or general advertising, including (i) any advertisement, article, notice or other communications published in any newspaper, magazine or similar media (including any internet site that is not password protected) or broadcast over television or radio or (ii) any seminar or meeting whose attendees were invited by any general solicitation or general advertising;

43

(j)  if a natural person (or an entity that is an "alter ego" of a natural person (e.g., a revocable grantor trust, an IRA or an estate planning vehicle)), such Transferee has received and read a copy of the initial privacy notice in connection with the General Partner's collection and maintenance of non-public personal information with respect to such Transferee, and such Transferee hereby requests and agrees, to the extent permitted by applicable law, that the General Partner shall refrain from sending to such Transferee an annual privacy notice, as contemplated by 16 CAR Part 313, §313.5 (the United States Federal Trade Commission's Final Rules regarding the Privacy of Consumer Financial Information);

(k)  such Transferee acknowledges that the Partnership seeks to comply with all applicable anti-money laundering laws and regulations. In furtherance of these efforts, the Transferee represents, warrants and agrees that to the best of its knowledge after reasonable inquiry: (i) no part of any funds used by such Transferee to acquire the Units or to satisfy its capital commitment obligations with respect thereto has been, or shall be, directly or indirectly derived from, or related to, any activity that may contravene U.S. federal or state or non-U.S. laws or regulations, including anti-money laundering laws and regulations and (ii) no capital commitment, contribution or payment to the Partnership by the Transferee and no distribution to such Transferee shall cause the Partnership or the General Partner to be in violation of any applicable anti-money laundering laws or regulations including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 and the United States Department of the Treasury Office of Foreign Assets Control regulations. Such Transferee acknowledges and agrees that, notwithstanding anything to the contrary contained in this Agreement, any side letter or any other agreement, to the extent required by any anti-money laundering law or regulation, the Partnership and the General Partner may prohibit capital contributions, restrict distributions or take any other reasonably necessary or advisable action with respect to the Units, and such Transferee shall have no claim, and shall not pursue any claim, against the Partnership, the General Partner or any other Person in connection therewith; and

(l)  such Transferee will promptly provide such evidence of the foregoing as the General Partner may request from time to time.

In consideration of and subject to the amendment of Exhibit A to the Partnership Agreement including the Transferee as a Limited Partner for the Unit(s) assigned, the Transferee hereby agrees to be bound as a Limited Partner by the terms of the Partnership Agreement, and the Transferee hereby grants to the General Partner, its successors and assigns, a power of attorney constituting the General Partner, with full power of substitution, as the Transferee's true and lawful attorney and agent, with full power and authority, in the Transferee's name, place and stead to execute, under seal or otherwise, swear to, acknowledge, deliver, and record or file, as the case may be, as and where required:

(a)  the Partnership Agreement, any amendment to the Partnership Agreement, any amendment to the certificate of formation of the Partnership, or any other instrument which the General Partner deems necessary or appropriate to qualify, continue the qualification of, or keep in good standing, the Partnership in, or otherwise comply with the Laws of, the State of Delaware or any other jurisdiction under the Partnership Agreement in which the Partnership may carry on or be deemed to carry on activities or own property, or in which the General Partner may deem it prudent to register the Partnership, in order to maintain the limited liability of the Limited Partners or to comply with applicable Laws;

(b)  any certificate or other instrument that the General Partner deems necessary or appropriate to reflect any amendment, change or modification of the Partnership in accordance with the terms of the Partnership Agreement;

(c)  any certificate or other instrument that the General Partner deems necessary or appropriate to comply with the Laws of the United States of America or Canada or any political subdivision of the United States of America or Canada;

(d)  any conveyance or other instrument that the General Partner deems necessary or appropriate to reflect or in connection with the sale of all or any part of any Property or other assets of the Partnership or the dissolution or termination of the Partnership under the terms of the Partnership Agreement;

(e)  any instrument required for any election, designation, application or determination relating to the Partnership under the Code or other tax legislation;

(f)  any document that the General Partner deems necessary or appropriate to be executed or filed in connection with the activities, assets or undertaking of the Partnership or the Partnership Agreement;

44

(g) any document required to be filed with any governmental body, agency or authority in connection with the activities, assets or undertaking of the Partnership or the Partnership Agreement;

(h) any application for any grant, incentive or credit under any federal, provincial or state program for any activity of the Partnership;

(i) any transfer forms or other certificate or instrument on behalf of or in the name of whomsoever as may be necessary to effect the transfer of any Unit in under the terms of the Partnership Agreement;

(j) any other document or instrument on behalf of and in the name of the Partnership or the Limited Partners as may be deemed necessary or desirable by the General Partner to carry out fully the provisions of the Partnership Agreement or any other agreement of the Partnership in under its respective terms; and

(k) to complete, amend or modify any of the foregoing to complete any missing information or correct any clerical or other errors in the completion of any of the foregoing.

The power of attorney hereby granted is irrevocable, is coupled with an interest, will survive the death, disability, incapacity, insolvency, bankruptcy, liquidation, dissolution, winding up or other legal incapacity of the Transferee and will survive the further assignment, to the extent of the obligations of the Transferee under the Partnership Agreement, by the Transferee of the whole or any part of the interest of the Transferee in the Partnership and extends to bind the heirs, executors, administrators, personal representatives, successors and assigns of the Transferee, and may be exercised by the General Partner, executing on behalf of the Transferee, by executing any instrument with a single signature as the General Partner of the Partnership or as attorney and agent for all of the Limited Partners executing such instrument, or by such other form of execution as the General Partner may determine, and it will not be necessary for the General Partner to execute any instrument under seal notwithstanding the manner of execution of the power of attorney by the Transferee. This power of attorney will not merge on the dissolution of the Partnership but will continue in full force and effect thereafter for the purposes of concluding any matters pertaining to the Partnership, to the activities previously carried on by the Partnership or to the dissolution of the Partnership and the winding up of its affairs.

The Transferee hereby ratifies and confirms all that the General Partner shall lawfully do or cause to be done by virtue of the foregoing power of attorney, agrees to be bound by any representation or action made or taken in good faith by the General Partner pursuant to the foregoing power of attorney in accordance with the terms hereof, and waives any and all defenses which may be available to contest, negate or disaffirm any action of the General Partner taken in good faith under such power of attorney.

This document shall be governed by and construed in accordance with the Laws of the State of Delaware.

| ☐ | Check here if the Transferee's Registered Representative and Broker Dealer are the same as those of the Transferor. If not, please provide information with respect to Transferee's Registered Representative and Broker Dealer below. <br> Registered Representative:_____ <br> Broker Dealer:_____ |
|---|---|

**For Transferees who are natural persons, please indicate how the Units are to be registered:**

| ☐ | (a) | **Separate or individual property.** *(A married Subscriber who resides in a community property state must submit written consent from his or her spouse to purchase Units using community funds.)* |
|---|---|---|
| ☐ | (b) | **Tenants in Common.** *(Both parties must sign this Declaration.)* |
| ☐ | (c) | **Joint Tenants with right of survivorship.** *(Both parties must sign this Declaration.)* |
| ☐ | (d) | **Husband and Wife Tenants by the Entirety.** *(Both parties must sign this Declaration.)* |
| ☐ | (e) | **Husband and Wife Community Property.** *(Community property states only. Both husband and wife must sign this Declaration.)* |
| ☐ | (f) | **Trust.** *(Include the name of trust, the name of trustee and the date on which the trust was formed. Please include a copy of the Trust documents.)* |
| ☐ | (g) | **Other** *(Describe and, if applicable, include a copy of entity governing documents):* |

**[Signature Page Follows]**

45

**Please note:  All Transferee signatures below must be Medallion Signature Guaranteed.**

DATED this _____ day of _____, 20____.

_____

Signature of Transferee

_____

Name of Transferee – Please Print

_____

_____

Mailing Address of Transferee

Social Security or Taxpayer Identification Number of Transferee:

_____

**MEDALLION SIGNATURE GUARANTEED BY:**

_____

Signature of Joint Transferee, if any

_____

Name of Joint Transferee, if any – Please Print

_____

Mailing Address of Joint Transferee, if different

Social Security or Taxpayer Identification Number of Joint Transferee, if any:

_____

**MEDALLION SIGNATURE GUARANTEED BY:**

46